# EXHIBIT 1

1        UNITED STATES DISTRICT COURT

2       SOUTHERN DISTRICT OF CALIFORNIA

3

4   IN RE:                          )

                                    )  Case No.

5   FERRERO LITIGATION,             )  3:11-CV-00205-H-CAB

                                    )

6   _____     )

7

8

9

10        VIDEOTAPED DEPOSITION OF ATHENA HOHENBERG

11            San Diego, California

12          Thursday, September 29, 2011

13

14

15

16

17

18

19

20

21

22   Reported by:  NIKKI ROY

23            CSR No. 3052

24

25

1        Deposition of ATHENA HOHENBERG, taken on behalf of

2   the Defendants, at 12235 El Camino Real, Suite 200,

3   San Diego, California, on Thursday, September 29, 2011 at

4   1:37 p.m., before NIKKI ROY, CSR No. 3052.

5

6

7   APPEARANCES OF COUNSEL:

8

9   FOR THE PLAINTIFFS:

10          LAW OFFICE OF RONALD A. MARRON, APLC

            BY:  RONALD A. MARRON, Attorney at Law

11          3636 Fourth Avenue

            Suite 202

12          San Diego, California 92103

            619.696,9006

13          ron.marron@gmail.com

14

15   FOR THE DEFENDANT:

16          WILSON SONSINI GOODRICH & ROSATI

            BY:  DALE BISH, Attorney at Law

17          --and-- KEITH EGGLETON, Attorney at Law

            650 Page Mill Road

18          Palo Alto, California 94304-1050

            650.493.9300

19          dbish@wsgr.com

            keggleton@wsgr.com

20

21   ALSO PRESENT:

22          TOM CAVANAUGH, Videographer

23

24

25

1          I N D E X
2   WITNESS            EXAMINATION                    PAGE
3   ATHENA MARNAE
    HOHENBERG
4
                       MR. BISH                       6
5
             E X H I B I T S
6
    NUMBER        DESCRIPTION                          PAGE
7
    Exhibit 1     Color print ad                        14
8
    Exhibit 2     Complaint                            111
9
    Exhibit 3     First Amended Consolidated           112
10                Complaint Against Defendant
                  Ferrero USA, Inc. for Violations
11
    Exhibit 4     Plaintiff Athena Hohenberg's         149
12                Responses and Objections to
                  Defendant Ferrero USA Inc.'s
13                First Set of Interrogatories In
                  Re Ferrero Litigation
14
    Exhibit 5     Plaintiffs' Opposition to            154
15                Ferrero's Motion to Dismiss
16  Exhibit 6     Printout from FDA website, "How      176
                  to Understand and Use a
17                Nutrition Facts Label"
18
19
20
21
22
23
24
25

1        I N D E X (CONTINUED):
2
3   QUESTIONS INSTRUCTED NOT TO ANSWER
4                Page      Line
5                 45        20
                  46        12
6                 49         5
                  65        16
7                 65        16
                  66         7
8                 66         7
                  68         9
9                 68         9
                  69         5
10                69         5
                  71         6
11                96         7
                  97         2
12               109        21
                 117         5
13               119        23
                 132        18
14               138         8
                 141        22
15               145        12
                 160        17
16               161        13
                 162         7
17               162        22
18
           INFORMATION REQUESTED
19
                 (None)
20
21
22
23
24
25

1      SAN DIEGO, CALIFORNIA, THURSDAY, SEPTEMBER 29, 2011

2                    1:37 P.M.

3

4       THE VIDEOGRAPHER:  Good afternoon.  This is the

5  start of the tape labeled number 1, Volume I, of the

6  videotaped deposition of Athena Hohenberg in the matter

7  of In Re Ferrero Litigation held in the United States

8  District Court, Southern District of California, case

9  number 3:11-CV-00205-H-CAB.

10     This deposition is being held at Wilson,

11  Sonsini, Goodrich & Rosati, 12235 El Camino Real,

12  San Diego, California, on September 29th, 2011, at

13  approximately 1:37 p.m.

14     My name is Tom Cavanaugh from TSG Reporting,

15  Incorporated.  I am the legal video specialist.  The

16  court reporter is Nikki Roy in association with TSG

17  Reporting.

18     Would counsel please introduce yourselves.

19     MR. BISH:  Dale Bish from Wilson, Sonsini,

20  Goodrich & Rosati on behalf of defendant Ferrero USA,

21  Inc.

22     MR. EGGLETON:  Keith Eggleton for the

23  defendant.

24     MR. MARRON:  Ronald Marron for the plaintiff.

25     THE VIDEOGRAPHER:  Thank you.

1    Will the court reporter please swear in the

2    witness.

3

4                    ATHENA MARNAE HOHENBERG

5              called as a deponent and sworn in by

6              the deposition officer, was examined

7                  and testified as follows:

8

9                      EXAMINATION

10    BY MR. BISH:

11       Q.    Good afternoon, Ms. Hohenberg.

12       A.    Good afternoon.

13       Q.    Am I saying your name right, Hohenberg?

14       A.    Yes.

15       Q.    Would you please mind stating your full name

16    for the record.

17       A.    Athena Marnae Hohenberg.

18       Q.    Okay.  Could you spell your middle name.

19       A.    M-a-r-n-a-e.

20       Q.    Okay.  Have you ever had your deposition taken

21    before?

22       A.    No.

23       Q.    So I'll explain a few ground rules before we

24    get into it.

25              I'm going to ask the questions.  You give your

1    answers.  And what we're after is your best recollection

2    of events.  Not asking you to guess.  Unless maybe if I

3    say, you know, can I have your best guess, we're here for

4    your best recollection.

5            You understand that?

6    A.    Yes.

7    Q.    And as part of that, is there any reason why

8    you couldn't offer your best recollection today?

9    A.    Shouldn't be.

10   Q.    For example, you're not on any medication that

11   would impair your memory, correct?

12   A.    No.

13   Q.    Okay.  And the second rule is, you know, for

14   the benefit of the court reporter.  If you could, you

15   know, audibly answer "yes" or "no" as opposed to shaking

16   your head or -- that's hard for her to pick that up.

17   A.    Okay.

18   Q.    And if you feel like you need a break at any

19   time just let me know.  We'll, you know, finish the line

20   of questions that we're on.  And then absolutely, we'll

21   give you whatever break you need.

22   A.    Okay.

23   Q.    Any questions?

24   A.    No.

25   Q.    And you understand that you're under oath

1   today, correct?

2       A.    Yes, I do.

3       Q.    Any questions about what that means?

4       A.    No, I don't.

5       Q.    And you understand that if, in the event this

6   case goes to trial, we would have the opportunity to show

7   the jury and the judge excerpts from today or the video

8   from today?

9       A.    Yes.

10      Q.    Okay.  Ms. Hohenberg, what do you hope to

11  accomplish in your lawsuit against Ferrero?

12      A.    For them to advertise correctly the product

13  that they are offering.

14      Q.    And what does that mean?

15      A.    It means that I -- I hope for them to change

16  their advertised -- their advertisement to reflect the

17  product of which it is.

18      Q.    Okay.  So, for example, you're not seeking to

19  prevent Ferrero from advertising Nutella at all, are you?

20      A.    No.

21      Q.    Okay.  Are you trying to prevent Ferrero from

22  using certain words in its advertisements for Nutella?

23      A.    Yes.

24      Q.    And what are those words?

25      A.    Well-balanced, nutritiousness, healthy.

1    Q.    Anything else?

2    A.    No.

3    Q.    What about the word "tasty"?

4    A.    No.

5    Q.    You're okay with the word "tasty"?

6    A.    Uh-huh.

7    Q.    It's fine for Ferrero to advertise Nutella as

8    being a tasty product, correct?

9    A.    Yes.

10   Q.    Okay.  And would you have a problem with a

11   statement like "Nutella can turn a balanced breakfast

12   into a tasty one"?

13         MR. MARRON:  Objection to form and an

14   incomplete hypothetical.

15   BY MR. BISH:

16   Q.    You can answer.

17         MR. MARRON:  You can answer.

18         THE WITNESS:  Repeat the question, please.

19   BY MR. BISH:

20   Q.    Would you have a problem with a statement like

21   "Nutella can turn a balanced breakfast into a tasty one"?

22         MR. MARRON:  Same objection.

23         THE WITNESS:  Yes.

24   BY MR. BISH:

25   Q.    And why is that?

1    A.    Because they don't -- it's not a balanced --

2    it's not part of a balanced breakfast item.

3    Q.    Okay.  What about "Nutella can add taste to a

4    balanced breakfast"?

5    A.    No.

6    Q.    Not okay?

7    A.    No.

8    Q.    And why not?

9    A.    Because it's not an item that should be served

10   for breakfast.

11   Q.    When can it be served?

12   A.    Dessert.

13   Q.    Any time else?

14   A.    No.

15   Q.    Okay.  Now, in general, do you want companies

16   to tell consumers what is in their product?

17        MR. MARRON:  Objection; incomplete hypothetical

18   and form.

19        You can answer.

20        THE WITNESS:  Repeat the question.

21   BY MR. BISH:

22   Q.    In general, would you prefer companies to tell

23   consumers what is in their product?

24   A.    In general?

25   Q.    Uh-huh.

1    A.    Yes.

2    Q.    So, for example, is it okay for Ferrero to tell

3  consumers that Nutella contains cocoa?

4    A.    If it contains cocoa.

5    Q.    What about the word "hazelnut," is it okay for

6  Ferrero to tell consumers there are hazelnuts in Nutella?

7    A.    If it contains it.

8    Q.    Okay.  And is it okay for Ferrero to tell

9  consumers that Nutella has a hazelnut taste?

10    A.    I think if it's being derived directly from

11  hazelnut, then yes.

12    Q.    As opposed to?

13    A.    As opposed to an artificial flavor.

14    Q.    So if Nutella is, in fact, made from 50

15  hazelnuts, do you have a problem with Ferrero telling

16  that to consumers?

17        MR. MARRON:  Objection; incomplete hypothetical

18  and form.

19        You can answer.

20        THE WITNESS:  In my opinion, I think that would

21  really determine the size or quantity in which it's being

22  served in.  If it's coming in a one gallon container and

23  it only has 50 hazelnuts, I don't think the proportions

24  are very accurate.

25  ///

Page 12

1   BY MR. BISH:

2       Q.    So if a jar of Nutella says "each jar contains

3   50 hazelnuts," would that be okay with you?

4       A.    What size jar?

5       Q.    The -- well, we'll say the small one.

6       A.    I wouldn't be educated enough to know if that

7   is a quantity amount to say that the product's mostly

8   made of hazelnut.

9       Q.    Okay.  I didn't use the word "mostly" but you

10  did.

11      A.    If it -- if the -- if I'm buying a hazelnut

12  product.

13      Q.    Uh-huh.

14      A.    And it's made mostly of hazelnut, if that 50

15  hazelnuts is that amount, then I would be okay with that.

16      Q.    So if there's a 13 ounce jar of Nutella, and

17  the jar says "each jar contains 50 hazelnuts per jar."

18      A.    Okay.

19      Q.    Or "made from 50 hazelnuts per jar," and in

20  fact that's true, you don't have any problem with Ferrero

21  telling that to consumers do you?

22          MR. MARRON:  Yeah, I'd just like to object on

23  this line of questioning.  It calls for expert opinion on

24  what the FDA regulations are.  And perhaps what the

25  labeling requirements are for the FDA, um, as well as

1 FTC.

2          If you know -- if you know the answer to what

3 the labeling requirements are, I suppose you can answer.

4          THE WITNESS:  I don't.

5          MR. BISH:  And can we agree to just object to

6 form today?

7          MR. MARRON:  Well, when it calls for an expert

8 opinion, I just, along those lines for any type of, you

9 know, FDA labeling or what the label should or shouldn't

10 say or what it's required to say or what it's required

11 not to say, that calls for expert opinion.  So I just

12 wanted to put that on the record --

13          MR. BISH:  So would you mind --

14          THE DEPOSITION OFFICER:  I'm sorry, the last

15 part, I couldn't hear.  "On the record"?

16          MR. MARRON:  Yeah.  I just want to point out

17 that objections along this line of questioning.

18          MR. BISH:  But would you mind just objecting on

19 the grounds that it calls for expert testimony?

20          MR. MARRON:  Yes.

21          MR. BISH:  You would mind?

22          MR. MARRON:  Oh, no.  I wouldn't mind.

23 BY MR. BISH:

24     Q.    So back to your goals for the lawsuit, you want

25 Ferrero to use the word "healthy" or "nutritious" or

1    "balanced," correct?

2         A.    Correct.

3         Q.    And you want Ferrero to tell consumers what's

4    in Nutella.

5         A.    Yes.

6         Q.    Okay.  Any other goals?

7         A.    To inform the public.

8         Q.    Any other goals?

9         A.    No.

10        Q.    Is one of your goals to receive thousands of

11   dollars from Ferrero?

12        A.    No.

13        Q.    My client would be glad to hear that.

14              Okay.  Let's look at an ad.  I'm going to hand

15   the reporter to mark as Defendant's Exhibit 1.

16              (The document referred to was marked by

17              the CSR as Deposition Exhibit 1 for

18              identification and attached to the

19              deposition transcript hereto.)

20   BY MR. BISH:

21        Q.    Ms. Hohenberg, the reporter has handed you

22   what's been marked as Defendant's Exhibit 1.

23              Have you seen this document before?

24        A.    Yes.

25        Q.    When is the first time you saw Defendant's

1    Exhibit 1?

2         A.    In general of -- of this piece of paper or the

3    advertisement?

4         Q.    The advertisement.

5         A.    I've seen this picture on the television.  A

6    general -- like, I mean -- what is your question?

7         Q.    Have you seen this picture on television or

8    maybe?

9         A.    I've seen a general -- general.

10        Q.    Something like this?

11        A.    Like this.

12        Q.    Now, have you seen this particular

13   advertisement before?

14        A.    On the Internet, no.

15        Q.    Or anywhere?

16        A.    No.

17        Q.    No.

18              Now, did you provide this advertisement to your

19   lawyers in this lawsuit?

20        A.    No.

21        Q.    This didn't come from you?

22        A.    No.

23        Q.    Okay.  Okay.  Now, if you -- just looking at

24   the image itself, we'll -- putting the words aside.  And

25   we'll come back to the words, I promise.

1      A.      Uh-huh.

2      Q.      Just looking at the pictures, do you have any

3  objection to the use of this picture as an advertisement?

4      A.      I do.

5      Q.      And what's the nature of your objection?

6      A.      It appears to be a breakfast setting; daylight

7  outside, orange juice, milk on the table, toast.

8      Q.      Do you think it's improper for Ferrero to show

9  Nutella on whole wheat bread?

10          MR. MARRON:  Objection to form, incomplete

11  hypothetical.

12  BY MR. BISH:

13      Q.      Okay.  You can answer.

14      A.      Am I still answering?

15      Q.      Yeah.

16      A.      Repeat the question.

17      Q.      Do you think, is it your opinion, that it's

18  improper for Ferrero to show Nutella on whole wheat

19  bread?

20      A.      No.

21      Q.      Do you have any objection to having fruit

22  displayed in the advertisement?

23      A.      With the setting of it being a breakfast hour,

24  yes.

25      Q.      Now, if it was dark outside, would that change

1   your answer?

2       A.    Yes.

3       Q.    Your answer would be different?

4       A.    Uh-huh.

5       Q.    So it would be okay for Ferrero to depict fruit

6   on the table if it was dark outside?

7               MR. MARRON:  Objection; form of the question,

8   misstates her testimony.

9               THE WITNESS:  Still answering?

10  BY MR. BISH:

11      Q.    Yeah.

12              MR. MARRON:  Yeah.  The only time you don't

13  answer is if I instruct --

14              THE WITNESS:  If you tell me not to answer, got

15  it.

16              MR. MARRON:  -- not to answer because it's

17  attorney-client or something.

18              THE WITNESS:  Repeat the question for me.

19  BY MR. BISH:

20      Q.    So in your opinion, would it be okay for

21  Ferrero to have fruit on the table in its advertisements

22  if it was dark outside?

23      A.    Yes.

24      Q.    Okay.  Do you have any objections to showing

25  people, folks drinking orange juice in the advertisement?

1       A.      No.

2       Q.      Any objection to folks drinking milk in the

3   advertisement?

4       A.      No.

5       Q.      Would that depend if it was light outside or

6   dark outside?

7       A.      I think it would.

8       Q.      Okay.  So it would have to be --

9       A.      Again --

10      Q.      -- dark outside?

11      A.      Yes.

12      Q.      Okay.  The implication of your answer being

13  that it's only okay to eat Nutella when it's dark

14  outside?

15      A.      My implications is that Nutella should not be

16  served as a breakfast item or as a dessert item, and you

17  eat dessert at night.

18      Q.      Okay.  Take a quick detour and get some kind of

19  background questions.

20              What's your current address?

21      A.      267 Daisy Avenue, Imperial Beach.

22      Q.      Okay.

23      A.      California 91932.

24      Q.      And how long have you lived there?

25      A.      Ten months.

1    Q.    And before then did you still live in Imperial

2  Beach?

3    A.    Yes.

4    Q.    How long have you lived in Imperial Beach?

5    A.    Since 2003.

6    Q.    And before then what city did you live in?

7    A.    Before then, I lived in Connecticut.

8    Q.    Until, going back how long?

9    A.    One year.

10    Q.    And before Connecticut?

11    A.    San Diego, '96.

12    Q.    San Diego proper?

13    A.    San Diego everywhere.

14    Q.    Okay.

15    A.    There's a long list.

16    Q.    If you could, just briefly describe your

17  education you received after high school, if any?

18    A.    I attended a little bit of college; a

19  psychology class, a business entrepreneur class.  And

20  then I am licensed, I'm a licensed skin care esthetician.

21    Q.    Licensed?

22    A.    Skin care.

23    Q.    Skin care.

24    A.    Esthetician.

25    Q.    Okay.  So no college degree?

1      A.    No.

2      Q.    Okay.  And could you briefly describe your work

3  history after -- after attending a little college?

4      A.    I've worked in the hotel management business

5  for -- on and off for 12 years.

6            MR. MARRON:  By the way, Dale, when you get --

7  when you get done with this line of questioning, we're

8  going to take a little break, okay?

9  BY MR. BISH:

10     Q.    Twelve years?

11     A.    On and off for 12 years, yes.

12     Q.    Okay.  And what do you currently do?

13     A.    I'm a property manager.

14     Q.    And what does that entail?

15     A.    I manage rental units.

16     Q.    How many?

17     A.    Approximately 130.

18     Q.    Hundred and 30?

19     A.    Correct.

20     Q.    One three zero.

21           Okay.  And you have two daughters, correct?

22     A.    I have one daughter.

23     Q.    And one step daughter?

24     A.    Yes.

25     Q.    Okay.  And your youngest daughter, how old is

1   she?

2        A.   She's three.

3        Q.   She's three.

4             And how old was she when you filed this

5   lawsuit?

6        A.   Three.

7        Q.   Three.  And your older daughter, how old is

8   she?

9        A.   Nineteen.

10       Q.   How old was she when you filed the lawsuit?

11       A.   Eighteen.

12       Q.   Now, do you serve both of your daughters

13   dinner?

14       A.   I do.

15       Q.   Okay.  And when you give them dinner, do you

16   give them the same identical portions?

17       A.   No, I do not.

18       Q.   Give less to the three-year-old?

19       A.   Yes, I do.

20       Q.   How do you determine the -- how much to give

21   each one of them?

22       A.   My three-year-old has a much smaller stomach

23   than my 19-year-old.

24       Q.   So just -- yeah, how do you make the decision

25   about how big the portion is for your three-year-old?

1      A.     Common sense.

2      Q.     Kind of a gut feel?

3      A.     Yeah.

4      Q.     Okay.  But it's smaller than for your

5  19-year-old?

6      A.     Yes.

7      Q.     Yeah.

8             Smaller stomach needs fewer calories, that kind

9  of thing.

10     A.     I don't know about fewer calories, but...

11     Q.     Okay.

12     A.     I don't know about that, but not as much to

13  fill the stomach.

14            MR. BISH:  Okay.  We can take a quick break if

15  you really need to.  But considering --

16            MR. MARRON:  I'm just wondering, do we have a

17  place to caucus?  Do we have our own room that we

18  could --

19            MR. BISH:  Well, we're breaking so you can

20  caucus?

21            MR. MARRON:  Yeah, just for five minutes.

22            MR. BISH:  Okay.  But given that we started so

23  late, let's keep the breaks to a minimum.

24            MR. MARRON:  Yeah, we will.  I just want to --

25  I haven't had a chance to talk to my client.

1          THE VIDEOGRAPHER:  Okay.  All agreed to go off

2    the record, we're off the record at 1:56 p.m.

3          (Recess from 1:56 p.m. to 2:02 p.m.)

4          THE VIDEOGRAPHER:  We're back on the record at

5    2:02 p.m.

6    BY MR. BISH:

7     Q.    Ms. Hohenberg, before I ask any more questions,

8    I should also ask that you and I try not to talk over

9    each other.  It's important that I say a complete

10   question, you pause and give your attorney a chance to

11   object, if he needs, and then respond.  So that -- mostly

12   for the benefit of the court reporter so that she's not

13   trying to record two people talking at once.

14         Is that okay?

15    A.    Uh-huh.  Yes.

16    Q.    And I'll try to do the same.

17         How many times have you purchased a jar of

18   Nutella?

19    A.    Once.

20    Q.    And I think I read somewhere that, to the best

21   of your memory, it was about two and a half years ago,

22   correct?

23    A.    To the best of my memory, yes.

24    Q.    So approximately spring 2009?

25    A.    Yes.

Page 24

1      Q.    Okay.  Do you recall which month by any chance?

2      A.    I do not.

3      Q.    Okay.  Do you recall how old your youngest

4   daughter was when you bought Nutella?

5      A.    She would have been a year and a half.

6      Q.    Year and a half.

7            And what about your older daughter, do you

8   recall how old she was?

9      A.    She wasn't living with me at the time.

10     Q.    Okay.  Did you ever see her in that period of

11  time, was she ever at your house?

12     A.    Holidays.

13     Q.    Okay.  And where did you buy the jar of

14  Nutella?

15     A.    I bought it at the commissary in Imperial

16  Beach.

17     Q.    Is that where you typically shop for food?

18     A.    Basic groceries, yes.

19     Q.    And where else do you shop?

20     A.    Occasionally Albertsons, Vons, Costco.

21     Q.    And when you shop at Albertsons, do you have a

22  preferred savings card by any chance?

23     A.    I do.

24     Q.    You do.

25            In your name?

1    A.    I don't know what name it's under anymore.

2    Q.    Okay.

3    A.    I've had it so long.

4    Q.    You've had it so long, okay.

5          And when you shop at Vons, do you have a Vons

6    Club Card?

7    A.    I do.

8    Q.    Okay.  Under your name --

9    A.    Again, same.  I've --

10   Q.    Had it forever?

11   A.    Uh-huh.

12   Q.    Okay.  And you use it regularly?  Like when you

13   check out, you put in your phone number or something?

14   A.    Something like that, yes.

15   Q.    Do you actually have either of those cards?

16   A.    Uh-huh.

17   Q.    You do, okay.

18         And do you ever shop at CVS Pharmacy?

19   A.    I do.

20   Q.    Okay.  Do you have an Extra Care Card?

21   A.    I do.

22   Q.    You do.

23         And how long have you had that?

24   A.    I don't know.

25   Q.    Long time, okay.

1           Do you also shop at Wally's?

2     A.    I do.

3     Q.    Okay.  And Target?

4     A.    Occasionally.

5     Q.    And I think you said Costco, right?

6     A.    Yes.

7     Q.    Okay.  And Wal-Mart?

8     A.    Yes.  I try not to.

9     Q.    Okay.  When you shop for your family, are there

10    any health issues that affect your decisions like, for

11    example, does anybody have diabetes?

12    A.    No.

13    Q.    Are your kids generally healthy?

14    A.    Yes.

15    Q.    Okay.  Are you a generally healthy person?

16    A.    Yes.

17    Q.    Okay.  Blood pressure, cholesterol, all fine --

18    A.    Perfect.

19    Q.    -- as far as you know?

20    A.    Yes.

21    Q.    Okay.  Any allergies in your household?

22    A.    To food?

23    Q.    Yes.

24    A.    No.

25    Q.    So nobody's allergic to peanuts, for example?

1     A.    I'm not, no.

2     Q.    Either of your daughters?

3     A.    No.

4     Q.    Okay.  So let's talk about that day in the

5 commissary when you bought Nutella, who was with you?

6     A.    I don't recall.

7     Q.    Either of your daughters?

8     A.    I don't recall.

9     Q.    And so to the best of recollection, can you

10 just describe what happened.  Were you walking down the

11 aisle and a jar of Nutella caught your eye or something?

12     A.    Yes.  I was introduced -- or I saw the

13 advertisement on television and thought I'd give it a

14 whirl.

15     Q.    And how -- before you were in the commissary,

16 about how long before had you seen that advertisement?

17     A.    I don't know if I really recall.

18     Q.    Was it a matter of hours, days, months?

19     A.    Probably would have been a couple weeks maybe.

20     Q.    Weeks.

21     So again, in the spring 2009?

22     A.    Uh-huh.

23     Q.    That's your best recollection?

24     A.    My best recollection, yeah.

25     Q.    Okay.  So you'd seen the ad, and you were

1    walking down the aisle and you saw Nutella; is that

2    right?

3         A.     Uh-huh.

4         Q.     And can you just walk me through your thought

5    process, if you can remember, about what you were going

6    to do?

7         A.     It was a good alternative for me.  I don't like

8    peanuts.  I don't like peanut butter.  And being that it

9    was advertised as a healthy, nutritiousness breakfast

10   item, I thought it would be a good alternative for my

11   daughter as well.

12        Q.     So you don't like peanut butter?

13        A.     I do not.

14        Q.     Were you buying Nutella instead of something?

15        A.     No, I was not.

16        Q.     Okay.  It's just something -- something new?

17        A.     Uh-huh.

18        Q.     Okay.  So what happened?  You just saw the jar,

19   did you turn it around and look at the nutrition

20   information?

21        A.     I did not.

22        Q.     You didn't turn it around?

23        A.     No.

24        Q.     Just put it in your cart?

25        A.     The cart.

1    Q.    Okay.  Were you curious to know if Nutella

2    contained sugar?

3    A.    I didn't -- didn't question it.

4    Q.    Were you curious -- well, but were you curious

5    to know if it did?

6    A.    No.

7    Q.    No.

8          Were you curious to know if it contained any

9    fat?

10   A.    No.

11   Q.    Did it matter to you one way or the other?

12   A.    It would if it had high levels of it, yes.

13   Q.    And what do you mean by "high levels of it"?

14   A.    Unsafe levels.

15   Q.    And what do you mean by "unsafe levels"?

16   A.    Something that can cause health issues.

17   Q.    Is there a particular amount that you

18   believe --

19   A.    I don't know what the amounts would be.

20   Q.    Okay.  Haven't given it any thought?

21   A.    I don't know what the amounts would be.

22   Q.    I assume the answer is the same but were you

23   curious to know if Nutella contained any saturated fat?

24   A.    No.

25   Q.    In your mind, is fat and saturated fat similar,

1    different, same?

2         A.    I don't know.

3         Q.    Okay.  Do you recall what else you bought that

4    day?

5         A.    I don't.

6         Q.    You don't.

7               Do you recall if you used a credit card to buy

8    your purchases that day?

9         A.    I don't.

10        Q.    Don't recall one way or the other?

11        A.    I don't.  I probably did not use a credit card.

12        Q.    Well, what did you probably use?

13        A.    I probably wrote a check.

14        Q.    Probably wrote a check, okay.

15              Do you recall how much you paid for the jar of

16   Nutella?

17        A.    It was probably somewhere between two and $3.

18        Q.    Do you have any way to -- sitting here today,

19   do you have any way to determine how much you paid?

20        A.    No, I do not.

21        Q.    Have you tried to determine how much you paid

22   for it?

23        A.    As far as?

24        Q.    In connection with this lawsuit?

25        A.    Researching?

1    Q.    Yeah.

2    A.    Like going back to the store?

3    Q.    Right.

4    A.    No.

5    Q.    Okay.  So you bought it, you took it home.  Did

6  you try it?

7    A.    Yes, I did.

8    Q.    Okay.  What was your impression of it, the

9  Nutella?

10    A.    It was good.  It was very, very sweet.

11    Q.    Very, very sweet.

12    A.    Uh-huh.

13    Q.    So now -- so you tried it, "very, very sweet."

14  At that point, did you -- did it cross your mind that

15  perhaps it has sugar in it?

16    A.    Probably not the first time around.

17    Q.    Second time around?

18    A.    Yeah.  It got to the point where it was very,

19  very sweet and tasted more like chocolate.  And we don't

20  eat chocolate for breakfast.

21    Q.    Do you eat chocolate at all?

22    A.    Very, very rarely.

23    Q.    How -- how -- just to give -- how frequently;

24  once a month, once a year?

25    A.    I may have a piece of chocolate a couple times,

Page 32

1    maybe once every two to three months.

2        Q.     And what about your kids?

3        A.     Probably the same.

4        Q.     Both kids?

5        A.     My three-year-old.

6        Q.     What about your 19-year-old?

7        A.     I don't know what she does.

8        Q.     Okay.

9        A.     She's an adult.

10       Q.     Well, while she's been living with you have you

11   seen her eat chocolate?

12              MR. MARRON:  Objection; assumes facts not in

13   evidence.

14              THE WITNESS:  No, I.

15   BY MR. BISH:

16       Q.     Do you know if she eats chocolate at school,

17   ever?

18       A.     My three-year-old?

19       Q.     No, no.  Your 19-year-old?

20       A.     My 19 year old's not in school.

21       Q.     When she was in school do you know if she ate

22   chocolate?

23       A.     I don't.

24       Q.     Never asked?

25       A.     She didn't -- she didn't live with me.

1    Q.    All right.  So we should --

2    A.    Yeah.

3    Q.    I'm sorry.  When did she start living with you?

4    A.    In April.

5    Q.    April of this year?

6    A.    Correct.

7    Q.    Okay.  After high school?  Was she out of high

8  school when he started living with you?

9    A.    She was out of high school, correct.

10   Q.    Okay.  So after you had tasted it a few times,

11  I believe you said that you suspected that there was

12  sugar --

13   A.    Uh-huh.

14   Q.    -- in Nutella, right?

15   A.    Uh-huh.

16   Q.    At that point, did you look at the label to see

17  how much sugar was in Nutella?

18   A.    I did not.

19   Q.    Why not?

20   A.    I had no interest.  I stopped using it as a

21  breakfast item.

22   Q.    And when was that, approximately?

23   A.    Maybe a month or so after I purchased it.

24   Q.    Okay.  So you stopped using it, so we're going

25  to say late spring, early summer 2009?

Page 34

1    A.    Possibly.

2    Q.    Okay.  Didn't touch it after that?

3    A.    No.  I used it in my ice cream.

4    Q.    Oh, I see.  On ice cream.

5          Just -- just with ice cream?

6    A.    Uh-huh.

7    Q.    No other times of the day?

8    A.    No.  I don't eat ice cream often.  So the jar

9    lasted me a very long time.

10   Q.    Right.

11         What kind of ice cream do you buy?

12   A.    Usually I -- brownie cookie dough ice cream.

13   Q.    Is there a particular brand you like?

14   A.    I think Ben and Jerry's makes one.

15   Q.    Mine too.  Love the Ben and Jerry's.  I'm a

16   Cherry Garcia kind of guy.

17         Okay.  So you put Nutella on the -- brownie

18   cookie Ben and Jerry's?

19   A.    Uh-huh.

20   Q.    That sounds good.

21         Okay --

22   A.    It was.

23   Q.    And do you give that to your three-year-old?

24   A.    She may have a bite or two.

25   Q.    Bite or two.

1          Less than you?

2     A.    Very much less than me.

3     Q.    And why is that?

4     A.    She's three years old, she doesn't need it.  At

5   the time, one years old.  Didn't need it.

6     Q.    Right; smaller portions for the three-year-old.

7     A.    Yes.

8     Q.    Much smaller portions for a one-year old,

9   right?

10    A.    Yes.

11    Q.    Okay.  Now, when you tasted Nutella, did you

12  notice any other flavor besides chocolate?

13    A.    I did not.  Let me retract that a little bit.

14  It was kind of an off flavor.  So it wasn't like eating a

15  piece of milk chocolate.

16    Q.    Did it -- what was the other flavor you

17  noticed, just not pure chocolate?

18    A.    Not pure.

19    Q.    It was something else?

20    A.    Yeah.

21    Q.    Okay.

22    A.    Not recognizable.

23    Q.    Now, when -- before you stopped serving it as a

24  breakfast food.

25    A.    Uh-huh.

1    Q.    Were you putting it on whole wheat bread?

2    A.    I believe I put it on a waffle.

3    Q.    On a waffle.

4          What kind of waffle?

5    A.    An Eggo.

6    Q.    Eggo.

7          Eggo, just a regular original Eggos --

8    A.    Uh-huh.

9    Q.    -- that I ate when I was a kid?

10   A.    Uh-huh.

11   Q.    Not the fancy stuff now, the natural whole

12   wheat Eggos?

13   A.    No.

14   Q.    Do you still eat Eggos?

15   A.    Occasionally.

16   Q.    What about your daughter?

17   A.    I don't personally eat them.  My daughter may

18   occasionally eat them.

19   Q.    So now, when your daughter eats Eggos what do

20   you put on top of it?

21   A.    Butter or peanut putter.

22   Q.    Butter or peanut butter.

23         But you don't like peanut butter?

24   A.    Correct.

25   Q.    Your daughter does?

1     A.     Yes.

2     Q.     Okay.  How much butter do you put on it?

3     A.     Maybe a teaspoon.

4     Q.     Give or take.  I mean, maybe a little bit more,

5  maybe a little bit less, just guesstimating?

6     A.     I don't fill every hole with butter.

7     Q.     Okay.  What about, how much peanut butter do

8  you put on?

9     A.     I'd say anywhere between half tablespoon to a

10  tablespoon.

11     Q.     Half a tablespoon, okay, to a tablespoon.

12            You don't put on two tablespoons?

13     A.     No.

14     Q.     Okay.  That's too much?

15     A.     Too much.

16     Q.     And you just know that, right?  It's just your

17  gut feel it's too much?

18     A.     I can cook.

19     Q.     All right.  Okay.  You ever put syrup on the

20  Eggos?

21     A.     No.

22            THE COURT REPORTER:  I'm sorry?

23  BY MR. BISH:

24     Q.     Syrup, have you ever put syrup on the Eggos?

25     A.     No.

1    Q.    Never?

2    A.    No.

3    Q.    Have you ever bought syrup?

4    A.    Yes.

5    Q.    When's the last time you bought syrup?

6    A.    I don't recall.

7    Q.    More than five years ago?

8    A.    No.

9    Q.    Approximately?

10   A.    Definitely more than a year, maybe even two

11   years ago.

12   Q.    More than two, less than five?

13   A.    Yes.

14   Q.    Okay.  What about jellies or jams, you ever buy

15   jellies or jams?

16   A.    I do.

17   Q.    You ever put those on Eggos?

18   A.    No.

19   Q.    What do you use that for?

20   A.    Peanut butter and jelly sandwiches for lunch.

21   Q.    And how much jelly and jam do you put on a

22   peanut butter and jelly sandwich for your daughter?

23   A.    Jelly or jam.

24   Q.    Uh-huh.

25   A.    Half a tablespoon to a tablespoon.

1    Q.    Not -- okay.

2          Not more than a tablespoon?

3    A.    No.

4    Q.    What kind of jelly do you buy?

5    A.    Grape.

6    Q.    What brand?  Smuckers?

7    A.    Smuckers.

8    Q.    Yes.  I love Smuckers.

9    A.    And then I also have jalapeno -- or a habanero

10   mango dressing, all organic, that I buy from the farmers'

11   market.

12   Q.    The Smuckers isn't organic, is it?

13   A.    No.

14   Q.    Okay.  And you give the Smuckers to your

15   daughter?

16   A.    For peanut butter and jelly sandwiches for

17   lunch.

18   Q.    Okay.  Is it like the original Smuckers, not

19   the low sugar or whatever Smuckers?

20   A.    No.  It's original.

21   Q.    The original.

22         All right.  So how long did it take you to

23   finish the jar of Nutella?  A year?

24   A.    Probably a year and a half.

25   Q.    Year and a half.

1      A.     Year, year and a half.

2      Q.     Any idea how many servings it took you to get

3  through it?

4      A.     No, I don't.

5      Q.     Any idea how much you were serving at a time; a

6  tablespoon, two tablespoons?

7      A.     Maybe two tablespoons on ice cream.

8      Q.     On ice cream?

9      A.     Uh-huh.

10      Q.     What about on the -- on the Eggos?

11      A.     Half a tablespoon.

12      Q.     Half tablespoon, okay.

13             Half a tablespoon?

14      A.     (No audible response.)

15      Q.     Okay.  And then -- this might sound silly, but

16  when you finished the Nutella, did you throw the jar

17  away?

18      A.     I did.

19      Q.     And when was that, about a year and a half?

20      A.     Yes.

21      Q.     Okay.  So -- so about a year ago from today,

22  about?

23      A.     Approximately.

24      Q.     Okay.

25      A.     Yeah.

1    Q.    All right.  So if you could try to place a

2    value on it, how much was that jar of Nutella worth to

3    your family?  A dollar amount, if you could.

4    A.    Rephrase the question for me.

5    Q.    Yeah.  So you were first using it -- you were

6    first using it on Eggos.  And then you stopped using it

7    on Eggos for breakfast food because it had too much

8    sugar, I believe is what you said, right?

9    A.    Uh-huh.

10   Q.    So you started using it as a dessert topping,

11   correct?

12   A.    Correct.

13   Q.    All right.  So you enjoyed it, right?

14   A.    Uh-huh.

15   Q.    Okay.  It tasted good, right?

16   A.    Yes.

17   Q.    And your daughter liked it?

18   A.    Yes.

19   Q.    Do you have any way to value, if you paid two

20   to $3 for it, how much was it worth to you?

21   A.    I'm not sure if I know how to answer that

22   question.

23   Q.    Just give it your best shot.

24   A.    I don't know that I could really put a dollar

25   amount on it.  It wasn't what I purchased --

1      Q.    Okay.

2      A.    -- it for.

3      Q.    Right.

4      A.    So...

5      Q.    It was something, you just don't know how much?

6           MR. MARRON:  I'll just -- it'll be a belated

7    objection, but it calls for expert opinion on valuations

8    and damages.

9    BY MR. BISH:

10      Q.    You can answer.

11      A.    Okay.  I don't know that I would really put a

12    value on it because I didn't -- I bought it for a

13    breakfast item and it didn't turn out to be a breakfast

14    item.

15      Q.    Right, but you ended up -- so you ended up

16    using it for something else, though, right?

17      A.    Yeah.

18      Q.    And you liked it?

19      A.    I liked it.

20      Q.    And I think I already asked this, but if you

21    hadn't bought Nutella would you have bought something

22    else instead?

23           MR. MARRON:  Objection; calls for speculation.

24           THE WITNESS:  No.

25    ///

1    BY MR. BISH:

2        Q.    Okay.  Okay.  So on the peanut butter that you

3    buy for your daughter, what brand do you typically buy?

4        A.    Skippy.

5        Q.    Skippy.

6              Regular, original Skippy, reduced fat Skippy,

7    natural Skippy?

8        A.    Regular.

9        Q.    Did you ever see the reduced fat Skippy in the

10   grocery store?

11       A.    I think I've probably seen it.

12       Q.    Is there a reason you don't buy that, it's not

13   like you --

14       A.    I've never tried it.

15       Q.    Having a reduced fat peanut butter not

16   important to you?

17       A.    I've just never tried it.

18       Q.    Okay.  What about the natural Skippy, ever

19   tried that?

20       A.    No.

21       Q.    Any reason why not?

22       A.    I don't buy peanut butter often.

23       Q.    Right.

24             Is buying natural foods important to you?

25       A.    When appropriate.

Page 44

1      Q.    Sometimes yes, sometimes no?

2      A.    Yeah.

3      Q.    Does it depend on the day?

4      A.    No, it depends on my pocketbook.

5      Q.    Right.

6      A.    Natural organic foods are a lot more expensive.

7      Q.    Right, but -- so if you have two bottles of

8  Skippy, and I don't -- I'm not sure if there's any price

9  difference, if there's a jar of natural Skippy and a jar

10 of original Skippy, is there a reason you buy the

11 original Skippy and not the natural Skippy?

12     A.    Um...

13           MR. MARRON:  Objection; form, incomplete

14 hypothetical.

15           You can answer the question if you understand

16 it.

17           THE WITNESS:  I think it's more just -- it's

18 kind of what everyone grew up with.  So it's just a

19 product you automatically grab.

20 BY MR. BISH:

21     Q.    You buy what you're used to, right?

22     A.    Correct, yeah.

23     Q.    If you have a good experience, you --

24     A.    Yeah.  If you like it, yeah, no need to change.

25     Q.    Okay.  Sitting here today, do you regret buying

1    the Nutella?

2        A.    No.

3        Q.    No.

4              Have you suffered any physical harm from eating

5    Nutella?

6        A.    No.

7        Q.    Has your four-year-old -- or sorry, your

8    three-year-old?

9        A.    No.

10       Q.    So how were you injured by -- well, maybe --

11   were you injured by purchasing Nutella?

12       A.    No.

13             MR. MARRON:   Objection; calls for a legal

14   conclusion.   Not a lay -- this is a layperson

15   understanding of what injury is.   Anyway, that's my

16   objection.

17   BY MR. BISH:

18       Q.    Okay.   Whose idea was it to sue Ferrero?

19       A.    Mine.

20       Q.    And when did you -- when did you decide to sue

21   Ferrero?

22             MR. MARRON:   Yeah, I'd like to instruct my

23   client not to invade the attorney-client privilege.   If

24   you can answer the question without going into anything

25   that you discussed with your attorney, then I would --

1  you can do so.  But if you can't answer the question

2  without invading -- I mean revealing attorney-client

3  communications, then I'd instruct you not to answer any

4  of those questions.

5            But can you rephrase your question, please.

6  BY MR. BISH:

7       Q.    I said when did you decide to sue Ferrero?

8       A.    I don't recall the dates.

9       Q.    How long ago, approximately?

10      A.    Sometime this year.

11      Q.    This year, okay.

12            So it would have been a year after you were

13  done -- well, so six months after you were done with

14  Nutella you decided to sue Ferrero, right?  You'd already

15  thrown it away six months ago.  Then you decided to sue

16  Ferrero just out the blue?

17            MR. MARRON:  Objection; attorney-client

18  privilege.

19            I'll instruct my client not to answer any

20  questions that reveal attorney-client communications.

21  BY MR. BISH:

22      Q.    Can you answer the question without divulging

23  communications from your lawyer?

24      A.    Ask the question again, please.

25      Q.    Okay.  So you had thrown away the Nutella about

1   a year ago from today, right.  And then, so about six

2   months goes by and then you decided to sue Ferrero; is

3   that right?

4       A.    I wouldn't be able to put a time frame on it.

5       Q.    Okay.  Did you discuss suing Ferrero with Laura

6   Rude-Barbato before you filed your lawsuit?

7       A.    No.

8       Q.    When's the first time you met Laura

9   Rude-Barbato?

10           MR. MARRON:  Objection; assumes facts not in

11  evidence.

12           THE WITNESS:  I haven't met her.

13  BY MR. BISH:

14      Q.    You haven't.

15           Never?

16      A.    No.

17      Q.    Ever talked to her?

18      A.    No.

19      Q.    Any idea where she lives?

20      A.    No.

21      Q.    Have you ever been involved in a lawsuit

22  before?  No?

23      A.    As a plaintiff, no.

24      Q.    As a defendant?

25      A.    Yes.

1    Q.    What was the nature of that action?

2    A.    Personal.

3    Q.    Okay.  But you weren't deposed in that action?

4    A.    No, I was not.

5    Q.    Did you offer any testimony at trial?

6    A.    (No audible response.)

7    Q.    No, okay.

8          So I assume the answer is no, that you -- have

9    you ever sought to act as a lead plaintiff before, before

10   this lawsuit?

11   A.    Ask the question again.

12   Q.    Have you ever sought to act as a lead plaintiff

13   in a lawsuit before this one?

14   A.    No.

15   Q.    Do you understand the phrase "lead plaintiff"?

16   A.    Yes.

17   Q.    Okay.  Are you seeking to act as lead plaintiff

18   in this action?

19   A.    Yes.

20   Q.    Have you ever participated in a class action

21   before?

22   A.    No.

23   Q.    How many hours have you devoted to this

24   lawsuit?

25   A.    A lot.

1    Q.    Approximately?

2    A.    I'd say, at this point, maybe a workweek.

3    Q.    Forty hours?

4    A.    Yeah.

5    Q.    Okay.  How did you select your lawyer?

6          MR. MARRON:  Objection; attorney-client

7    privilege.

8          If you can answer the question without

9    divulging any attorney-client communications, then you

10   may do so.  Otherwise, I'll instruct you not to answer.

11         THE WITNESS:  No.

12   BY MR. BISH:

13   Q.    No you can't answer?

14   A.    Correct.

15   Q.    What were the factors that you considered when

16   you were selecting a lawyer for this lawsuit?

17         MR. MARRON:  Objection; assumes facts not in

18   evidence.

19         You can answer the question if you can.

20         THE WITNESS:  I can't answer the question.

21   BY MR. BISH:

22   Q.    You can't, okay.

23         Were there factors you considered in selecting

24   a lawyer?

25   A.    No.

1    Q.    So you didn't look for experience, for example?

2    A.    No.

3    Q.    Who is your lawyer in this lawsuit, is it

4    Mr. Marron?

5    A.    Yes.

6    Q.    Anybody else?

7    A.    He has an assistant.

8    Q.    Right.

9          Do you know Mr. Greg Weston?

10   A.    No, I do not.

11   Q.    Do you know Mr. Jack Fitzgerald?

12   A.    No, I don't.

13   Q.    So they're not your lawyers in this action?

14   A.    No.

15   Q.    Okay.  Do you expect to be personally

16   compensated monetarily from this lawsuit?

17   A.    No.

18   Q.    Have you discussed this lawsuit with anybody

19   other than your lawyer?

20   A.    No.

21   Q.    No friends?

22   A.    Not in detail, no.

23   Q.    Family?

24   A.    Not in detail.

25   Q.    Nobody's asked you why are you suing?  Anybody?

1    A.    Not really.

2    Q.    Did you review the complaint that was -- that

3  Mr. Marron filed on your behalf against Ferrero?

4    A.    Yes.

5    Q.    Carefully?

6    A.    Uh-huh.

7    Q.    Anything inaccurate in there?

8    A.    Other than my daughter's three.

9    Q.    Uh-huh.

10    A.    Not four.

11    Q.    So you reviewed it, the complaint, before it

12  was filed and you didn't notice that your daughter was

13  listed as being four?

14    A.    I'm sorry?

15    Q.    So when you reviewed the complaint -- I'm

16  sorry, did you review the complaint before it was filed?

17    A.    I -- yes.

18    Q.    Is there a reason you didn't correct that?

19    A.    I might have corrected it.  I'm not sure.

20    Q.    If you saw it you would have corrected it,

21  right?

22    A.    Yes.

23    Q.    And you read the complaint carefully?

24    A.    Well, no.  I did correct it.  Whether or not it

25  got changed, and it did not --

1    Q.    I see.

2    A.    Because it got passed through.

3    Q.    Have you reviewed any amended versions of the

4    complaint that has been filed on your behalf?

5    A.    I'm not sure.

6    Q.    You're not sure.

7          Well, how many complaints do you recall

8    reviewing?

9    A.    I've read a lot of paperwork.  I'm not sure.

10   Q.    Do you recall reviewing a complaint on or

11   around the 3rd of July this year, during the holiday

12   weekend?

13   A.    I don't remember.

14   Q.    What'd you do this 4th of July?

15   A.    I went to my girlfriend's house.  Made

16   carnitas, watched the fire works from her balcony.

17   Q.    My kind of 4th.

18         So you don't recall reviewing a complaint on or

19   around the 3rd of July this year?

20   A.    On that Sunday, probably not.

21   Q.    Saturday, Sunday?

22   A.    4th of July was on a Monday.

23   Q.    Right, so that weekend.

24   A.    I don't recall.

25   Q.    And are you aware that Ferrero moved to dismiss

1    the amended complaint in this action?

2        A.    Yes.

3        Q.    Do you recall if you opposed that motion?  No?

4        A.    I don't know.

5        Q.    So do you recall reviewing an opposition to

6    Ferrero's motion to dismiss, does that ring a bell?

7        A.    I'm not sure.  You're using legal terms with

8    me, so break this down.  Sorry.

9        Q.    Right.

10       A.    Explain that a little better.

11       Q.    So you recall that Ferrero moved to dismiss,

12   filed a motion to dismiss with the court, correct?

13       A.    To settle, or what does that mean?

14       Q.    To -- asking the court to dismiss the

15   complaint.

16       A.    Dismiss the case, okay.

17       Q.    Do you recall that?

18       A.    Yes.

19       Q.    Do you recall if you opposed that motion?

20            MR. MARRON:  Yeah, objection on attorney-client

21   privilege.

22            Other than what you've learned from your

23   counsel, you can answer the question.  But if there's

24   anything that we've discussed, I would appreciate if you

25   don't divulge any of our --

Page 54

1            THE WITNESS:   Okay.

2            MR. MARRON:   -- communications.

3    BY MR. BISH:

4        Q.    I'm not asking what your lawyer said to you or

5    what you said to them.   I'm just asking did you

6    personally review the brief that was filed on your behalf

7    opposing Ferrero's motion to dismiss?

8        A.    I don't recall.

9        Q.    Okay.  So you don't recall if you approved the

10   filing of that opposition?

11       A.    I don't -- I don't necessarily want to answer.

12       Q.    You don't want to answer?

13       A.    No.  I -- I'm confused as to where the line of

14   questioning is.  So...

15       Q.    I'm -- I'm -- I'm just asking if you recall

16   approving the opposition brief that was filed on your

17   behalf opposing Ferrero's motion to dismiss?

18            MR. MARRON:  Yeah, I'd like to object.  You

19   know, you've been asking questions about a lot of

20   documents in the abstract without giving the witness the

21   benefit of reviewing the documents.

22            So I just want to let the record reflect that

23   there's been a line of questioning regarding documents

24   without the witness having the benefit of reviewing the

25   documents.

1          You can answer the question with that.

2          MR. BISH:  Again, let's keep the speaking

3    objections to a minimum.  It's unnecessary.

4          MR. MARRON:  That's -- I'm making a record for

5    what's -- you know, for the benefit of the court who's

6    probably going to see portions of this transcript that's

7    not here right now, that is not aware that she's not able

8    to refer to the documents itself or the responses.

9    BY MR. BISH:

10       Q.    Do you recall the question?

11       A.    I agree.  I mean, without knowing...

12       Q.    Yeah.  So sitting here today, you just don't

13   recall.

14       A.    I've read a lot of paperwork.

15       Q.    Are you aware that the parties scheduled a

16   mediation in this action?

17          MR. MARRON:  Objection; attorney-client

18   privilege.

19          THE WITNESS:  Repeat the question, please.

20   BY MR. BISH:

21       Q.    Are you aware that the parties have scheduled a

22   mediation in this action?

23       A.    Yes.

24       Q.    Did you intend to physically attend the

25   mediation?

1    A.    Yes.

2    Q.    You did, okay.

3          Have you looked for documents to produce in

4    this litigation?

5    A.    I have.

6    Q.    You have.

7          Where did you look?

8    A.    Through my e-mail address.

9    Q.    Find anything?

10   A.    No.

11   Q.    Just your e-mail?  Did you look on the rest of

12   your computer as well, like your desktop or whatever?

13   A.    I just did a search.

14   Q.    What did you search for?

15   A.    Nutella.

16   Q.    Anything else?

17   A.    Any related words that would have gone with it.

18   I don't...

19   Q.    So what are the words you searched for?

20   A.    I know Nutella was one of them.

21   Q.    Anything else?

22   A.    I don't recall.  There was maybe another word

23   or two.

24   Q.    Like Ferrero?

25   A.    Ferrero would have been another one.

1    Q.    Anything else?

2    A.    I don't believe so.

3    Q.    Okay.  What did you do to -- what did you do to

4  prepare for today's deposition?

5    A.    Showed up.

6    Q.    Did you meet with your lawyer beforehand?

7    A.    Yes.

8    Q.    And when was that?

9    A.    Sunday.

10   Q.    Sunday.  Any other times?

11   A.    To prepare for today --

12   Q.    Yeah.

13   A.    -- no.

14   Q.    How long was the meeting on Sunday?

15   A.    Approximately an hour, hour and a half.

16   Q.    Who was there?

17   A.    My attorney and I.

18   Q.    Mr. Marron?

19   A.    Correct.

20   Q.    Nobody else?

21   A.    No.

22   Q.    Okay.  Did you review any documents to prepare

23  for today's deposition?

24   A.    Yes.

25   Q.    What'd you review?

1    A.    The paperwork that I had.

2    Q.    A lot of paperwork?

3    A.    Uh-huh.

4    Q.    Okay.  So going back to the television ad that

5  you recall seeing in early 2009, what do you recall about

6  that ad?

7    A.    I recall seeing a mom with children --

8    Q.    A mom?

9    A.    -- around a kitchen bar/table serving Nutella

10  on toast.  The advertisement was advertising that it was

11  a healthy, nutritiousness, well-balanced item, something

12  along those lines, for breakfast.

13    Q.    Do you recall any specific words that were used

14  in that ad?

15    A.    Nutritionist -- nutritiousness, I believe was

16  one.  Healthy.

17    Q.    Any others?

18    A.    Other than -- I'm not sure.

19    Q.    Yeah, any other words stand out in your mind?

20    A.    No.  I didn't memorize the ad.

21    Q.    Any other things -- yeah, any other parts of

22  that ad that stand out in your mind that you recollect?

23    A.    No.

24    Q.    So you recall an ad, mom with children sitting

25  around a kitchen bar/table eating --

1      A.      Breakfast.

2      Q.      -- Nutella on toast, right?

3      A.      Eating, breakfast hour, yeah.

4      Q.      And you recall the words "healthy and

5  nutritious" were used?

6      A.      Yeah, for breakfast.

7      Q.      Do you recall what time of day you saw that ad?

8      A.      I do not.

9      Q.      You don't recall if it was in the evening or

10  the morning?

11      A.      I don't.

12      Q.      Let me ask you this:  Do you watch daytime TV?

13      A.      I don't.

14      Q.      You don't.

15              Like ever?

16      A.      I work.  So no, not much.

17      Q.      Right.  That's a good question.  Do you recall

18  like the day of the week that you saw the ad?

19      A.      I don't.

20      Q.      But you know you don't watch daytime TV because

21  you work, right?

22      A.      Correct.

23      Q.      Okay.  So most likely in the evening?

24      A.      Most likely in the evening or on the weekend,

25  but...

Page 60

1    Q.    Okay.  What kind of shows do you watch?

2    A.    The Closer and occasionally Hell's Kitchen.

3    Q.    So do I.  Gordon Ramsey.

4    A.    Uh-huh.

5    Q.    Closer and Hell's Kitchen.  And that was -- was

6    that what you were watching back in 2009?

7    A.    Uh-huh.

8    Q.    "Yes"?

9    A.    Yes.

10   Q.    Okay.  Anything else that you recall watching

11   in 2009?

12   A.    Those are the only two shows I record, so...

13   Q.    You don't watch a lot of TV?

14   A.    I don't.

15   Q.    You don't watch like Oprah, for example?

16   A.    I don't.

17   Q.    Do you watch any cooking shows?

18   A.    Occasionally.

19   Q.    Like what?

20   A.    What are the names of those shows?  The

21   Japanese -- what's his name?  The cook off with -- I

22   don't know the names of the shows.  I'm not recalling

23   them.

24   Q.    Okay.  But they're like -- kind of Gordon

25   Ramsey type of shows as opposed to instructional cooking

1   shows; is that right?

2       A.   I think the one, it's the Japanese one where

3   he -- they have to make a spread out of one item.

4       Q.   Okay.

5       A.   And it's a cook off.

6       Q.   Like Iron Chef something?

7       A.   Iron Chef.  Thank you.

8       Q.   I've never watched I but a lot of people do.

9       A.   Occasionally.

10      Q.   So at that time your daughter was about one,

11  one and a half maybe?

12      A.   (No audible response.)

13      Q.   Okay.

14      A.   Yes.

15      Q.   Now, did the ad you saw, did it show a mom

16  giving Nutella to a one-year old?

17      A.   I don't recall.

18      Q.   Do you recall how old the kids were in the

19  commercial you saw, about?

20      A.   Young children.

21      Q.   Young?

22      A.   Uh-huh.

23      Q.   What's your best guess as to how old they were,

24  based on your impression of the ad?

25      A.   I'd say anywhere between, depending on size,

1    two and seven.

2         Q.    Two and seven.

3               Do you think there was a two-year-old in the

4    ad?

5         A.    I don't recall.  They were small children to

6    medium-sized children.

7         Q.    Now, would that have been important --

8         A.    Not teenagers.

9         Q.    I'm sorry to interrupt.  Go ahead and finish.

10        A.    That's okay.  Go ahead.

11        Q.    Would it have mattered to you if it was a

12   two-year-old in the commercial as opposed to teenagers in

13   the commercial?

14        A.    No.

15        Q.    It would have the same effect?

16        A.    Yes.

17        Q.    Okay.  Have you heard of somebody named Connie

18   Evers?

19        A.    I don't believe so, no.

20        Q.    No.

21               MR. MARRON:  I'd like to belatedly object on

22   attorney-client privilege of -- if you learned of

23   anything -- I mean if you learned about Connie Evers or

24   if you heard her name mentioned by your attorney, then

25   I'd like to instruct you not to divulge any

1   communications that we've had.

2           THE WITNESS:  Okay.

3           MR. MARRON:  Yeah.

4   BY MR. BISH:

5       Q.    But you haven't.  So there are no privileged

6   communications, right?

7       A.    (No audible response.)

8       Q.    Okay.  And since you've never heard of

9   Mrs. Evers, is it fair to say that statements made by her

10  did not influence your decision to buy Nutella one way or

11  the other?

12      A.    Right.

13          MR. MARRON:  Objection; assumes facts not in

14  evidence, attorney-client privilege.

15          You can answer.

16          THE WITNESS:  Correct.

17  BY MR. BISH:

18      Q.    So you haven't read any portions of the

19  deposition transcript of Ms. Evers in connection with

20  this lawsuit?

21      A.    I don't believe so, no.

22      Q.    Okay.  Do you recall seeing any print ads in

23  magazines for Nutella?

24      A.    No.

25      Q.    No.

Page 64

1          Do you subscribe to any magazines?

2     A.    Not on purpose.

3     Q.    Yeah, okay.

4           Are you aware that the Nutella sold in the

5   United States today does not contain partially

6   hydrogenated vegetable oil?

7     A.    Repeat the question.

8     Q.    Are you aware that the Nutella sold in the

9   United States today does not contain any partially

10  hydrogenated vegetable oil?

11    A.    No.

12    Q.    No, didn't know that.

13          Is it surprising to you?

14    A.    I haven't purchased the product since.

15    Q.    All right.  So I'm just going to use the

16  shorthand PHVO?

17    A.    Okay.

18    Q.    It's my speech impediment.

19          Do you have know what PHVO is?

20    A.    No.

21    Q.    No.

22          So does it matter to you if PHVO is in a

23  product or not?

24    A.    I don't what it is.  I mean specifically I'm

25  not sure what it is.

Page 65

1    Q.   So when you buy foods, you don't look at a

2  label and say oh that has PHVO in it, I'm not going to

3  buy it, right?

4    A.   I don't typically look at the nutritional

5  items.

6    Q.   Okay.  And are you aware that you are suing

7  Ferrero, in part, because Nutella used to contain PHVO?

8    A.   Is it called something else?

9    Q.   Huh-uh.

10         MR. MARRON:  Yeah, objection; attorney-client

11  privilege.

12         Other than what you've learned from your

13  attorneys, you can answer that.

14         THE WITNESS:  I choose not to answer.

15  BY MR. BISH:

16    Q.   I'm just asking if, sitting here today, if

17  you're aware that you are suing Ferrero, in part, because

18  Nutella used to contain PHVO?

19         MR. MARRON:  Same objection.  Anything --

20  anything that you've learned from your attorneys, I'll

21  ask you not to divulge.

22         THE WITNESS:  Okay.

23         MR. MARRON:  If you can answer the question

24  without divulging what you've discussed with your

25  attorneys, then you may do so.  Otherwise, I'll instruct

1    you not to answer.

2              THE WITNESS:  I'm not going to answer.

3    BY MR. BISH:

4        Q.    Okay.  What about trans fat, do you know what

5    trans fat is?

6        A.    I'm aware of it.

7        Q.    What are you aware of?

8              MR. MARRON:  Again, I'd like to instruct my

9    client other than what you -- attorney-client privilege.

10   Other than what you've learned from your counsel, if you

11   have an independent knowledge of what trans fat is then

12   you can answer.  Otherwise, if it's something that you've

13   learned through discussions with counsel, I'll instruct

14   you not to answer.

15             THE WITNESS:  I'm not going to answer.

16   BY MR. BISH:

17       Q.    Everything you know about trans fat came from

18   your lawyer?

19       A.    No.

20       Q.    So putting aside what came from your lawyer,

21   what is your understanding of trans fat?

22       A.    I don't really have one.

23       Q.    Okay.  Do you know if the Nutella you bought

24   contained trans fat?

25       A.    I don't.

1    Q.   You don't know one way or the other?

2    A.   I don't.

3    Q.   Now, when you pick products, do you look for

4 products that have zero trans fat or it just doesn't

5 affect your purchasing decision?  Doesn't affect it?

6    A.   I don't -- I cook a lot of things from scratch.

7 So I'm not sure where that is effective.

8    Q.   Right.

9    So when you -- but when you buy the things you

10 cook with, are you aware whether or not it says trans

11 fat, zero grams trans fat, does that matter to you when

12 you buy a product?

13    A.   No.

14    Q.   No.

15    And do you feed your family dairy products like

16 milk?

17    A.   Lactaid.

18    Q.   Lactaid?

19    A.   Correct.

20    Q.   But butter, right?

21    A.   Butter, yes.

22    Q.   Natural butter?

23    A.   Real butter.

24    Q.   Real butter, not margarine?

25    A.   No.

Page 68

1    Q.    What about -- what about meat, does your family

2    eat meat?

3    A.    Occasionally.

4    Q.    What kind of meat?

5    A.    Chicken, pork, beef.

6    Q.    Any kind of beef in particular; ground beef,

7    sirloin, tri-tip?

8    A.    Yeah.  Usually ground beef to rib eye.

9    Q.    So are you aware that you are suing Ferrero, in

10   part, because you allege that Nutella used to have trans

11   fat?

12          MR. MARRON:  Objection; attorney-client

13   privilege.

14          If you -- if you have an independent

15   recollection other than what you've discussed with your

16   counsel, you can answer.  Otherwise, I'll instruct the

17   witness not to answer.

18          THE WITNESS:  I'm not going to answer.

19   BY MR. BISH:

20   Q.    And why is that, why aren't you going to

21   answer?

22          MR. MARRON:  She's relying on counsel's advice.

23   BY MR. BISH:

24   Q.    Everything you learned about trans fat you

25   learned from your lawyer?

1          MR. MARRON:  Objection; misstates her

2   testimony.

3          MR. BISH:  Actually, you're right -- on that

4   part, on that question.

5      Q.   So I'm asking if you are aware, sitting here

6   today, that you are suing Ferrero, in part, because

7   Nutella, you allege, used to have trans fat?  And that's

8   a yes-or-no question.

9          MR. MARRON:  Objection; attorney-client

10   privilege.

11          If you have independent knowledge other than

12   what you've discussed with your counsel, you can answer.

13   Otherwise, I'll instruct you not to answer.

14          MR. BISH:  So just to be clear, I'm asking for

15   a yes or no.  Are you going to instruct her to answer --

16   not to answer yes-or-no questions?

17          MR. MARRON:  If -- if you've learned about the

18   subject matter that he's requesting a yes-or-no answer

19   about through your attorney, then I'll instruct her not

20   to answer.  You don't have to answer that.

21          THE WITNESS:  I'm not going to answer.

22   BY MR. BISH:

23      Q.   Not going to answer, okay.

24          In your opinion, should food manufacturers be

25   prohibited from using PHVO?

1     A.     To clarify, trans fat?

2     Q.     I'm talking about partially hydrogenated

3  vegetable oil.  In your opinion, should food

4  manufacturers be prohibited from using PHVO?

5          MR. MARRON:  Objection; calls for a legal

6  conclusion.

7  BY MR. BISH:

8     Q.     I'm asking for your opinion.

9     A.     I don't know.

10    Q.     Don't know.

11           Have you given it any thought?

12    A.     No.

13    Q.     Okay.  So you don't have a position, for

14  example, on how much PHVO is too much in a product?

15    A.     I do not.

16    Q.     No position.

17           And again, in your opinion, should food

18  manufacturers be prohibited from selling products that

19  contain trans fat?  No position?

20    A.     No position.

21    Q.     Do you have -- do you have a position one way

22  or the other if a product contains trans fat, artificial

23  trans fat, whether or not it's fit for human consumption,

24  one way or the other?

25    A.     No.

1        Q.      No.

2                And same thing for PHVO.  If a product contains

3    PHVO, do you have a position one way or the other if it's

4    unfit for human consumption?

5        A.      No, I don't have a position.

6        Q.      Okay.  Are you aware of any specific health

7    risks associated with the consumption of trans fat?

8                MR. MARRON:  Objection; attorney-client

9    privilege.

10               Other than what you've learned from your

11   lawyer, if you can answer the question then do so.

12   Otherwise, I'll instruct the client not to answer.

13               THE WITNESS:  Not to answer.

14   BY MR. BISH:

15       Q.      Putting aside communication with your lawyer,

16   do you have any independent knowledge of the health risks

17   associated with the consumption of trans fat, artificial

18   trans fat?

19       A.      I've heard hearsay.

20       Q.      Hearsay.  A term that only lawyers can love.

21               And what have you heard?

22       A.      That overall it's not healthy.

23       Q.      Anything in particular?

24       A.      No.

25       Q.      No.  Now, in your complaint, do you recall

1    alleging that in December 2010 you were having

2    conversations with friends where you learned about the

3    health impacts of eating Nutella?  Do you recall that

4    allegation in your complaint?

5        A.    I'd have to reread it.

6        Q.    Okay.

7        A.    I'm not sure.

8        Q.    So stated differently, do you recall in

9    December 2010 having any conversations with anybody

10   regarding the health impacts of eating products like

11   Nutella?

12       A.    I don't recall.

13       Q.    So you don't recall having any conversations

14   with friends saying hey, do you know what's in Nutella?

15            MR. MARRON:  Objection; argumentative, she's

16   asked and answered.

17   BY MR. BISH:

18       Q.    Just want to make sure I understand, you don't

19   recall any conversations in December 2010 --

20       A.    I don't remember.

21       Q.    -- about Nutella at all?

22       A.    I don't remember.

23       Q.    Okay.  Now, so I asked about trans fat.

24            Are you aware of any potential health effects

25   of consuming saturated fats?

1     A.    I don't know.

2     Q.    You don't know.

3           What about sugar?

4           MR. MARRON:  Objection; attorney-client

5     privilege.

6           Other than what you've learned from your

7     lawyers.

8           THE WITNESS:  I know that consuming high levels

9     of sugar is definitely not good for you.

10    BY MR. BISH:

11    Q.    In what way?

12    A.    Raises your energy level up too high, too

13    quickly.  And typically you crash.

14    Q.    Is that the same -- is that the case for all

15    sugars?

16          MR. MARRON:  Objection; calls for expert --

17          THE WITNESS:  Yeah.

18          MR. MARRON:  -- opinions.

19    BY MR. BISH:

20    Q.    So I'm trying to understand.

21    A.    I wouldn't know specifically names of sugars

22    that don't.  I know diabetic's insulin, I think that's a

23    different kind of sugar.  But I don't -- I don't know

24    enough about it.

25    Q.    So my question was -- you said that consuming

Page 74

1  high levels of sugar is definitely not good for you,

2  correct?

3      A.    (No audible response.)

4      Q.    Right, so let's make a list of in what ways is

5  consuming high levels of sugar not good for you.  And

6  you've listed raises energy too fast, when you come down.

7          Anything else?

8      A.    I know --

9          MR. MARRON:  Again, objection; attorney-client

10  privilege, and also calls for an expert opinion.

11          If you have an independent knowledge, then you

12  can answer.

13          THE WITNESS:  I don't know about a knowledge,

14  but I have an opinion.  You know, you get shaky.  I know

15  my heart -- my heart rate tends to speed up a little bit.

16  And then afterwards I feel weak and -- I don't want to

17  say dysfunctional but, you know, shaky when you come down

18  off of it.

19  BY MR. BISH:

20      Q.    Anything else?

21      A.    A rough --

22      Q.    Right.

23      A.    -- idea.

24      Q.    Nothing else in particular or generally?

25      A.    (No audible response.)

Page 75

1    Q.    Okay.

2    A.    Get a little moody.

3    Q.    Moody, okay.  Got it.

4          All right.  So now my question is, you just

5    identified, we'll say four health effects of consuming

6    too much sugar.

7    A.    Uh-huh.

8    Q.    And is it your understanding, your opinion that

9    that's the same for all kinds of sugar?

10   A.    I don't know.

11   Q.    Do you draw a distinction between processed

12   sugar and nonprocessed sugar?

13         MR. MARRON:  Objection; calls for an expert

14   opinion.

15   BY MR. BISH:

16   Q.    I'm asking in your mind, do you --

17   A.    I don't -- I don't -- with the terms, with

18   those terms, I don't -- I don't know.

19   Q.    So processed sugar, unprocessed sugar doesn't

20   matter to you?

21         MR. MARRON:  Objection.

22         THE WITNESS:  I don't know.

23         MR. MARRON:  Misstates her testimony.

24   BY MR. BISH:

25   Q.    You don't know?

1    A.    I don't know.

2    Q.    Okay.  Now, what about sugar from fruit, sugar

3    in a nectarine, for example, same concerns?

4    A.    From what I understand --

5    Q.    Right.

6    A.    -- it's a healthier option for you.  It's a

7    natural sugar source -- or a natural --

8    Q.    Right.

9    A.    -- source.

10   Q.    Okay.  But you buy sugar, correct?

11   A.    Uh-huh.

12   Q.    "Yes"?

13   A.    Yes.

14   Q.    Okay.  Even though -- so you're aware of the

15   health risks that you've identified, the four health

16   risks you've identified, and you buy sugar anyways,

17   correct?

18   A.    Yes.

19   Q.    Not worried about it?

20   A.    I don't consume sugar on a ridiculously high

21   level.

22   Q.    And what does that mean?

23   A.    I use it to bake with occasionally.

24   Q.    What did you bake?

25   A.    Cookies.

1    Q.    Do you have a standard recipe for cookies?

2    A.    I don't.  I don't bake often.

3    Q.    Approximately how much sugar do you use when

4    you make cookies?

5    A.    Depends how big the batch is.

6    Q.    Okay.

7    A.    But I follow the recipe of what it calls for.

8    Q.    So you do have recipes?

9    A.    I do have recipes, uh-huh.

10   Q.    About how many?

11   A.    How many recipes or how many cookie recipes?

12   Q.    Okay.  How many cookie recipes?

13   A.    I have a book that's probably 300 pages?

14   Q.    Just for cookies or?

15   A.    Yes.

16   Q.    Holey moley.  A book I need at my house.

17         Okay.  And do you have any favorite recipes --

18   A.    I don't.

19   Q.    -- in that book of 300?

20         Out of the 300, do you recall any recipes

21   you've used?

22   A.    Macaroons, I believe.

23   Q.    Okay.  Anything else?

24   A.    No.

25   Q.    Okay.  Do you recall how much sugar you used

1   when you made macaroons?

2       A.    I do not.

3       Q.    A cup --

4       A.    I do not.

5       Q.    -- maybe?  Any -- any approximation?

6       A.    I do not.

7       Q.    Okay.

8             MR. MARRON:  Good time to take a break?

9             MR. BISH:  Sure.

10            MR. MARRON:  Okay.  Let's take five minutes.

11            THE VIDEOGRAPHER:  All agreed to go off the

12   record, we're off the record at 2:58 p.m.

13            (Recess from 2:58 p.m. to 3:11 p.m.)

14            THE VIDEOGRAPHER:  We're back on record at

15   3:11 p.m.

16   BY MR. BISH:

17      Q.    So Ms. Hohenberg, let's talk about what is

18   acceptable to you for breakfast.  We talked a little bit

19   about Eggos.

20            What else do you give your daughter --

21   daughters for breakfast?

22      A.    Typically she'll eat cereal.

23      Q.    What kind of cereal?

24      A.    Cheerios, Special K, Honey Bunches of Oats.

25      Q.    What kind of Cheerios?

Page 79

1      A.     The regular.

2      Q.     And when she eats Cheerios, does she eat

3  anything else?

4      A.     No.

5      Q.     So just Cheerios and milk?

6      A.     Yes.

7      Q.     So cereal, Eggos, anything else you ever give

8  your daughter?

9      A.     Eggs, toast, bagels and cream cheese, fruit,

10 fruit bowls.

11     Q.     Okay.  Anything else?

12     A.     (No audible response.)

13     Q.     All right.  So when it's eggs and toast, is it

14 just eggs and toast, anything else?

15     A.     Not usually.

16     Q.     When it's bagel and cream cheese, anything

17 else?

18     A.     Maybe a banana.

19     Q.     And other days, when it's just fruit?

20     A.     Uh-huh.  The fruit usually has an organic

21 granola and yogurt in it.

22     Q.     Is there a brand that you buy of that?

23     A.     I don't.  I purchase it at a cafe.

24     Q.     Oh.  What cafe?

25     A.     Katie's Cafe in -- down where I live.

Page 80

1    Q.    Okay.  What else, in your mind, is an

2    acceptable breakfast food?

3    A.    I think it can vary.  It depends on if it's

4    Sunday and pancakes or waffles are in order, or biscuits

5    and gravy.  Just kind of depends on what day of the week

6    it is.

7    Q.    Okay.  So if it's Sunday and it's pancakes,

8    what else goes with the pancakes?

9    A.    Typically hash browns, bacon or sausage, eggs.

10   Q.    Anything else?

11   A.    Orange juice.

12   Q.    OJ.

13         And if it's a biscuits and gravy day, anything

14   else?

15   A.    Orange juice, eggs.

16   Q.    So biscuits and gravy, orange juice and eggs?

17   A.    Uh-huh.

18   Q.    Okay.  What kind of gravy?

19   A.    Again, I purchase it at the cafe.

20   Q.    At Katie's?

21   A.    Uh-huh.

22   Q.    Eat there a lot?

23   A.    Maybe once -- once a week, once every two

24   weeks.

25   Q.    On weekends?

Page 81

1    A.    Yeah.

2    Q.    So out of all the breakfast we just talked

3 about, do you regard all of them as being balanced

4 breakfasts?

5    A.    I'm not a big fan of pancakes and waffles.

6    Q.    Why not?

7    A.    They're heavy.

8    Q.    What does that mean?

9    A.    I know they weigh me down.  They don't give me

10 a -- an energetic feeling.  You know, like I've just

11 eaten something healthy.

12    Q.    Yeah.

13    A.    So they're heavy to sit on the stomach.  Along

14 with the biscuits and gravy.

15    Q.    Okay.  But you feel it's -- so it's heavy, but

16 is it a balanced breakfast?

17    A.    Yeah, somewhat.

18    Q.    And do you have a definition of "balanced

19 breakfast"?

20    A.    Per se, no.

21    Q.    In general?

22    A.    I'm a homemade type of cooker, so I can cook

23 eggs and toast from scratch.  I think that's more

24 well-balanced than buying a box of Egg Beaters, or

25 something along those lines.  I don't know.

1      Q.     Okay.

2      A.     But eating fruit is healthy --

3      Q.     Uh-huh.

4      A.     -- in my opinion.

5      Q.     Okay.  But I'm just trying -- do you have any

6   general definition of the phrase "balanced breakfast"?

7      A.     Not high in sugar.

8      Q.     Anything else?

9      A.     No.

10     Q.     Does the amount of fat matter in a balanced

11  breakfast?

12     A.     I would think so.

13     Q.     Yeah, I'm asking for your understanding of

14  balanced breakfast.  And you said can't be high in sugar.

15  And I said anything else.  You said not really.

16            So what about fat?

17     A.     I would think not having high levels of fat in

18  it, I'm not -- I'm not sure.  I don't know if any of

19  those products have a lot of fat in them, so I'm not

20  sure.

21     Q.     You don't know if any of those products have

22  high levels of fat?  No?

23     A.     No.

24     Q.     Okay.  But, now, you say that Nutella on whole

25  wheat bread is not -- cannot be part of a balanced

1    breakfast?

2         A.    Correct.

3         Q.    And why is that exactly?

4         A.    Because Nutella contains a high amount of

5    sugar.

6         Q.    Any other reason?

7         A.    I don't view it as being a nutritiousness

8    balanced item to be used at breakfast.

9         Q.    Okay.  So now, when you say you think, so are

10   you talking about Nutella itself or a breakfast that

11   includes Nutella can't be balanced?

12        A.    Repeat the question.

13        Q.    Are you -- are you drawing a distinction

14   between Nutella itself or a breakfast -- for example,

15   Nutella on whole wheat toast with, you know, a glass of

16   orange juice and a glass of skim milk?

17        A.    I don't find that appropriate, no.

18        Q.    Why?

19        A.    For breakfast, because it's a high -- there's

20   too much sugar.  It's too sweet to eat as a breakfast

21   item.

22        Q.    And how much sugar is too much sugar?

23        A.    I would say when it's more than half the

24   product itself, if it's the first ingredient.

25        Q.    So how much sugar is too much sugar at

1    breakfast?

2        A.    I don't know.

3        Q.    You don't have --

4              MR. MARRON:  Objection.  That's been asked and

5    answered.  I think we're venturing into being

6    argumentative here.

7    BY MR. BISH:

8        Q.    I'm asking do you have a threshold amount of

9    sugar that is too much at breakfast?

10             MR. MARRON:  Yeah, same objection.  Do you want

11   her to quantify it in the form of grams or?

12             MR. BISH:  That'd be great.

13             MR. MARRON:  Can you quantify it in a --

14             THE WITNESS:  I can't, no.  I can't.

15   BY MR. BISH:

16       Q.    Do you know how much sugar your kids consume on

17   a given day?

18       A.    No, I do not.

19       Q.    You don't track that?

20       A.    No, I do not.

21       Q.    Do you know how many calories your kids consume

22   on a given day?

23       A.    No, I do not.

24       Q.    You don't track that?

25       A.    No.

1    Q.    How about fat?

2    A.    No.

3    Q.    Why not?

4    A.    I wasn't raised that way.

5    Q.    But is it important to you to know how much

6    sugar your kids are eating in a given day?

7    A.    It's not something I really thought about in

8    that kind of a realm.

9    Q.    How do you think about it?

10   A.    I -- I don't count calories myself so I don't

11   count calories for my three-year-old.  I know we eat

12   healthy.

13   Q.    You know you eat healthy.

14   A.    Yes.

15   Q.    Okay.  So now, if your daughter has a breakfast

16   that has sugar in the morning, do you do anything for the

17   rest of the day to make sure that your daughter has less

18   sugar throughout the rest of the day?

19   A.    I don't know that I necessarily know how much

20   sugar would be in her bowl of cereal in the morning, in a

21   bowl of Cheerios.  I don't know how much sugar is in a

22   bowl of Cheerios.

23   Q.    Okay.

24   A.    I do limit her candy intake if that's what

25   you're getting at, or something along those lines.

1    Q.    Well, I'm just trying to understand how -- do

2  you -- how do you balance your daughter's diet throughout

3  the day?  Is that something you are trying to do?  So

4  if --

5    A.    Uh-huh.

6    Q.    Is that a "yes"?

7    A.    Her school does it, yeah.

8    Q.    Her school does it?

9    A.    I send her to school with lunch.  There's

10  guidelines of what she can and cannot have in her lunch

11  pail.  They purchase a certain kind of juice that they

12  serve the children.  And when she comes home, she has her

13  dinner and either her milk or her orange juice.

14    Q.    So when -- what do you mean the school has

15  guidelines about what can be in her lunch pail?

16    A.    For instance, I cannot send her to school with

17  a fruit roll-up.

18    Q.    What about yogurt?

19    A.    Yogurt is usually fine.

20    Q.    Like GoGurt?

21    A.    Uh-huh.

22    Q.    That's okay?

23    A.    Uh-huh.

24    Q.    "Yes"?

25    A.    I haven't been told it's not okay.

1    Q.    Do you buy GoGurt?

2    A.    I do.

3    Q.    Do you give it to your daughter?

4    A.    No.

5    Q.    For breakfast?

6    A.    No.

7    Q.    For lunch?

8    A.    Yes.

9    Q.    Does your daughter ever have yogurt at

10   breakfast?

11   A.    No.

12   Q.    Why not?

13   A.    She's a particular child.

14   Q.    Okay.  What else do those guidelines say?

15   A.    No juice can be sent to school with them.  No

16   candy of any form.  Those little fruit things in a bag,

17   gummy fruits or whatever.  I don't know what those are

18   called.

19   Q.    Okay.  Does your daughter ever have cupcakes or

20   cakes at school, like for a birthday party or something?

21   A.    Occasionally.

22   Q.    Occasionally.

23         Are you okay with that?

24   A.    I am because they restrict the amount that they

25   can eat.

Page 88

1    Q.    The amount of the portion?

2    A.    Uh-huh.

3    Q.    Okay.  But it can be a regular old cupcake,

4  right, with --

5    A.    No.

6    Q.    -- plenty of sugar?

7          No?  No sugar?

8    A.    It has to be a mini cupcake.

9    Q.    What's the size of a mini cupcake?

10   A.    They're usually about that big (indicating).

11   Q.    Okay.  Any idea how much sugar is in a cupcake

12 about that big?

13   A.    I don't.

14        MR. MARRON:  For the record, she was indicating

15 about a one inch in diameter hole when she said a

16 cupcake, mini cupcake that big.

17 BY MR. BISH:

18   Q.    Is that in the guidelines at the school?

19   A.    Yes, it is.

20   Q.    Specifications about how big the cupcake has to

21 be?

22   A.    Yes.

23   Q.    Okay.  And you have those guidelines?

24   A.    Somewhere.

25   Q.    In your house?

1    A.    Uh-huh.  Yes.

2    Q.    So on the days that your daughter has a cupcake

3  at school, presumably with sugar in it, correct, do you

4  try to restrict the amount of sugar she has at home?

5    A.    Yes, I do.

6    Q.    So if she has a cupcake at school, then you --

7  you try to limit the amount of sugar she has the rest of

8  the day?

9    A.    Correct.

10    Q.    You can balance, right?

11    A.    Yes.

12    Q.    And if she had a healthy lunch at school, say

13  salads and, you know, whatever you consider to be

14  healthy, then maybe you're more inclined to let her have

15  sugar at home, correct?

16    A.    On the rare occasion, yes.

17    Q.    On the rare occasion.

18    A.    We don't eat a lot of sweets.

19    Q.    Okay.  Is it acceptable to serve syrup at

20  breakfast, in your opinion?

21         MR. MARRON:  Objection; incomplete

22  hypothetical, assumes facts not in evidence.

23         You can answer.

24         THE WITNESS:  I don't like syrup, so I don't

25  serve syrup.

Page 90

1   BY MR. BISH:

2       Q.    Would you have an objection to a company

3   advertising syrup as a breakfast food?

4             MR. MARRON:  Objection; form of the question.

5             THE WITNESS:  I guess not.

6   BY MR. BISH:

7       Q.    And why not?

8       A.    Because it's something you typically top a

9   pancake or a waffle with.

10      Q.    But it has a lot of sugar in it, correct?

11      A.    I don't know.

12      Q.    You don't know if syrup has sugar in it?

13      A.    I haven't read the label.

14      Q.    What about jelly, is it acceptable to serve

15  jelly at breakfast, in your opinion?

16            MR. MARRON:  Yeah, just -- objection; the form

17  of the question again, incomplete hypothetical.  It

18  depends on what kind of jelly or syrup, I would imagine.

19            MR. BISH:  You would imagine?  Your turn's

20  next.

21            MR. MARRON:  Okay.

22  BY MR. BISH:

23      Q.    So why don't you give it a shot.

24      A.    I'd have to agree with that statement.  You

25  know, jam and jelly is a lot of sugar.

1       Q.      Right.

2       A.      I used to make it growing up.

3       Q.      So let's talk about the jelly you buy,

4   Smuckers.

5       A.      Uh-huh.

6       Q.      Is it acceptable for Smuckers to advertise

7   jelly as a breakfast food?

8       A.      I don't know.

9               MR. MARRON:  Objection; calls for a legal

10  conclusion.

11  BY MR. BISH:

12      Q.      Well, have you sued Smuckers for advertising

13  its products as a breakfast food?

14      A.      I've never entered into another lawsuit.

15      Q.      So that's a no, right?

16      A.      No.

17      Q.      Okay.  What about muffins, are muffins an okay

18  breakfast food?

19              MR. MARRON:  Objection; incomplete

20  hypothetical, form.

21              You can answer.

22              THE WITNESS:  Occasionally.

23  BY MR. BISH:

24      Q.      Occasionally.

25              Do you ever eat at Starbucks?

1    A.    I don't.

2    Q.    Do you have any objection to Starbucks having

3    blueberry muffins available for breakfast?

4    A.    I don't care.

5    Q.    You don't care because you don't go to

6    Starbucks?

7    A.    I don't.

8    Q.    Katie's, do they sell muffins at breakfast?

9    A.    They have muffins on the counter.

10   Q.    Yeah.  What kind?

11   A.    I don't know.

12   Q.    You don't buy them?

13   A.    Nope.

14   Q.    Any objection to Katie's Cafe selling muffins

15   at breakfast?

16   A.    I don't care.

17   Q.    What about coffee cake, is that an acceptable

18   breakfast food, in your opinion?

19   A.    No.

20   Q.    No.

21         Why not?

22   A.    It's too sweet.

23   Q.    All coffee cake is too sweet for breakfast?

24   A.    I don't know about all.  I haven't tried all.

25   Q.    Right.

1          In general, though?

2     A.    The ones that I've eaten, yes, they're too

3     sweet.

4     Q.    Banana bread, is that an acceptable breakfast

5     food?

6     A.    Occasionally.

7     Q.    Pumpkin bread, is that an acceptable breakfast

8     food?

9     A.    Occasionally maybe.

10    Q.    What else do you put on your ice cream?

11    A.    Hot fudge or caramel.

12    Q.    Any particular brand?

13    A.    I don't recall.

14    Q.    Anything else?

15    A.    No.

16    Q.    What about whipped cream?

17    A.    Not usually.

18    Q.    Ever buy whipped cream?

19    A.    Have I ever bought whipped cream?

20    Q.    Yeah.

21    A.    I don't think so.

22    Q.    Do you consider your daughter an active kid?

23    A.    Yes.

24    Q.    Very?

25    A.    Uh-huh.

1    Q.    Okay.  Sports?

2    A.    She's not real -- old enough for sports, per

3    se, but she likes to kick balls around.

4    Q.    Like your three-year-old is an unbelievable

5    soccer player, so...

6    A.    Maybe some day.

7    Q.    Okay.  But very active?

8    A.    Yes.

9    Q.    Gets enough exercise?

10    A.    Yes.

11    Q.    Wouldn't -- you wouldn't characterize her as

12    leading a sedentary lifestyle, for example?

13    A.    No.

14    Q.    No, okay.

15          So we talked earlier about when you decided to

16    buy Nutella.  Were you buying it for your daughter, for

17    you or for both?

18    A.    For both.

19    Q.    Both, okay.

20          And what were you seeking to buy, what were you

21    trying to buy when you bought Nutella?

22    A.    Oh, I'm sorry.

23    Q.    What were the characteristics you were looking

24    for?

25    A.    For me, an alternative to peanut butter.  For

1   her, additional well-balanced nutritiousness, healthy

2   alternative for breakfast.

3        Q.    For breakfast?

4        A.    Correct.

5        Q.    What about as a snack?

6        A.    I didn't really buy it as a snack.

7        Q.    And did you want the breakfast to taste good?

8        A.    One would hope, yes.

9        Q.    Yes.  So you were looking for a healthy

10  breakfast that tasted good, right?

11            MR. MARRON:  Objection; misstates her

12  testimony.

13            THE WITNESS:  I was looking for a balanced,

14  healthy alternative.

15  BY MR. BISH:

16       Q.    Okay.  That tasted good?

17       A.    That tasted good.

18       Q.    And we can agree that Nutella tastes pretty

19  good, right?

20       A.    It does taste good.

21       Q.    But now you have come to believe that Nutella

22  on whole wheat bread -- whole wheat toast is not a

23  balanced, healthy alternative, correct?

24       A.    Correct.

25       Q.    And that's because of the sugar?

Page 96

1      A.    Yes.

2      Q.    Anything else?

3      A.    No.

4      Q.    The amount of fat in Nutella was acceptable to

5   you?

6      A.    At the time I was unaware.

7      Q.    What about now?

8           MR. MARRON:   Objection; attorney-client

9   privilege.

10           Other than what you've learned from your

11   counsel, if you can answer the question, please do so.

12           THE WITNESS:   I'm not going to answer.

13   BY MR. BISH:

14      Q.    I've asked if it was acceptable -- if the

15   amount of sugar in Nutella is acceptable to you now as a

16   breakfast food?   I'm sorry.   I'm sorry.   Let me rephrase.

17           Is the amount of fat in Nutella acceptable,

18   acceptable to you now as a breakfast food?

19           MR. MARRON:   Objection; attorney-client

20   privilege.

21           Other than what you've learned from your

22   counsel, if you can answer the question.   If you cannot

23   without divulging what attorney-client communications,

24   instruct the witness not to answer.

25           THE WITNESS:   I'm not going to answer.

1  BY MR. BISH:

2      Q.    Okay.  So if -- if sugar is off the table,

3  okay, if there was -- say there was zero grams of sugar

4  in Nutella, would it be acceptable breakfast food to you

5  now?

6              MR. MARRON:  Yeah, same objection.

7              THE WITNESS:  Not going to answer.

8  BY MR. BISH:

9      Q.    Because of attorney-client privilege?

10     A.    Correct.

11     Q.    Okay.  I'm struggling to figure out how

12  conversations between your lawyer and you are invaded if

13  I'm asking you, if you were standing -- if you had a jar

14  of Nutella in your kitchen, and it had zero grams of

15  sugar, would you be willing to give it to your daughter

16  today, yes or no?

17             MR. MARRON:  Objection; that's an incomplete

18  hypothetical.

19             If she's learned about certain facts regarding

20  the contents of Nutella through her attorney, that would

21  be divulged through -- with her answer, then I'd instruct

22  her not to answer it.

23             But if you have an independent, you know,

24  information or knowledge of --

25             Anyway, if you could rephrase the question

1    maybe.

2             MR. BISH:  Is there an instruction there?

3             MR. MARRON:  I believe I stated my objection,

4    but could you repeat the question, please.

5             MR. BISH:  Go ahead and read it back.

6             (The record was read as follows:

7             Q    Okay.  I'm struggling to figure out

8             how conversations between your" --)

9             MR. BISH:  I'm sorry.  The question before.

10   Let me see if I can help you here.

11            THE DEPOSITION OFFICER:  I've got it.

12            (The record was read as follows:

13            Q    Okay.  So if -- if sugar is off the

14            table, okay, if there was -- say there was

15            zero grams of sugar in Nutella, would it

16            be acceptable breakfast food to you now?)

17            MR. MARRON:  I guess I'd object on the basis of

18   form.  And with respect to it being vague and ambiguous,

19   that the word "acceptable."

20            But you can answer the question, if you

21   understand it.

22            THE WITNESS:  I don't understand it.  I'm not

23   going to answer.

24   BY MR. BISH:

25        Q.    What don't you understand?

Page 99

1      A.    The question in general and today.

2      Q.    Is the amount of fat in a serving of Nutella

3   acceptable or unacceptable to you as a breakfast food?

4      A.    I don't know.

5      Q.    You don't know.

6            Have you given any thought to how much fat is

7   acceptable at breakfast?

8      A.    No.

9      Q.    Why not?

10     A.    Because I haven't.

11     Q.    Do you agree with me that some amount of fat is

12   a good thing at breakfast?

13           MR. MARRON:  Objection; calls for an expert

14   opinion.

15   BY MR. BISH:

16     Q.    I'm asking if you agree.

17     A.    I don't know.

18     Q.    You don't know.

19           MR. MARRON:  And form.

20   BY MR. BISH:

21     Q.    Do you strive to give your kids a no-fat

22   breakfast?

23     A.    I don't look at the -- the ingredients in that

24   aspect.

25     Q.    Do you ever look at the ingredients of a

1    product?

2         A.    Occasionally.

3         Q.    What would cause you to look at the ingredients

4    of a product?

5         A.    Tasting, taste.

6         Q.    So you look to the ingredients to see what it's

7    going to taste like?

8         A.    No, after I've tasted it.

9         Q.    Okay.  What are you looking for?

10        A.    What it's made out of.

11        Q.    Okay.  What about the nutrition facts panel of

12   a product, do you ever look at that?

13        A.    Occasionally.

14        Q.    What -- in what circumstances do you look at

15   the nutrition facts panel?

16        A.    Sitting on a kitchen counter and I'm bored.

17        Q.    Not to inform yourself about what's in a

18   product or not?

19        A.    Occasionally.

20        Q.    And on what occasions do you recall looking at

21   the nutrition facts panel of a product?

22        A.    If a conversation came up amongst friends or

23   something, I might be curious to know how much protein's

24   in something.

25        Q.    Have you ever looked at the guidelines issued

1    by the American Heart Association regarding the amount of

2    calories and fat that one ought to consume in a day?

3         A.    I'm sorry, repeat the question.

4         Q.    Have you ever looked at the guidelines issued

5    by the American Heart Association regarding the amount of

6    calories and fat that humans are supposed to consume in a

7    day?

8         A.    No.

9         Q.    Do you know if the complaint alleges facts

10   about those guidelines from the American Heart

11   Association?

12        A.    I believe it does.

13        Q.    But you never looked at the guidelines?

14        A.    From the American Heart Association?

15        Q.    Uh-huh, yes.

16        A.    Like on their website?

17        Q.    Or anywhere.

18        A.    No.

19        Q.    But it's in your complaint against Ferrero,

20   correct?

21        A.    I believe so.

22              MR. MARRON:  Dale, when you get a chance, just

23   do a little housekeeping because Athena's got her

24   daughter, she's got to make arrangements for her.  Do you

25   have any idea how late we're going to be here or how much

1    longer you have, just so we can make phone calls?

2         MR. BISH:  I'd say at least two more hours.

3         MR. MARRON:  Okay.  So that would be --

4         MR. BISH:  Do you need to take a break and make

5    some phone calls?

6         MR. MARRON:  Yeah, if we could go off the

7    record and make a couple phone calls that would be

8    helpful.

9         THE VIDEOGRAPHER:  I'm going to change out the

10   tape since we're getting at that ten-minute warning.

11        MR. MARRON:  Thank you.

12        THE VIDEOGRAPHER:  This concludes media number

13   1, Volume I, in the deposition of Athena Hohenberg.

14   We're off the record at 3:41 p.m.

15        (Recess from 3:41 p.m. to 3:51 p.m.)

16        THE VIDEOGRAPHER:  This is the start of media

17   number 2, Volume I, in the deposition of Athena

18   Hohenberg.  We're on the record at 3:51 p.m.

19   BY MR. BISH:

20   Q.    So before we broke we were talking about the

21   American Heart Association guidelines, right?

22   A.    Correct.

23   Q.    And I'd asked if you'd ever reviewed the

24   American Heart Association guidelines for how much -- how

25   many calories to eat in a day, correct?

1    A.    Correct.

2    Q.    Have you?

3    A.    I don't -- I don't recall.

4    Q.    And what about fat?

5    A.    I don't recall.

6    Q.    And what about sugar?

7    A.    I don't recall.

8    Q.    Have you ever looked at any guidelines for how

9    much sugar to eat each day?

10    A.    I might have.  I don't know.

11    Q.    So you don't have in your mind -- sitting here

12    today, you don't have any guidelines about how much sugar

13    to eat each day, do you?

14          MR. MARRON:  Objection; form.

15          THE WITNESS:  No, I don't.

16    BY MR. BISH:

17    Q.    For you or your kid, your daughter?

18    A.    No, I don't.

19    Q.    Now, you said that you don't eat a lot of

20    sweets, correct?

21    A.    Correct.

22    Q.    That's your decision for your family, right?

23    A.    Correct.

24    Q.    Other people will have made different

25    decisions, right?

1      A.      To each their right.

2      Q.      Right.

3              Other people might be fine with more sugar at

4      breakfast, correct?

5      A.      Correct.

6      Q.      You've just taken for you -- your personal

7      decision is not that much sugar at breakfast, right?

8      A.      Not that much sugar period, correct.

9      Q.      And that decision was just based on your feel,

10     correct?

11     A.      Correct.

12             MR. MARRON:  Objection; form.

13             If you could just pause --

14             THE WITNESS:  Sorry.

15             MR. MARRON:  -- so I can object.

16     BY MR. BISH:

17     Q.      And that decision wasn't based on scenes, was

18     it?

19             MR. MARRON:  Objection; form.

20             THE WITNESS:  No.

21     BY MR. BISH:

22     Q.      Wasn't based on any guideline, was it?

23     A.      No.

24     Q.      Just your individual decision, correct?

25     A.      Correct.

1    Q.    Okay.  Have you ever looked at the FDA

2   guidelines for how much fat to eat each day?

3    A.    No.

4    Q.    So before I was talking about American Heart

5   Association, now I'm talk about the FDA guidelines.

6    A.    Uh-huh.

7    Q.    You understand?

8    A.    Correct.

9    Q.    Do you know what the FDA is?

10    A.    I do, yeah.

11    Q.    Well, Food and Drug Administration.

12    A.    There you go, thank you.

13    Q.    Okay.  But you are aware that human beings do

14   need fat, correct?

15    A.    Correct.

16    Q.    Okay.  You just don't know how much fat, right?

17    A.    Correct.

18         MR. MARRON:  Objection; form.

19   BY MR. BISH:

20    Q.    And if you wanted to find out how much fat one

21   ought to consume in a day, where would you look?

22    A.    I'd probably Google it.

23    Q.    Would you place considerable weight on what the

24   Food and Drug Administration has to say about that?

25         MR. MARRON:  Objection; form, it calls for an

1   expert opinion.

2           You can answer if you care to.

3           THE WITNESS:  Repeat the question.

4   BY MR. BISH:

5       Q.    Well, my question is would you place

6   considerable weight on what the Food and Drug

7   Administration had to say about the amount of fat one

8   ought to consume in a day?

9       A.    I don't know.

10      Q.    You don't know?

11      A.    No.

12      Q.    Do you find the Food and Drug Administration to

13  be a credible source of information?

14          MR. MARRON:  Objection; form.

15          THE WITNESS:  I don't know.

16  BY MR. BISH:

17      Q.    You don't know if the FDA is a credible source

18  on nutrition?

19          MR. MARRON:  Objection; asked and answered,

20  argumentative.

21          THE WITNESS:  I would assume that they would

22  be, yes.

23  BY MR. BISH:

24      Q.    Is there any more credible organization or

25  government entity that you would look to?

1          MR. MARRON:  Objection; form, calls for

2     conjecture, incomplete hypothetical.

3          THE WITNESS:  I'm not aware.

4     BY MR. BISH:

5     Q.    Well, you find the American Heart Association

6     to be credible, correct?

7     A.    One would think.

8     Q.    You cited it -- you cited the American Heart

9     Association in your complaint, right?

10    A.    Okay.  Yes.

11    Q.    So you find that to be a credible source for

12    nutritional information, right?

13    A.    Yes.

14    Q.    Okay.  Now, if the American Heart Association

15    recommends eating between 50 and 70 grams of fat a day,

16    do you have any reason to believe that is an incorrect

17    number?

18          MR. MARRON:  Objection; form, incomplete

19    hypothetical.

20          You can answer.

21          THE WITNESS:  If that's what the recommendation

22    is.

23    BY MR. BISH:

24    Q.    But you've never looked?

25    A.    I don't recall.

1      Q.    Do you have any reason to believe you did look

2   for the American Heart Association's recommendation for

3   fat in a day?

4           MR. MARRON:  Objection; calls for conjecture.

5   She's been asked and answered.

6           THE WITNESS:  Do I need to answer that again?

7   BY MR. BISH:

8      Q.    It's the first --

9      A.    Repeat the question.

10     Q.    It's the first time I asked it.  Do you have

11  any reason to believe that you did look for the American

12  Heart Association's recommendation on the amount of fat

13  to consume in a day?

14     A.    That I did believe -- I'm not understanding the

15  question to be different from the prior question.

16     Q.    Do you recall looking?  It's a pretty

17  straightforward question.

18     A.    On the American Heart Association's --

19     Q.    Website, anywhere?

20          MR. MARRON:  Yeah, I think that's been asked

21  and answered.

22          THE WITNESS:  Yeah, it has.

23  BY MR. BISH:

24     Q.    And the answer is no, correct?

25     A.    Correct.

1    Q.    Did you ever look at the Nutella website?

2    A.    No, I have not.

3    Q.    Never?

4    A.    No.

5    Q.    And just to clarify what we talked about

6    earlier, you bought Nutella because you thought Nutella

7    itself was a well-balanced product for breakfast?

8         MR. MARRON:  Yeah, objection.  It's been asked

9    and answered.  I don't know how many times you want her

10   to -- you know, to ask the question.  But I think you've

11   already asked it once.  So...

12        MR. BISH:  I'm just trying to clarify.

13        MR. MARRON:  You're trying to get her to say

14   something different than she testified to earlier.  It's

15   argumentative.

16        THE WITNESS:  Ask the question again, please.

17   BY MR. BISH:

18   Q.    Did you buy Nutella because you thought it was

19   a well-balanced breakfast product, the Nutella itself?

20   A.    The container, correct.

21   Q.    Not because it could be part of a well-balanced

22   meal?

23        MR. MARRON:  Objection.  It's been asked and

24   answered.  She answered that.

25        THE WITNESS:  Yeah.

1    BY MR. BISH:

2        Q.     No?

3        A.     It's repetitive at this point.

4        Q.     The last --

5               MR. MARRON:  Yeah, I'll instruct my client not

6    to answer because you've already asked her this question.

7    BY MR. BISH:

8        Q.     You've never looked at the nutrition fact panel

9    on Nutella, right?

10       A.     Repeat the question.

11       Q.     You have never looked at the nutrition fact

12   panel on Nutella, right?

13       A.     Never?

14       Q.     Never.

15       A.     No, that's incorrect.

16       Q.     When did you?

17       A.     After I purchased it.

18       Q.     How long after?

19       A.     I'm unaware.

20       Q.     While you were still eating it?

21       A.     Most likely, yes.

22              MR. MARRON:  I'd caution my client, rather than

23   speculate, if you have an independent recollection of

24   when -- of when you did something, then it's okay to

25   estimate, give your best recollection.  But rather than

1    engage in any conjecture or speculation, I'd just caution

2    you if you don't have a specific recollection --

3              THE WITNESS:  Okay.

4              MR. MARRON:  -- to state that.

5              THE WITNESS:  Okay.

6              MR. BISH:  I'm going to mark as Defendant's

7    Exhibit 2 -- this is a copy.  Sorry.

8              (The document referred to was marked by

9              the CSR as Deposition Exhibit 2 for

10             identification and attached to the

11             deposition transcript hereto.)

12             MR. BISH:  For the record, I've -- Defendant's

13   Exhibit 2 is a copy of the master consolidated

14   complaint -- no.

15             MR. MARRON:  No.  Actually, it's not.

16             MR. BISH:  First amended consolidated

17   complaint.

18             MR. MARRON:  Is this -- are you marking this as

19   Exhibit 1 or as Exhibit 2, because we have the initial

20   complaint here before us, the one that was filed on --

21             MR. BISH:  Oh, you're right.

22             MR. MARRON:  -- February 1st, 2011.

23             MR. BISH:  You're right.  Keep that and we'll

24   add to it.

25             MR. MARRON:  Okay.

1          (The document referred to was marked by
2           the CSR as Deposition Exhibit 3 for
3           identification and attached to the
4           deposition transcript hereto.)
5          MR. BISH:  I'll state for the record, while the
6    witness is reviewing the documents, Defendant's Exhibit 2
7    is a copy of the complaint filed on February 1st, 2011.
8    Whereas Defendant's Exhibit 3 is a copy of the first
9    amended consolidated complaint.
10         MR. MARRON:  Can I get -- let's see what we've
11   got here.  Never mind.
12         Okay.  Which document, in particular, would you
13   like her to look at?
14   BY MR. BISH:
15     Q.    Ms. Hohenberg, have you had an opportunity to
16   review the exhibits I've handed you?
17     A.    Yes.
18     Q.    Okay.
19         MR. MARRON:  Can I ask you a question?  Which
20   complaint are you asking her -- do you want her to
21   reference the first one first or the -- or the
22   consolidated one?  Is there any one in particular you
23   want her --
24         MR. BISH:  We're going to do both.
25         MR. MARRON:  Okay.  All right.  Which one are

1    you going to refer to for the first set of questions?

2             MR. BISH:  I'm about to ask the question.

3             MR. MARRON:  Okay.  Okay.

4    BY MR. BISH:

5        Q.    Starting with Defendant's Exhibit 2, which is

6    the complaint.  Exactly.  And if you could turn to page 3

7    of Defendant's Exhibit 2, paragraph 10.

8             Are you with me?

9        A.    Correct.  Yes, I am.

10       Q.    The first sentence, Ms. Hohenberg, is a

11   four-year-old child.  We talked about that earlier, that

12   was not correct?

13       A.    Correct.

14       Q.    Okay.  The second sentence:

15               At various times during the class

16            period, Ms. Hohenberg purchased Nutella spread

17            after being exposed to relying upon

18            advertisements and representations by Defendant

19            that Nutella is a healthy breakfast and is

20            nutritious.

21            See that?

22       A.    (No audible response.)

23       Q.    Now, you only bought it once, correct?

24       A.    Correct.

25       Q.    Not at various times?

1     A.    No.

2     Q.    So that sentence is incorrect as well, right?

3     A.    Correct.

4     Q.    Now, if you go to paragraph 11, the one below,

5  you see where it says:

6             In and around December 2010,

7          Ms. Hohenberg learned through friends what

8          ingredients were in the Nutella that she was

9          feeding her family.

10         You see that?

11    A.    Uh-huh.

12    Q.    And that's not correct, is it?

13    A.    I don't know whether it is or isn't.  You've

14  asked me that question already --

15    Q.    Right.

16    A.    -- and I couldn't recall the days.

17    Q.    Sitting here today, you don't recall talking in

18  December 2010 to friends about Nutella, right?

19    A.    I don't know if it was December.

20    Q.    But you did talk to friends about Nutella?

21    A.    I was -- I had a conversation about Nutella.

22    Q.    And who were those friends?

23    A.    Various people, acquaintances.

24    Q.    Would you name them?

25    A.    I don't recall.

Page 115

1    Q.    You don't have any recollection as to who you

2    discussed Nutella with?

3    A.    I don't.

4    Q.    Okay.  Okay.  You can put -- put that complaint

5    aside.  Let's talk about Defendant's Exhibit 3, which is

6    the first amended consolidated complaint.

7            Looking at paragraph 9, you see the second

8    sentence -- or I'm sorry, it's the first sentence:

9                After being exposed to Ferrero's

10               long-term misleading advertising campaign

11               described herein and the reliance on various

12               Ferrero statements, Plaintiffs purchased

13               Nutella throughout the class period.

14               Do you see that?

15   A.    Yes.

16   Q.    Again, you only purchased it once, right?

17   A.    Correct.

18   Q.    You didn't purchase it in 2000, did you?

19   A.    I'm sorry, when?

20   Q.    You didn't purchase Nutella in 2000, did you?

21   A.    In 2000?

22   Q.    Yeah.

23   A.    No.

24   Q.    Are you aware of the class period that you're

25   alleging in this complaint?

1    A.    The class period?

2    Q.    What are the dates of the class period in your

3    complaint?

4    A.    This?

5          MR. MARRON:  Objection; calls for a legal

6    conclusion.

7          THE WITNESS:  As far as when this all started?

8    BY MR. BISH:

9    Q.    And when was that?

10   A.    I'm asking you a question.  What are you asking

11   me?

12   Q.    Yeah, I'm asking if you know what the class

13   period is in your complaint.

14   A.    I'm not understanding what that means.

15   Q.    You're not familiar with the phrase "class

16   period"?

17   A.    If you can define it, please.

18   Q.    Okay.  Okay.  If you'll look on page 30 of

19   Defendant's Exhibit 3.  At the bottom of page 30,

20   paragraph 119.

21         See that?

22   A.    Uh-huh.  Yes.

23   Q.    Okay.  If you flip to the next page, when

24   you're done reading.

25   A.    Okay.

1    Q.    Do you see where class period is defined?

2    A.    Yes.

3    Q.    "On or after January 1, 2000," you see that?

4    A.    Correct.

5    Q.    Why did you bring a lawsuit on behalf of

6    everybody back to January 1, 2000?

7          MR. MARRON:   Objection; attorney-client

8    privilege.

9          If your understanding of why we brought a

10   lawsuit back to 2001 -- I mean back to 2000 is derived

11   from a conversation you had with your lawyer, then I'm

12   going to instruct the client not to answer.

13         THE WITNESS:   Okay.

14   BY MR. BISH:

15   Q.    Can you answer?

16   A.    No.

17   Q.    Everything you know about the class period you

18   learned from your lawyer?

19   A.    Correct.

20   Q.    Okay.  For example, you didn't see any

21   advertisements for Nutella dating back to January 1,

22   2000, did you?

23   A.    Repeat the question.

24   Q.    You didn't see any advertisements for Nutella

25   dating back to January 1st, 2000, did you?

1       A.      I don't believe so.

2       Q.      And you didn't buy Nutella in January 2000, did

3   you?

4       A.      No, I did not.

5       Q.      And the first time you saw any advertisement

6   for Nutella was in 2009, correct?

7       A.      I believe so, yes.

8       Q.      You didn't see any ads in 2008?

9       A.      Not that I'm aware of.

10      Q.      2007?

11      A.      Not that I'm aware of.

12      Q.      2006?

13      A.      Not that I'm aware of.

14      Q.      2005?

15      A.      Not that I'm aware of.

16      Q.      Okay.  No ad before -- whatsoever, before

17  January 2000 -- before 2009, correct?

18      A.      To my best recollection.

19      Q.      Okay.  If you'll go back to paragraph 10:

20              Plaintiff Athena Hohenberg is and was at

21  all relevant times herein a resident of the

22  County of San Diego in California who purchased

23  Nutella during the class period defined herein

24  for herself and her four-year-old child because

25  she sought a healthy snack or breakfast

1    alternative for her household.

2    Is that an accurate allegation?

3    MR. MARRON:  Objection; compound.  But you --

4    she's already pointed out that there's a four -- that her

5    child's not four years old.  Sloppy lawyering on my part.

6  BY MR. BISH:

7    Q.    Were you seeking a healthy snack for your

8  household?

9    A.    I was seeking a breakfast item.

10   Q.    Not a snack?

11   A.    It could have been an occasional snack.

12 "Healthy" being the key word.

13   Q.    Okay.  If you look at paragraph 15, the next

14 page, it's a short one:

15         Sales of Nutella in California are

16         greater than in any other single state in the

17         nation.

18   MR. MARRON:  Objection; attorney-client

19 privilege.

20   If the question that you're going to ask is --

21 well, go ahead and ask the question first, I guess.

22 BY MR. BISH:

23   Q.    Do you have any evidence to support this

24 allegation?

25   MR. MARRON:  Objection; attorney-client

1    privilege.

2         Other than what you've learned from your

3    counsel, if you have any independent knowledge or

4    evidence that supports that allegation.

5         THE WITNESS:  I'm not going to answer.

6    BY MR. BISH:

7    Q.    Well, this is a yes-or-no question:  Do you

8    have any evidence whatsoever to support this allegation?

9         I'm not asking you for what you told your

10   lawyers, what they told you.  I'm asking have you seen

11   any evidence whatsoever to support that allegation?

12   A.    No.

13   Q.    And if you look at paragraph 20:

14             Plaintiffs have incurred and during the

15             pendency of this action will incur attorney's

16             fees and costs herein.

17             Do you see that?

18   A.    Yes.

19   Q.    You have incurred attorney's fees?

20   A.    I'm sorry?

21   Q.    You have incurred attorney's fees?

22        MR. MARRON:  Yeah, objection; calls for a legal

23   conclusion.

24        THE WITNESS:  I don't understand the question.

25   ///

Page 121

1    BY MR. BISH:

2        Q.    Do you understand the allegation?

3        A.    Of paragraph 20?

4        Q.    Yes.

5        A.    No, I do not.

6        Q.    Have you paid your lawyers any money out of

7    pocket?

8        A.    No, I haven't.

9        Q.    Have your lawyers issued you any invoice for

10   their work?

11       A.    No.

12       Q.    Do you know if your lawyers are on a

13   contingency fee basis?

14       A.    I don't know.

15       Q.    Do you know how much the contingency fee --

16   well, if you don't know, I guess you don't know how

17   much --

18       A.    Correct.

19       Q.    -- the rate would be, okay.

20             Okay.  If you could turn to paragraph 70.  I'm

21   going to ask you a question about the last sentence, but

22   feel free to read the whole thing if you want.

23             (Document reviewed by witness.)

24             MR. MARRON:  Dale, when it's convenient, could

25   we can get off the record for a refill?

1          MR. BISH:  Just water?

2          MR. MARRON:  No.  I was going to get some 7-Up.

3          MR. BISH:  Sure.

4          MR. MARRON:  Yeah.

5          MR. EGGLETON:  Could we go off the record for a

6     minute?

7          MR. MARRON:  Is that okay?

8          MR. BISH:  Yeah.

9          THE VIDEOGRAPHER:  We're all agreed to go off

10    the record --

11         MR. BISH:  Off the record.

12         THE VIDEOGRAPHER:  -- we're off the record at

13    4:16 p.m.

14         (Recess from 4:16 p.m. to 4:24 p.m.)

15         THE VIDEOGRAPHER:  We're back on record at

16    4:24 p.m.

17    BY MR. BISH:

18     Q.    I'm actually going to ask about paragraph 74:

19          Nutella also uses genetically modified

20          soy lecithin which has been genetically

21          engineered and sprayed with pesticides and is

22          not healthy for children's growth and

23          development.

24          You see that?

25     A.    Yes, I do.

1   Q.    Do you have any factual basis to support that

2   allegation?

3        MR. MARRON:  Yeah, objection on attorney-client

4   privilege.

5        Other than information or evidence that may

6   have been presented through your attorneys, do you have

7   independent knowledge of or any evidence of this to help

8   support this allegation?

9        THE WITNESS:  No.

10  BY MR. BISH:

11   Q.    So it's a yes-or-no question if you have any

12  evidence one way or the other that would support this

13  allegation.

14   A.    Answer's still no.

15   Q.    Okay.  If you look at paragraph 76.

16   A.    (Witness complies.)

17   Q.    Feel free to read the whole thing.

18        (Document reviewed by witness.)

19        THE WITNESS:  Okay.

20  BY MR. BISH:

21   Q.    Do you recall approving this allegation in

22  paragraph 76?

23        MR. MARRON:  Objection; attorney-client

24  privilege.

25        If you can -- I guess I'll object to the form

Page 124

1    of the question too.

2           If you can answer the question without

3    divulging any attorney-client communications, I'd

4    instruct you to do so.

5    BY MR. BISH:

6        Q.    It's just a yes-or-no question.

7        A.    Can you rephrase the question, then.

8        Q.    Do you recall if you approved the allegations

9    of paragraph 76 before this complaint was filed?

10       A.    I don't recall.

11       Q.    Okay.  So if you look at the -- well, I guess

12   it's all one sentence.  So picking at parts:

13             Throughout the class period --

14             And you'll recall the class period --

15       A.    Yes.

16       Q.    -- is 2000 to the present:

17             Throughout the class period, Ferrero

18             engaged and members of the class were exposed

19             to a long-term advertising campaign in which

20             Ferrero utilized various forms of media

21             included but not limited to print advertising

22             on the Nutella label and elsewhere, websites,

23             television commercials, physicians, and unpaid

24             press coverage.

25             I'll stop there, but I can keep reading

1          if you want.

2                   My question is:  Do you have any reason

3          to believe that Nutella was advertised on

4          television throughout the class period.

5      A.   I'm not sure if it was or wasn't.

6      Q.   Do you have any reason to believe that Nutella

7   was advertised in print advertisements throughout the

8   class period?

9      A.   I'm not sure if it was or wasn't.

10      Q.   Do you have any reason to believe that Nutella

11   was advertised on the website throughout the class

12   period?

13      A.   I'm not sure if it was or wasn't.

14      Q.   If you're not sure, then why would you make

15   this allegation?

16          MR. MARRON:  Objection; argumentative.

17          THE WITNESS:  I don't know.

18   BY MR. BISH:

19      Q.   Other than the label on this jar, the jar that

20   you bought, and you can feel free to take a look at it.

21      A.   Okay.

22      Q.   Have you seen any other label for Nutella ever?

23      A.   I don't think so, no.  I'm not sure.  I don't

24   think so.

25      Q.   So you don't -- sitting here today, you don't

1    recall seeing a label other than the one on this jar

2    which, I believe, is the one you bought.

3        A.    I don't recall it.

4            MR. MARRON:  We'll stipulate, Counsel, that

5    that's the only label that she's -- that this particular

6    class representative has seen.

7    BY MR. BISH:

8        Q.    And now, this is the label with the nutrition

9    facts panel that you looked at some time after you bought

10   Nutella, correct?

11       A.    Whether it's the same or not, I'm not sure.

12       Q.    Okay.  When you looked at the nutrition facts

13   panel after you bought Nutella, did you learn anything

14   from it?

15           MR. MARRON:  As she sits here today or at the

16   time?

17   BY MR. BISH:

18       Q.    At the time.

19       A.    In the nutrition facts box?

20       Q.    Yeah.

21       A.    I did, yes.

22       Q.    What did you learn?

23       A.    That it had a high amount of sugar in it.

24       Q.    And now, when you -- anything else?

25       A.    Second ingredient is palm oil.

1    Q.   Does that mean anything to you?

2    A.   It's a form of fat, I believe.  I learned --

3    MR. MARRON:  He's just talking about the -- is

4 there -- I mean, he's trying to --

5    THE WITNESS:  Yeah.

6 BY MR. BISH:

7    Q.   I'm asking what -- I want everything you

8 learned from the facts panel when you looked at it.

9    A.   That it wasn't a hazelnut spread.

10    Q.   And what do you mean by that?

11    A.   Well, in purchasing it, as previously stated

12 before, after seeing the advertisement, aside from the

13 fact that I was looking for the healthy nutritiousness

14 well-balanced part of breakfast, it was an alternative

15 for me from peanut butter.  And I like hazelnuts.

16    Q.   And you learned that from looking at the facts

17 panel?

18    A.   After the fact.  Into the ingredients, yeah.

19    Q.   What did you learn from -- I know you don't

20 recall the time period, but you recall discussions with

21 your friends about Nutella, correct?

22    A.   Okay.

23    Q.   What did you learn -- is that right?

24    A.   Yes.

25    Q.   Okay.  What -- what did you learn from them

Page 128

1   that you didn't already know about Nutella?

2        A.    I think it was more the palm oil question mark,

3   how much it had in the product.  I was aware that it had

4   a lot of sugar.

5        Q.    And as I think you just said, when you looked

6   at the nutrition facts panel you noticed it had palm oil

7   as well, right?

8        A.    (No audible response.)

9        Q.    "Yes"?

10       A.    Yes.  Sorry.

11       Q.    So what did you -- what did your friends tell

12   you that you didn't already know?

13            MR. MARRON:  Objection; asked and answered.

14            This is kind of argumentative because you've

15   asked her this before.

16            THE WITNESS:  You're asking me to recall a

17   conversation that I don't recall specific details to.

18   BY MR. BISH:

19       Q.    Anything generally?  Do you recall anything

20   generally about what they told you, what you learned from

21   your friends that you didn't already know?

22       A.    That palm oil is not good for you.  That it had

23   high amounts of palm oil in it.

24       Q.    Anything else?

25       A.    Other than the sugar conversation that we've

1    already had.

2        Q.    Sticking with paragraph 76.

3              I believe you testified that you never looked

4    at the Nutella website, right, so it would not be

5    accurate to say that you were exposed to the website?

6        A.    Correct.

7        Q.    And you don't recall seeing anything in print

8    ads, so it would not be correct to say that you were

9    exposed to print ads?

10       A.    No.

11       Q.    No, that would not be correct?

12       A.    Yes, that would be correct.

13       Q.    Okay.  Now, what about the -- no.

14             Okay.  Paragraph 89.

15             (Document reviewed by witness.)

16   BY MR. BISH:

17       Q.    Have you had a chance --

18       A.    Uh-huh.

19       Q.    -- to read paragraph 89?

20       A.    Yes.

21       Q.    Do you understand it?

22       A.    Yes.

23       Q.    Now, it says:

24                  Elsewhere on its websites, Ferrero

25             states that it recommends that Nutella is eaten

1          at breakfast because it purportedly has a low

2          glycemic index so that it helps maintain energy

3          and concentration levels longer.

4          See that?

5     A.   Yes.

6     Q.   Do you understand what that means?

7     A.   In a roundabout way, yes.

8     Q.   What does glycemic index mean to you?

9     A.   Where your sugar levels are.  Being hyper as

10  opposed to not be.

11    Q.   Okay.  That's your understanding of the

12  glycemic index?

13    A.   I would think so.  I'm not sure.  I mean, it's

14  my best judgment.

15    Q.   Based on reading this or --

16    A.   Glycemia or hypoglycemia in general.

17    Q.   Do you have an understanding of what the

18  glycemic index is apart from the allegations in the

19  complaint?

20         MR. MARRON:  Yeah, objection; attorney-client

21  privilege.

22         Other than what you've learned from your

23  counsel, you can answer the question.

24         THE WITNESS:  No.

25  ///

1   BY MR. BISH:

2       Q.     Okay.   Now, you allege:

3                      This statement is false as Nutella's

4              very high sugar content rendered a high

5              glycemic content food.

6              Do you see that?

7       A.     Yes.

8       Q.     Now, you say that the statement is false, what

9   facts do you have to support that?

10      A.     Repeat the question -- or rephrase the

11  question, please.

12      Q.     Now, you allege in your complaint that Ferrero

13  has made a false statement elsewhere on its websites.

14  What evidence do you have that this is a false statement?

15             MR. MARRON:   Objection as to form.

16             Do you know what he's -- do you understand the

17  question?

18             THE WITNESS:   No, I don't understand the

19  question.

20  BY MR. BISH:

21      Q.     What don't you understand about it?

22      A.     I don't understand what your question is.

23      Q.     Now, if you look at the bottom of the page,

24  page 25 of Defendant's Exhibit 3, there's a picture of

25  what appears to be a website.

1         You see that?

2    A.    Yes.

3    Q.    Any idea where that website is from?

4    A.    No.

5    Q.    Okay.  Well, you see where it says -- I know

6    it's small print but it says "Nutella has a glycemic

7    index of 33."

8         Do you see that?

9    A.    Yes.

10   Q.    Is that wrong?

11        MR. MARRON:  Objection; calls for expert

12   testimony, expert opinion and attorney-client privilege.

13        Other than what you've learned from your

14   counsel, if you know --

15        THE WITNESS:  Yeah.

16        MR. MARRON:  If you know it's wrong.

17   BY MR. BISH:

18   Q.    Sitting here today, do you believe that Nutella

19   does not have a glycemic index of 33?

20        MR. MARRON:  Same objection; attorney-client

21   privilege.

22        Other than what you've learned from your

23   attorneys.  If your only knowledge is derived from

24   discussion with your counsel, then I'll instruct you not

25   to answer.

1          THE WITNESS:  Not answer.

2    BY MR. BISH:

3      Q.    Again, this is a yes-or-no, I'm not asking what

4    they told you or what you told them.

5          Sitting here today, do you believe that Nutella

6    does not have a glycemic index of 33?

7      A.    I can't answer that.

8      Q.    Why not?

9      A.    Because I can't.

10     Q.    Because you don't know?

11     A.    I can't answer that.

12     Q.    Because you don't know?

13         MR. MARRON:  Or is it because it's what your

14   attorney informed you?

15         THE WITNESS:  Yeah, there we go.

16   BY MR. BISH:

17     Q.    You have had a conversation with your attorneys

18   about the glycemic index?

19         MR. MARRON:  Yeah, again, just answering that

20   question would divulge the discussions that we had.

21         THE WITNESS:  Yeah.

22   BY MR. BISH:

23     Q.    Okay.  Now, you understand that you have

24   alleged that Ferrero made a false statement, right?

25   That's your allegation, correct?

Page 134

1    A.    Correct.

2    Q.    Do you have any evidence to support that

3  allegation?

4    A.    The advertisement that I saw on television?

5    Q.    No.  I'm talking about this.

6    A.    In general, that they're advertising it to be a

7  healthy, nutritiousness, well-balanced breakfast item.

8    Q.    Okay.  I'm talking about the specific statement

9  here that you allege is actually false.

10    A.    I can't answer that.

11    Q.    Because you don't know?

12    A.    I guess.

13    Q.    Paragraph 91.

14          (Document reviewed by witness.)

15          THE WITNESS:  Okay.

16  BY MR. BISH:

17    Q.    Okay.  To the best of your recollection, is

18  this the television ad you saw?

19    A.    In paragraph 91 only?

20    Q.    Yes.

21    A.    I'm not sure.

22    Q.    And do you see the word "healthy" in there?

23    A.    No.

24    Q.    Do you see the word "nutritious" in there?

25    A.    No.

1    Q.    So that's not the ad you saw, correct?

2    A.    No.

3    Q.    Paragraph 92.  Do you believe this is the

4  advertisement you saw?

5         MR. MARRON:  You know, just for the record, I'd

6  like to object along these lines of questioning because

7  she can't see the visual of what the commercial is.

8  You're asking her -- asking her whether or not she saw a

9  commercial based on this, this dialogue.  So I'll put

10  that this is an incomplete hypothetical.

11         And I'll object to this line of questioning

12  altogether with respect to whether or not what she saw,

13  because there's no depictions, no visual depictions on

14  these pages.  So for you to -- for her to give an opinion

15  on whether or not she saw it, or testimony on whether she

16  saw it without actually seeing the commercial is

17  fundamentally unfair.

18         I'll allow her to answer these questions, but

19  just know that this is based on -- it assumes facts not

20  in evidence and is an incomplete presentation of what the

21  commercial is.

22         So if you know, you can answer.

23         THE WITNESS:  Ask the question again, please.

24  BY MR. BISH:

25    Q.    Do you believe this is the advertisement you

1    saw?

2        A.    I'm not sure.

3        Q.    And the word "healthy" is not in there,

4    correct?

5        A.    No.

6        Q.    The word "nutritious" is not in there, correct?

7        A.    No.

8        Q.    The word "well-balanced" is not in there,

9    correct?

10       A.    No.

11       Q.    Okay.  Paragraph 93.

12             (Document reviewed by witness.)

13             THE WITNESS:  Okay.

14   BY MR. BISH:

15       Q.    Do you believe this is the advertisement you

16   saw?

17       A.    I'm not sure.

18       Q.    You don't know?

19       A.    I'm not sure.

20       Q.    Do you see the word "healthy" in there?

21       A.    Yes.

22       Q.    Do you see -- I believe it's there twice:

23                   As a mom --

24                   I'm reading:

25                   As a mom, I'm a great believer in

Page 137

1          Nutella, a delicious hazelnut spread that I use

2          to get my kids to eat healthy foods.

3          Do you see that?

4    A.    Yeah.

5    Q.    Do you have a problem with that statement?

6    A.    Yes.

7    Q.    What's your problem with that statement?

8    A.    Other than we've already covered the fact that

9    in my opinion I don't feel it's a healthy product.

10   Q.    Okay.  Now, we're talking -- but it doesn't say

11   that, does it?

12   A.    No, it doesn't say that.  It's misleading.

13   Q.    How so?

14   A.    Because it's presumptuous.

15   Q.    How so?

16   A.    It's leading you to believe that Nutella is a

17   healthy food.

18   Q.    "Delicious hazelnut spread that I use to get my

19   kids to eat healthy foods."

20   A.    Okay.  I don't agree with putting sugar on a

21   piece of whole wheat piece to convince your child to eat

22   a healthy product.

23   Q.    Like jelly?  You don't put jelly on whole wheat

24   bread?

25   A.    Not at breakfast time.  We've covered this.

1    Q.    But some people do, right?

2          MR. MARRON:  Objection.  This is getting --

3    you're getting a little bit argumentative, Dale.

4    BY MR. BISH:

5    Q.    And it's okay for Smuckers to be a breakfast

6    food, correct?

7    A.    I'm sorry.  Say that again.

8    Q.    It's okay for Smuckers to be a breakfast food?

9          MR. MARRON:  Objection; assumes facts not in

10   evidence, it's argumentative.

11         THE WITNESS:  We've answered these questions

12   already.

13         MR. MARRON:  You don't have to answer that

14   question.

15   BY MR. BISH:

16   Q.    I believe a little bit ago you said you liked

17   hazelnuts, right?

18   A.    Correct.

19   Q.    That's a good ingredient, in your opinion?

20   A.    It's a good nut, yes.

21   Q.    What makes it a good nut?

22   A.    Your taste buds.  Personal preference.

23   Q.    Now, are there any new nutritional aspects of a

24   hazelnut that you like?

25         MR. MARRON:  Yeah, objection; attorney-client

1  privilege.

2        Other than what you've learned from your

3  attorneys related to any nutritional properties of

4  hazelnuts, if you can answer that question without

5  revealing any attorney-client communications, then you

6  may do so.

7        THE WITNESS:  Ask the question again, please.

8  BY MR. BISH:

9     Q.    Okay.  Putting aside any conversations with

10 your lawyer, are there nutritional aspects of the

11 hazelnut that you like?

12        MR. MARRON:  Same objection.

13        If you can, you can answer it without revealing

14 attorney-client communications.

15        THE WITNESS:  Yeah.  In my opinion, I feel

16 hazelnuts are healthy.

17 BY MR. BISH:

18    Q.    In what way?

19    A.    I don't want to generalize nuts because not all

20 nuts are healthy for you in large consumption.  But I

21 think it's amongst one of many nuts that are generally

22 healthy for you.

23    Q.    And I want to understand why that is.  What

24 about a hazelnut do you feel is healthy?

25    A.    It's an earth grown product.  I mean...

1      Q.     Is there anything you associate with hazelnuts?

2            MR. MARRON:  Yeah, same attorney --

3      attorney-client privilege.

4            On any -- other than any communications that

5      you've had with your attorney, if you can answer the

6      question.

7            THE WITNESS:  Ask the question again, please.

8      BY MR. BISH:

9      Q.     Is there any -- is there any nutrient that you

10     associate with the hazelnut?

11     A.     I don't know.

12     Q.     So do you think that hazelnuts have protein,

13     for example?

14     A.     I would think they do, but I'm not positive.

15     Q.     And do you think that hazelnuts are low in fat?

16     A.     I'm not sure.

17     Q.     So you just have an impression that the

18     hazelnut is healthy, correct?

19            MR. MARRON:   Same objection.

20            THE WITNESS:   I do have an impression that

21     hazelnuts are healthy, yes.

22     BY MR. BISH:

23     Q.     So as a -- do you think a hazelnut is a

24     wholesome ingredient?

25     A.     Yes.

1    Q.    Okay.  What about skim milk, do you think skim

2  milk is a wholesome ingredient?

3    A.    I don't like milk, so it's probably not a good

4  question for me.

5    Q.    That's a personal preference, right?

6    A.    Yeah.

7    Q.    Okay.  Putting your personal preference aside,

8  do you think skim milk is a wholesome ingredient?

9    A.    I honestly don't know.

10    Q.    Don't know, okay.

11          Paragraph 99.

12          (Document reviewed by witness.)

13          THE WITNESS:  Okay.

14  BY MR. BISH:

15    Q.    So where it starts third sentence:

16              These claims are misleading because

17          Nutella contains high levels of saturated fat,

18          sugar, oil, artificial flavoring and other

19          objectionable ingredients.

20          Do you see that?

21    A.    Yes.

22    Q.    What are the other objectionable ingredients

23  you're referring to?

24          MR. MARRON:  Objection; attorney-client

25  privilege.

1          Other than what you've learned from your

2     counsel.  If you can answer it through independent --

3          THE WITNESS:  No.

4     BY MR. BISH:

5     Q.    No, you --

6     A.    I can't answer.

7     Q.    Everything you -- your idea of an objectionable

8     ingredient came from your attorney?

9     A.    I -- I can't -- yeah.  No, I can't answer that.

10    Q.    Because what you learned -- your understanding

11    of objectionable ingredients came from your attorney,

12    right?

13    A.    Correct.

14    Q.    Paragraph 108.

15          (Document reviewed by witness.)

16    BY MR. BISH:

17    Q.    See it says:

18               Nutella costs more than similar products

19          without misleading advertisements and

20          misrepresentations and would have cost less

21          absent the false and misleading statements and

22          material omissions described herein.

23          You see that?

24    A.    Yes.

25    Q.    What are the similar products you're referring

1    to in paragraph 108?

2              MR. MARRON:  This is other than what you

3    testified about earlier.

4              THE WITNESS:  I'm sorry?

5              MR. MARRON:  I guess my --

6              MR. BISH:  No, no, no.  I'm asking what the

7    plaintiff is referring to when she alleges that Nutella

8    costs more than similar products.

9              MR. MARRON:  Okay.

10             MR. BISH:  You can object to form.

11             MR. MARRON:  Yeah, object to form and with --

12             MR. BISH:  Let's not coach the witness now.

13             MR. MARRON:  I'm not coaching the witness.  But

14   this is obviously the attorney's work product, so...

15             MR. BISH:  Your complaint is -- the filed

16   complaint is work product?

17             MR. MARRON:  Yeah, not in the -- I mean, you

18   can ask her -- you're free to ask questions about it.

19   But I'm just saying this is obviously --

20             MR. BISH:  I'm asking when --

21             MR. MARRON:  Okay.

22   BY MR. BISH:

23      Q.    Ms. Hohenberg, when you alleged that Nutella

24   costs more than similar products, what similar products

25   are you referring to?

1    A.    Similar products, I would assume -- I mean I

2  would say probably peanut butter.

3    Q.    Anything else?

4    A.    Not off the top of my head, no.

5    Q.    And how much -- and you paid two to $3 for

6  Nutella?

7    A.    To my best recollection.

8    Q.    How much does peanut butter cost?

9    A.    I think maybe Skippy's probably 3.30, 3.40,

10  something like that.  I'm not sure.

11    Q.    So Nutella doesn't cost more than the Skippy's

12  as referenced, right?

13    A.    I honestly don't recall how much.

14    Q.    Okay.  And aside from peanut butter, anything

15  else?

16    A.    Not that I can recall right now.

17    Q.    And the second half of that sentence:

18          And would have cost less absent the

19          false and misleading statements and material

20          omissions described herein.

21          What facts do you have to support that

22  allegation?

23    A.    I'm not sure.

24    Q.    Do you understand that allegation?

25          MR. MARRON:  I'll just say object; calls for an

1    expert opinion.

2              But you can answer if you -- if you understand.

3              THE WITNESS:  I don't.

4    BY MR. BISH:

5         Q.    You don't understand?

6         A.    No.

7         Q.    You don't, right.

8              Okay.  So that was actually my question, do you

9    understand that allegation?

10        A.    No, I don't.

11        Q.    You don't understand that allegation, okay.

12             So you have no reason -- sitting here, you have

13   no reason to believe that Ferrero would have charged less

14   for Nutella absent the false and misleading statements

15   and material omissions described herein, do you?

16             MR. MARRON:  Objection; attorney-client

17   privilege.

18             Other than what you've learned from your

19   attorneys, if you can answer the question.

20             THE WITNESS:  I can't answer the question.

21   BY MR. BISH:

22        Q.    It's a yes-or-no question.  It doesn't call for

23   attorney-client --

24        A.    I don't know.

25        Q.    -- privileged information.

1    A.    I'm sorry.  I don't know.

2    Q.    You don't know.

3          No facts to support that allegation, correct?

4    A.    I don't know.

5    Q.    You don't know if you have any facts?

6    A.    I can't answer the question.  I'm not fully

7    understanding the question, so...

8    Q.    Do you have any reason to believe that Ferrero

9    would have charged less for Nutella if it had never run

10   an advertising campaign?

11   A.    I don't know.

12         MR. MARRON:  Objection; calls for expert

13   opinion and attorney-client privilege.

14   BY MR. BISH:

15   Q.    Now, paragraph 111:

16               Plaintiffs and members of the class

17         purchased Nutella instead of competing products

18         based on the false statements,

19         misrepresentations and omissions described

20         herein.

21         Do you see that?

22   A.    Uh-huh.  Yes.

23   Q.    Now, earlier you testified that you were not --

24   that you did not buy Nutella instead of something.

25         You recall that testimony?

1      A.    Yes.

2      Q.    Okay.  So paragraph 111 is not accurate, is it?

3            MR. MARRON:  Objection; misstates her

4      testimony, assumes facts not in evidence, is

5      argumentative.

6            THE WITNESS:  I'm sorry.  What's your question?

7      BY MR. BISH:

8      Q.    It's not accurate, is it?

9      A.    I don't know if it is or it isn't.  Sorry.

10     Q.    Do you believe that Ferrero violated any law in

11     advertising Nutella?

12           MR. MARRON:  Objection; attorney-client

13     privilege.

14           You can -- do not reveal any attorney-client

15     communications with respect to any statutes that we may

16     have advised you on.

17           And it also calls for a legal conclusion.

18           You can answer if you -- if you know the

19     answer, if you have an independent knowledge of what

20     statutes they violated.

21           THE WITNESS:  No, I don't.

22     BY MR. BISH:

23     Q.    Okay.  You can put that aside.

24           Now, do you recall answering any -- what

25     lawyers call interrogatories?

1    A.    I don't know if it was -- I have no idea.

2    Q.    A Latin phrase to you?

3    A.    It's a Latin phrase, yeah.

4    Q.    Okay.  Basically, and only what lawyers can

5    appreciate, we ask questions to each other in

6    interrogatories.

7          Do you recall that Ferrero asked certain

8    questions of you about a month ago?

9    A.    I think so.

10   Q.    Okay.

11   A.    Yeah.

12   Q.    And did you help prepare the responses to those

13   interrogatories?

14   A.    Yes.

15   Q.    Yes.

16         You approved them?

17         MR. MARRON:  Objection as to form.  She

18   assisted, she testified to that.

19         THE WITNESS:  Yeah.

20         MR. MARRON:  Whether or not she approved them

21   or not is -- I don't think we provided verifications yet

22   on those.

23   BY MR. BISH:

24   Q.    I'm asking if you approved them before they

25   were served on your behalf.

1    A.    I'm not sure.

2         MR. BISH:  Okay.  We can mark as Defendant's

3    Exhibit 4.

4              (The document referred to was marked by

5              the CSR as Deposition Exhibit 4 for

6              identification and attached to the

7              deposition transcript hereto.)

8         MR. MARRON:  Okay.  Any particular

9    interrogatory?

10        MR. BISH:  Yeah.

11   Q.    Have you had a chance to review Plaintiff's

12   Exhibit -- Defendant's Exhibit 4?

13   A.    Yes.

14   Q.    Okay.  So now, looking at, actually, number --

15   number 2.  We asked you to identify any special programs

16   offered by any food retailer that you or members of your

17   household have belonged to since January 1, 2008.

18             You see that?

19   A.    I'm sorry.  Where are you?

20   Q.    Interrogatory No. 2.  It's on page 6.  Sorry.

21   A.    Here we go.  Okay.  Okay.

22        MR. MARRON:  Objection to form.

23        Go ahead.

24        MR. BISH:  I didn't ask a question.

25        MR. MARRON:  The interrogatory itself is a

1    question, right.

2    BY MR. BISH:

3        Q.    Okay.  We talked earlier that you, in fact, do

4    have preferred savings cards for Albertsons, Vons Club

5    Card and an Extra Care Card, right?

6        A.    Yes.

7        Q.    Is there any reason you didn't list those in

8    response to this interrogatory?

9        A.    I was given -- I believe I was under the

10   impression that it was a membership type of card,

11   something where you get money back or a discount or

12   something like that.

13       Q.    Okay.  But you do have those, right?

14       A.    I do.

15       Q.    Okay.  Now, looking at No. 4, the following

16   page, the second sentence of your response:

17               Plaintiff does not believe she has any

18           records in her possession, custody or control

19           that reflect this purchase of Nutella.

20               I just want to confirm that you don't have any

21   receipts laying around that might reflect you bought

22   Nutella?

23       A.    No, I do not.

24       Q.    So how do you intend to prove that you, in

25   fact, did buy it?

1    A.    I'm saying I bought it.

2    Q.    We take your word for it?

3    A.    That's pretty much what it is.

4    Q.    You'd agree with me that most people wouldn't

5    keep their receipts that would reflect a purchase like

6    that, right?

7    A.    Unless you're a pack rat.

8    Q.    My wife.

9          Okay.  No. 6, we asked you to identify all

10   sources from which you have derived your understanding of

11   the phrase "balanced breakfast," right?

12   A.    Yes.

13   Q.    And your response was:

14              Plaintiff derived her understanding of

15         the phrase "balanced breakfast" from her

16         mother, books and education generally.

17         Right?

18   A.    Correct.

19   Q.    What did your mom say about balanced breakfast?

20   A.    To eat one before I went to school.

21   Q.    That it's important to eat a good breakfast

22   before you go to school, right?

23   A.    Yes.

24   Q.    Do you agree with me that not eating breakfast

25   before school is a very, very bad idea?

1   A.    In my opinion, yes.

2   Q.    Right.

3         What books are you referring to in that answer?

4   A.    Again, I think -- I know it was vague and my

5   answer is here, but I don't recall the names of books.

6   Q.    Ever read a nutrition book?

7   A.    I'm sure I have at some point in time or

8   another.

9   Q.    Like back in high school or --

10  A.    Back in high school.  Earlier.

11  Q.    Recently?

12  A.    Probably not.

13  Q.    Do you have any nutrition books sitting at your

14  house, for example?

15  A.    I think so.

16  Q.    You think so?

17  A.    I have a lot of books.

18  Q.    Okay.  Any particular books standing out in

19  your mind pertaining to nutrition?

20  A.    I think one of them is Eat Right for your Blood

21  Type.

22  Q.    Eat Right for your Blood Type?

23  A.    Something along those lines.

24  Q.    And you've read that?

25  A.    I'm not sure if that's in my possession.  No, I

1    did not read the whole book.  No.

2         Q.    Parts of it?

3         A.    Parts of it.

4         Q.    What do you recall from that?

5         A.    Foods that I should and should not eat for my

6    blood type.

7         Q.    It varies based on blood type, I didn't know

8    that.  That's interesting.

9         A.    That's what the book said.

10        Q.    Like I'm type A blood so I should eat different

11   than type B blood, something like that?

12        A.    Correct.

13        Q.    Something that would be nutritious for somebody

14   might not be for somebody else, is that --

15        A.    It's a book.

16        Q.    Okay.  "Education generally," what does that

17   mean?

18        A.    Just having common sense about food in general.

19   Learning, growing up, food pyramid.  They teach that in

20   school.

21        Q.    Food pyramid, what's your recollection of the

22   food pyramid?

23        A.    It's a triangle.

24        Q.    What's at the top?

25        A.    Fruits, vegetables, grains.

1          At the top?  I don't recall what order it goes

2     in.  It's been a while since I've seen one.

3          Q.    What's your understanding of the food pyramid,

4     what it is?

5          A.    That there's, what, five main sources in the

6     food pyramid that you should consume on a daily basis.

7          Q.    And what's different about the bottom than the

8     top?

9          A.    I don't know.

10         Q.    The bottom --

11         A.    Is probably more.

12         Q.    -- eat more of that.  And top is --

13         A.    That would make sense to me.

14         Q.    Go easy on it?

15         A.    I don't know.  I don't recall.  It's been a

16    long time since I learned that.

17              MR. BISH:  Okay.  I'll mark as Plaintiff's --

18    Defendant's Exhibit 5.

19              (The document referred to was marked by

20              the CSR as Deposition Exhibit 5 for

21              identification and attached to the

22              deposition transcript hereto.)

23              THE WITNESS:  Thank you.

24              MR. BISH:  While you're reviewing it, for the

25    record, Plaintiff's Exhibit -- Defendant's Exhibit 5 is

1    Plaintiff's Opposition to Ferrero's Motion to Dismiss.

2              (Document reviewed by witness.)

3              THE WITNESS:  Okay.

4    BY MR. BISH:

5       Q.    My first question is, have you seen this

6    Plaintiff's -- I must want to switch sides or something

7    today -- Defendant's Exhibit 5, have you seen this

8    document before today?

9       A.    That's a good question.  I'm not sure if I have

10   or haven't, to be honest.  I've looked at a lot of stuff.

11      Q.    If you'll turn to page 3 -- sorry.  It'll say

12   three at the bottom, the actual --

13      A.    The actual number.

14      Q.    Actual text.

15      A.    Yeah.

16      Q.    The paragraph that starts at line 8 underneath

17   the heading "Ferrero Claims Nutella Contributes to a

18   Balanced Breakfast:"

19              Ferrero's Nutella advertising campaign

20              centers around convincing consumers Nutella

21              contributes to a "balanced breakfast," which,

22              misleadingly suggests Nutella itself is

23              nutritious?

24              See that?

25      A.    Yeah.

1    Q.    The next sentence, ignore the numbers, that

2    "this term has a concrete meaning to consumers."

3          Do you see that?

4    A.    Yes.

5    Q.    What is that concrete meaning?

6          MR. MARRON:  Just an objection that this has

7    been asked and answered to the extent that you've already

8    asked her about, you know, a balanced breakfast.  And

9    she's answered what it meant to her.

10          THE WITNESS:  I agree.

11   BY MR. BISH:

12   Q.    Okay.  So now, this says "this term has a

13   concrete meaning to consumers," right, so I'm not talking

14   about you personally.  We talked about your personal

15   definition of it.

16          I want to know when you say "this term has a

17   concrete meaning to consumers," what is that concrete

18   meaning?

19          MR. MARRON:  Objection; calls for expert

20   opinion and calls for a legal conclusion.

21          You can answer.

22          THE WITNESS:  Again, that it's stating that

23   it's a balanced breakfast.

24   BY MR. BISH:

25   Q.    Right, but what is the concrete meaning of that

1    phrase?

2        A.    Other than the fact that it's leading consumers

3    to believe that it's a healthy product?  I don't -- I

4    don't quite understand.

5        Q.    When you say "this term," what does that mean?

6    "This term" we're talking about balanced breakfast,

7    right?

8        A.    I would assume so, yes.

9        Q.    Okay.  And this was filed on your behalf,

10   right?

11       A.    Yes.

12       Q.    So you understood this document, I assume,

13   before it was filed on your behalf, right?

14       A.    Uh-huh.

15       Q.    "Yes"?

16       A.    Yes.

17       Q.    "This term," we're talking about balanced

18   breakfast, correct?

19       A.    Yes.

20       Q.    "Balanced breakfast has a concrete meaning to

21   consumers."

22             How do we measure that concrete meaning?

23             MR. MARRON:  Yeah, objection; calls for expert

24   opinion, calls for a legal conclusion, attorney-client

25   privilege.

1          If you have an independent knowledge of what --

2     what he's trying to ask you, other than what you've

3     derived from your discussions with counsel, then you can

4     answer.

5          THE WITNESS:  I don't.

6     BY MR. BISH:

7     Q.    So you have your personal definition of

8     balanced breakfast, right, that we've talked about,

9     right?

10    A.    Correct.

11    Q.    Now, consumers might have a different

12    definition of that, right?

13         MR. MARRON:  Objection; calls for expert

14    opinion, calls for a legal conclusion, it's

15    argumentative.

16         THE WITNESS:  I am a consumer, so I'm not quite

17    sure what you're asking.

18    BY MR. BISH:

19    Q.    Right.

20         So you have your personal definition?

21    A.    As does everybody else.

22    Q.    Everybody else has their own personal

23    definition, right?

24    A.    Correct.

25    Q.    Thank you.

1          Page 19.

2          MR. MARRON:  When it's convenient for you,

3    Dale, can we get an update as far as timing goes, just so

4    we can make sure that we're -- she's got somebody

5    watching her daughter for a period of time.  But if it

6    keeps -- depending on how much longer we'll be here,

7    we'll have to make some other phone calls.  So...

8          MR. BISH:  Let's finish this document and make

9    some phone calls.

10          MR. MARRON:  Okay.  Do you have a time frame?

11          THE WITNESS:  Do you have a time frame?

12          MR. BISH:  Still at least an hour.

13          MR. MARRON:  Okay.

14          THE WITNESS:  What time is it now?

15          MR. BISH:  5:00.

16          MR. MARRON:  It's 5:10.

17          MR. BISH:  That's why we wanted to start in the

18    morning.  But, you know, we --

19          MR. MARRON:  That's fine.

20          MR. BISH:  I know you had to be in court this

21    morning.

22          MR. MARRON:  The only reason why we're asking

23    is because she's got to provide a baby-sitter.

24    BY MR. BISH:

25          Q.    Page 19.

1     A.     Uh-huh.

2     Q.     You with me?

3     A.     Yes.

4     Q.     Second paragraph starts:

5              Moreover, while Plaintiffs may not have

6            personally visited the Nutella website, they

7            were nevertheless exposed to the

8            representations there because they underlie

9            Ferrero's balanced breakfast message.

10           You see that?

11    A.     Yes.

12    Q.     But you didn't visit the website, correct?

13    A.     Correct.

14    Q.     So --

15           MR. MARRON:  Objection; asked and answered.

16    BY MR. BISH:

17    Q.     So can you explain to me how you're exposed to

18    the representations there?

19           MR. MARRON:  Objection; calls for a legal

20    conclusion, expert opinion.

21           Other than what you learned through your

22    counsel, if you can answer the question.

23           THE WITNESS:  No, I can't.

24    BY MR. BISH:

25    Q.     You can't answer?

1   A.    No.

2   Q.    Okay.  Next sentence:

3               Ferrero relies on Nutella to

4         substantiate this claim.

5               Next sentence:

6               Since Plaintiffs would not have seen the

7         balanced breakfast representation but for Evers

8         signing off on it, her opinions, which are

9         embodied on the Nutella website, contributed to

10        Plaintiffs in the punitive class of injuries.

11        Do you see that.

12  A.    Yes.

13  Q.    Do you understand that?

14        MR. MARRON:  Objection to the extent that it

15  reveals any client-attorney communications, I'll object

16  on attorney-client privilege, as well as calls for a

17  legal conclusion and expert opinion.

18        And can you -- can you answer the without

19  revealing those --

20        THE WITNESS:  No, I cannot.

21        MR. MARRON:  -- discussions?

22        THE WITNESS:  No.

23  BY MR. BISH:

24     Q.    So the question I asked is do you understand

25  it, and we just heard a nice little speech.

1          MR. MARRON:  Yeah, objection.  Again,

2   attorney-client privilege.

3          If your understanding is a -- is a result of

4   communications with your counsel, then I instruct the

5   client not to answer.

6   BY MR. BISH:

7     Q.    Sitting here today, yes or no, do you

8   understand that sentence?

9          MR. MARRON:  Can you -- can you answer the

10  question without revealing whether you've spoken --

11         THE WITNESS:  With a simple yes or no answer?

12         MR. MARRON:  -- with your attorneys?

13         Yeah.

14         MR. MARRON:  Is your understanding derived --

15  other than being derived from communications with your

16  counsel?

17         THE WITNESS:  No.

18         MR. MARRON:  Okay.  Then she can't -- then I'm

19  going to instruct her not to answer the question.

20  BY MR. BISH:

21    Q.    Whether or not -- okay.

22         Sitting here today -- I understand, I just want

23  to know if you understand what that is saying.  I'm not

24  asking you what your lawyers told you or didn't tell you.

25  I'm asking you if you understand it.

1          Did it make sense from a grammatical point of

2     view to you?

3          MR. MARRON:  Yeah, and I'm instructing her not

4     to answer if her understanding is derived from her

5     attorneys.

6     BY MR. BISH:

7       Q.    And you're going -- you're going to not answer

8     --

9       A.    Witness.

10      Q.    -- based on that instruction?

11           Okay.

12          MR. BISH:  Okay.  If you want you, you can go

13    ahead and go off the record to make your phone calls.

14          MR. MARRON:  So another hour, you think, is

15    that --

16          THE WITNESS:  Are we pretty accurate with that

17    time, because...

18          MR. BISH:  So we can do this --

19          THE VIDEOGRAPHER:  All agreed to go off the

20    record, we're off the record at 5:13 p.m.

21          (Recess from 5:13 p.m. to 5:22 p.m.)

22          THE VIDEOGRAPHER:  We're back on record at

23    5:22 p.m.

24    BY MR. BISH:

25      Q.    In your opinion, which is worse for a

1  school-aged kid, skipping breakfast or eating a breakfast

2  that has a good mix of nutrients along with 21 grams of

3  sugar and 3.5 grams of saturated fat?

4         MR. MARRON:  Objection; calls for a legal

5  conclusion, incomplete hypothetical, assumes facts not in

6  evidence.

7         You can answer the question if you understand

8  it.

9         THE WITNESS:  I agree.

10  BY MR. BISH:

11     Q.    So you -- you've said that you think it's

12  inappropriate to have what you believe is a high level of

13  sugar at breakfast, right?

14     A.    Uh-huh.  Yes.

15     Q.    And you think that Nutella on whole wheat bread

16  is too much sugar for breakfast, right?

17     A.    Yes.

18     Q.    Is that breakfast worse than not having any

19  breakfast at all, in your opinion?

20         MR. MARRON:  Objection; incomplete

21  hypothetical, calls for an expert opinion, irrelevant.

22         THE WITNESS:  I would have to say yes based on

23  the fact that I know my child's going to be getting a

24  snack an hour after she starts school.

25  ///

1   BY MR. BISH:

2       Q.    And what's that snack?

3       A.    It's a healthy snack that the school provides.

4       Q.    Such as?

5       A.    Fruit; orange slices, apple slices.  I'm not

6   positive what they serve every day.

7       Q.    Okay.  Don't know if that snack contains any

8   fiber?

9       A.    I'm not sure.

10      Q.    Don't know if that snack contains any fat?

11      A.    Not knowing what the product -- what the snacks

12  are on a daily basis, no, I'm not going to be aware of

13  what they are --

14      Q.    Okay.

15      A.    -- or what they contain.

16      Q.    I'm sorry.  Is your -- your daughter's in

17  preschool, right?

18      A.    She's in pre-kindergarten.

19      Q.    So when she's in first grade and there is no

20  snack an hour after they get there, it's important for

21  your daughter to have breakfast, right?

22      A.    Yes.

23      Q.    And which is more important, breakfast or no

24  sugar?

25            MR. MARRON:  Same objection; incomplete

1   hypothetical, assumes facts not in evidence, calls for an

2   expert opinion.

3   BY MR. BISH:

4       Q.    In your opinion.

5       A.    In my opinion I'm feeding my child a healthy

6   breakfast.  It's not going to contain a whole lot of

7   sugar.

8       Q.    Okay.

9       A.    I understand what you're asking.  That's my

10  answer.

11      Q.    Okay.  You don't know how much sugar is too

12  much.  You just don't know, right, 21 grams, ten grams,

13  five grams, you don't know?

14      A.    I can use common sense.

15      Q.    You can use common sense?

16      A.    I can use common sense.

17      Q.    Okay.  So if I could put Nutella on bread in an

18  amount that has less sugar than the breakfasts that you

19  feed your child now, still have a problem with it?

20          MR. MARRON:  Incomplete hypothetical, calls for

21  an expert opinion, assumes facts not in evidence.

22          THE WITNESS:  I didn't understand the question.

23  BY MR. BISH:

24      Q.    Okay.  If it was possible to put Nutella on

25  whole wheat bread and the overall -- the amount of sugar

Page 167

1    in that breakfast is less than the breakfast you're

2    feeding your child now, would you be willing to feed your

3    child that breakfast?

4              MR. MARRON:  Objection; form.

5              THE WITNESS:  I don't know.

6    BY MR. BISH:

7        Q.    Why not?

8        A.    Comparing to what other breakfasts am I feeding

9    my child?

10       Q.    Yeah.  We have -- we have what you're

11   feeding --

12       A.    Uh-huh.

13       Q.    -- her now, and we'll figure out how much sugar

14   is there.  And if we can put -- you know, give you a

15   breakfast that has less sugar than those breakfasts, any

16   objection to feeding your daughter that breakfast?

17             MR. MARRON:  Objection; incomplete hypothetical

18   assumes facts not in evidence, form.

19             Is your answer differently than what he asked

20   you last time?

21             THE WITNESS:  I don't know.

22   BY MR. BISH:

23       Q.    First time I asked it.

24       A.    I'm -- you're asking me that if I took a piece

25   of wheat toast.

1      Q.    Uh-huh.

2      A.    Put Nutella on it.

3      Q.    Uh-huh.

4      A.    As the product stands right now.

5      Q.    Uh-huh.

6      A.    And compare that to a bowl of Cheerios.

7      Q.    Yeah.

8      A.    What's your question?

9      Q.    Or any of the other breakfasts that you feed

10 your child now.

11     A.    Okay.  Let's say a bowl of Cheerios.  What's

12 your question.

13     Q.    Or, let's say, Eggos.

14     A.    Okay.

15     Q.    Whatever it is.

16     A.    What's your question?

17     Q.    If there's less sugar on that meal, would it be

18 okay to give to your child?

19     A.    If there's less sugar on the Nutella and the

20 wheat?

21     Q.    Yes.

22     A.    Comparing to those products, there's not.

23     Q.    But what if there were?

24           MR. MARRON:  Objection; incomplete

25 hypothetical, assumes facts not in evidence.

1   BY MR. BISH:

2       Q.    Let's make this concrete.  How many grams of

3   sugar are in two tablespoons of Nutella?

4       A.    Serving size, two tablespoons.  Grams.  22 --

5   nope, sorry, 21.

6       Q.    21, okay.

7             21 is too much for you, correct?

8       A.    Yes.  I -- I don't know the nutritional facts

9   label.  I typically look at the first ingredient.

10      Q.    You do?

11      A.    I do.

12      Q.    With every product you buy?

13      A.    When I do look.

14      Q.    Okay.

15      A.    That's where I look.

16      Q.    What does that mean to you if it's the first

17  product?

18      A.    It means it's the most of the product that's in

19  that container.  It goes from most to least.

20      Q.    Okay.  So 21 grams is too much?  That's why

21  we're here, right, this lawsuit?

22      A.    Yes.

23      Q.    21 grams too much?

24      A.    Yes.

25      Q.    Is ten too much?

1          MR. MARRON:  If you know.

2          THE WITNESS:  I don't know.

3     BY MR. BISH:

4          Q.    Closer, though?

5          A.    More reasonable than 21.

6          Q.    What about five?

7          A.    More reasonable.

8          Q.    Is five too high?

9          A.    I don't know.

10         Q.    You don't know?

11         A.    I'm not a nutritionist.

12         Q.    Right.

13         A.    I don't know.

14         Q.    Any idea how you could put Nutella on bread and

15    have only five grams of sugar?

16         A.    What's the question?

17         Q.    Do you have any idea if it's possible to put

18    Nutella on bread and only have five grams of sugar?

19         A.    Very small, small amount.

20         Q.    Half a tablespoon?

21         A.    Okay.

22         Q.    Divide by four?

23         MR. MARRON:  Yeah, object on this line of

24    questioning.  It calls for an expert opinion.

25         MR. BISH:  Division?

1          MR. MARRON:  Incomplete hypothetical.

2          MR. BISH:  Division calls for an expert?

3          MR. MARRON:  I'm saying the whole line of

4     questioning.

5          MR. BISH:  No.

6          MR. MARRON:  This line of questioning.

7          MR. BISH:  It's math.

8     BY MR. BISH:

9        Q.    Right?

10         MR. MARRON:  Are you a mathematician?

11         THE WITNESS:  I am not a mathematician.

12    BY MR. BISH:

13       Q.    But you can figure that out, correct?

14       A.    I understand where you're going.

15       Q.    You could figure that out, correct?

16       A.    Uh-huh.

17       Q.    "Yes"?

18       A.    Can I figure out the math?

19       Q.    Yes.

20       A.    Sure.

21       Q.    So if you wanted -- if your goal was to give

22    your daughter no more than five grams of sugar, you could

23    still use Nutella and get there by using one-fourth of

24    the serving size, right?

25         MR. MARRON:  Dale, I think the fundamental -- I

1   mean, she's not -- she doesn't understand grams and

2   metrics.

3          MR. BISH:  Okay.  Let's cut off the speaking

4   objections.  Object to form and let's have her answer so

5   we can get her out of here on time.

6          MR. MARRON:  Object to form.

7          MR. BISH:  If you want to keep arguing about

8   math we'll be here for a while.

9          MR. MARRON:  Okay.

10          MR. BISH:  If that's what you're client wants,

11   I'm happy to do that.

12          MR. MARRON:  Ask away.

13          MR. BISH:  Thank you.

14   Q.    Right?  You could have figured that out, right?

15   A.    Okay.

16   Q.    Yes?

17   A.    Sure, yes.

18   Q.    Okay.  Is five too much for you?

19   A.    I'm not sure.

20   Q.    Are any of the breakfasts you give your

21   daughter today, do they have more than five grams of

22   sugar in them?

23   A.    I don't know.

24   Q.    No idea?

25   A.    No idea.

1    Q.    Okay.  Did you ever think about trying that,

2    maybe just spreading a little bit of Nutella on the bread

3    to see if it was within your range of a healthy

4    breakfast?

5    A.    After I concluded that it was entirely way too

6    sweet to eat for breakfast, no.

7    Q.    That's a taste, right?

8    A.    Correct.

9    Q.    That's not a --

10    A.    Personal opinion.

11    Q.    -- health thing?

12         Oh, yeah, your personal opinion.

13         MR. MARRON:  Objection; argumentative.

14    BY MR. BISH:

15    Q.    Your personal opinion, does your daughter share

16    that personal opinion?

17    A.    She's three years old.

18    Q.    Does she like the taste of Nutella?

19    A.    It's been a while she's since had it.  I don't

20    know.

21    Q.    But she did at the time, though, right?

22    A.    (No audible response.)

23    Q.    Yeah.

24         So if you put just a half a tablespoon, half a

25    tablespoon on the bread, it would have been approximately

1    five grams of sugar.  And with that amount, you don't

2    know if that would be healthy or unhealthy, acceptable or

3    unacceptable to you; is that right?

4        A.    Correct.

5        Q.    Okay.  But you do portion control all the time

6    with your kids, don't you?

7        A.    For the most part, yes.

8        Q.    All the time.  Every night you have dinner.

9        A.    Uh-huh.

10       Q.    You give your three-year-old less than your

11   19-year-old, right?

12       A.    Yes.

13       Q.    Because it's just math, and it's your gut

14   instinct on how much is enough, right?

15            MR. MARRON:  Objection; compound.

16            THE WITNESS:  Yes.

17   BY MR. BISH:

18       Q.    Yes.

19            So what is it about Nutella, if you could have

20   a breakfast with only five grams of sugar, what about

21   Nutella is so inherently unhealthful that you decided to

22   file a lawsuit?

23            MR. MARRON:  Objection; argumentative.

24            Other than what she's already testified to?

25            THE WITNESS:  Ask the question again.

1           MR. MARRON:  Well, I think it's argumentative.

2           THE WITNESS:  Yeah.  I mean, it --

3    BY MR. BISH:

4       Q.    It doesn't mean don't answer it.

5       A.    I'm --

6       Q.    So what is it about Nutella?  You could put

7    Nutella on bread and only have five grams of sugar, so

8    what is it about Nutella that is so inherently

9    unhealthful that it can't be a breakfast food?

10      A.    You're playing on words.

11      Q.    I'm not.

12      A.    And I've asked these -- I've answered the

13   questions of the product.

14      Q.    Right.  And it was all about sugar, too much

15   sugar.

16      A.    Correct.

17      Q.    And I've said well, what if we get the sugar

18   down to one-fourth of the sugar?

19      A.    And you're playing on the words and bringing

20   math into the equation.

21      Q.    It's just portion control, which --

22      A.    Portion control, I understand.

23      Q.    -- you do all the time.  Probably every time

24   you give your kids a meal you do portion control, right?

25      A.    Correct.

1    Q.    So why can't you do portion control of Nutella?

2    A.    I choose not to.

3    Q.    And why not?

4    A.    Because I don't feel that it's a healthy

5  breakfast item, well-balanced breakfast item.

6    Q.    Because of the sugar?

7    A.    Correct.

8    Q.    That's it?

9    A.    (No audible response.)

10    Q.    Okay.

11    A.    I need to --

12    Q.    Okay.

13    A.    I have her --

14          MR. MARRON:  Oh, you want to call?

15          THE WITNESS:  Yeah.

16          THE VIDEOGRAPHER:  All agreed to go off the

17  record, we're off the record at 5:33 p.m.

18          (Recess from 5:33 p.m. to 5:41 p.m.)

19          THE VIDEOGRAPHER:  We are back on record at

20  5:41 p.m.

21          MR. BISH:  I'll mark as Defendant's Exhibit 6.

22          (The document referred to was marked by

23          the CSR as Deposition Exhibit 6 for

24          identification and attached to the

25          deposition transcript hereto.)

1          THE WITNESS:  Thank you.

2          MR. BISH:  For the record, Defendant's

3    Exhibit 6 is a printout from the Food and Drug

4    Administration's website entitled "How to Understand and

5    Use a Nutrition Facts Label."

6      Q.    Now, I assume you've never seen this document

7    before, correct?

8      A.    No.

9      Q.    And you've never visited the FDA's website,

10   correct?

11     A.    No.

12     Q.    Have you consulted any material regarding how

13   to read a nutrition facts label?

14     A.    Ever?

15     Q.    Ever.

16     A.    They might have taught it in school at some

17   point.  I'm not sure.

18     Q.    But you do from time-to-time consult nutrition

19   facts labels, correct?

20     A.    I've looked at them occasionally.

21     Q.    And you know what you're looking for, right?

22     A.    For the most part, yes.

23     Q.    Easy to understand?

24     A.    Most part.

25     Q.    Any parts that you don't understand?

1      A.     No.

2      Q.     Okay.  So, for example, so looking at

3  Defendant's Exhibit 6, there's a sample label for

4  macaroni and cheese.

5             You see that?

6      A.     Yes.

7      Q.     The nutrition facts.  Serving size, one cup,

8  right.  And you understand what a serving size is, right?

9      A.     Yes.

10     Q.     Okay.  Any idea how the serving size is

11 determined?

12     A.     The FDA puts it into effect, I would assume so.

13     Q.     Very good.

14     A.     Okay.

15     Q.     And you see where it says "servings per

16 container," right?

17     A.     Yes.

18     Q.     It says how many servings are in the container.

19            Pretty obvious?

20     A.     Yes.

21     Q.     It has the calories, and you understand what

22 calories are?

23     A.     Yep.

24     Q.     You see where it says calories in fat, you

25 understand what that means?

1    A.    Generally.

2    Q.    What do you understand it to mean, since you

3 said generally?

4    A.    Out of the fat content of the product, that's

5 how many calories you're going to get.

6    Q.    From the fat?

7    A.    Correct.

8    Q.    Then you go down and it has a certain number of

9 required characteristics, right.  So you have total fat.

10 It says saturated fat, trans fat, cholesterol, sodium,

11 total carbohydrates, et cetera, right?

12    A.    Yes.

13    Q.    And you understand that on the left it says how

14 much and on the right it says a percent daily value,

15 right.

16          You understand what that means?

17    A.    Yes.

18    Q.    Do you understand what the percent daily value

19 means?

20    A.    Percent daily value, no.  I -- I would assume

21 that it's the amount of which they tell you to eat in a

22 day.

23    Q.    Right.

24          That's your understanding, right?

25    A.    That's what I would gather from it.

1    Q.    Common sense?

2    A.    Yeah.

3    Q.    Okay.  So out of -- out of the nutrients listed

4    on this sample label, which are the ones that you pay

5    attention to or that you care about?

6    A.    I don't normally -- like I said, I don't -- I

7    look at this occasionally.

8    Q.    And you see where there's sugar?

9    A.    Yes.

10   Q.    And you see that there's actually no percentage

11   there for sugar?

12   A.    Correct.

13   Q.    You understand why that is?

14   A.    Because it's too low to have a percent.

15   Q.    Anybody ever told you that, in fact, they're

16   not required to list percentage of sugar on the facts

17   label?

18   A.    No, I'm not aware of that.

19   Q.    So you've never reviewed, for example, the

20   FDA's guidelines about how to describe sugar?

21   A.    As previously stated, I have not viewed FDA's

22   website.

23   Q.    Okay.  So let's just turn to -- let's see, what

24   is it?  Page 6 of 7 of Defendant's Exhibit 6.

25         About halfway down the page, you see where it

Page 181

1    says "sugars"?

2              (Document reviewed by witness.)

3              THE WITNESS:   Okay.

4    BY MR. BISH:

5        Q.    Okay.  See the explanation there:

6              No daily reference value has been

7         established for sugars because no

8         recommendations have been made for the total

9         amount to eat in a day.

10        You see that.

11       A.    Yes.

12       Q.    Okay.  And you don't have any particular

13   concept of how much sugar you should eat in a day, do

14   you?

15       A.    No, I do not.

16       Q.    Okay.  You don't think the FDA is wrong in not

17   establishing an amount per day?

18       A.    I don't know.

19       Q.    Now, if you go back to page -- page 2 of

20   Defendant's Exhibit 6.  About a third of the way down,

21   you see where it says, talking about serving size:

22              First place to start when you look at

23         nutrition facts label is serving size.

24         It goes on:

25              Serving sizes are standardized to make

1           it easier to compare similar foods.  They are

2           provided in similar units.

3           See that?

4    A.     Yes, I do.

5    Q.     And then you'll see in the next paragraph

6    there's the bold sentence that says:

7               Pay attention to the serving size,

8           especially how much servings there are in the

9           food package, then ask yourself how many

10          servings am I consuming, e.g., one-half

11          serving, one serving or more.

12          You see that?

13   A.     Yes.

14   Q.     And that's what you were just using your

15   intuition, right.  You don't necessarily take a label and

16   you don't do the math.  You just use your gut, right?

17   A.     Correct.

18   Q.     But the information is there and you just --

19   you don't use it, right?

20   A.     Most of the time not.

21   Q.     Right.

22          You just -- you rely on your gut feel?

23   A.     Correct.

24   Q.     Okay.  All right.  I think we're done with

25   that.

1          MR. BISH:  We should go off the record a second

2     while we cue up the video.

3          THE VIDEOGRAPHER:  All agreed to go off the

4     record, we're off the record at 5:48 p.m.

5          (Recess from 5:48 p.m. to 5:51 p.m.)

6          THE VIDEOGRAPHER:  We're back on record at

7     5:51 p.m.

8          MR. BISH:  Earlier when we were talking about

9     television commercials, your counsel made some objections

10    that we should show you the actual commercials.  So we're

11    going to go ahead and do that.  Let's roll.

12         MR. EGGLETON:  You want to have her pull out

13    the exhibit?

14         MR. BISH:  Yeah.  You can look at Defendant's

15    Exhibit 3, which is the first amended consolidated

16    complaint, and it's page 26.

17         MR. MARRON:  Now, does that represent the

18    entire dialogue for the commercial?

19         MR. BISH:  Take a look.

20         MR. MARRON:  If you know?

21         MR. BISH:  Let's take a look.

22         MR. MARRON:  Hold on for a second.  What

23    paragraph are you looking at?

24         MR. BISH:  Page 26, it says "mom first."

25    Paragraph 93.

Page 184

1          MR. MARRON:  I'm looking at the wrong one.

2          THE WITNESS:  It's --

3          MR. MARRON:  Yeah, I got you.  26.  All right.

4   I can't really see it, though.

5          MR. EGGLETON:  Show them all.

6          THE WITNESS:  Can we lift it up a little bit,

7   the screen.  Yeah, thank you.

8          MR. EGGLETON:  Yeah.  Do whatever you need to

9   do to make it easier to look at.  If you don't mind, I'll

10  just reach over you and click start here.

11          (Commercial being played.)

12  BY MR. BISH:

13     Q.    So looking at that, do you know if that's the

14  Nutella commercial you saw?

15     A.    I'm not sure.

16     Q.    Not sure, okay.

17          You know, we talked about -- when we read

18  before, we talked about your objection to that.  And you

19  said you don't agree with putting sugar on whole wheat

20  piece of toast to convince your kid to eat a healthy

21  product, right?

22     A.    Yes.

23     Q.    So is that -- is that your objection to that

24  commercial?

25     A.    Yes.

1      Q.    Anything else?

2      A.    Other than it's giving you an impression that

3   it's a healthy breakfast item.

4      Q.    And what's that impression from?

5      A.    The layout of the scene.

6      Q.    Okay.

7      A.    Fruit, orange juice sitting on the table.

8      Q.    Because of the time of day?

9      A.    Time of day.

10     Q.    Yeah.  Same as the print ads, right?

11     A.    Correct.

12     Q.    Anything else?

13     A.    I don't think so.

14     Q.    Okay.

15     A.    I'm not sure.

16           MR. BISH:  Next.

17           MR. EGGLETON:  Which one do you want?

18           MR. MARRON:  If you need to look at it again,

19   you can do so.

20           THE WITNESS:  Okay.

21           MR. BISH:  I don't have them memorized.  Let's

22   do Pass.

23           THE DEPOSITION OFFICER:  P-a-s-s?

24           MR. BISH:  Yeah.

25           MR. MARRON:  For the record, we played that

Page 186

1   mom -- I guess it was the mom commercial for, what was

2   it, a 30-second segment?

3              MR. BISH:  I believe -- having watched

4   commercials my whole life, I believe it's about 30

5   seconds.

6              MR. MARRON:  30 seconds, okay.

7              Which one are we watching now?

8              MR. BISH:  Pass.

9              MR. EGGLETON:  What paragraph?

10             MR. BISH:  I'm not positive which one it

11  corresponds to, so we can do it twice and figure it out.

12             MR. MARRON:  Can I -- can we go do that again.

13             MR. BISH:  Want to start it, get the first

14  line, then we can figure it out.

15             (Commercial being played.)

16             MR. BISH:  It says paragraph 92.

17             MR. EGGLETON:  Okay.  Paragraph what?

18             MR. BISH:  92.

19             (Commercial being played.)

20  BY MR. BISH:

21       Q.   Okay.  So your best recollection, is that the

22  television ad that you saw?

23       A.   I'm not sure.

24       Q.   You're not sure.

25             And that's the one, again, that doesn't have

1    the word "healthy" or "nutritious" in it at all, right?

2        A.    From -- yeah.

3        Q.    But you recall seeing an ad that had the words

4    "healthy" and "nutritious" in it, right?

5        A.    From what I recall, yes.

6        Q.    Okay.  What's your -- same objection about this

7    commercial, that's setting, time of day?

8        A.    Correct.

9        Q.    Anything else?

10       A.    Than what I previously stated?

11       Q.    Correct.

12       A.    No.

13             MR. BISH:  Okay.  Let's do Silence, which will

14   be paragraph 91.

15             THE WITNESS:  91 or 93?

16             MR. BISH:  91.

17             MR. MARRON:  They're going like that.

18             THE WITNESS:  Okay.

19             (Commercial being played.)

20   BY MR. BISH:

21       Q.    Ms. Hohenberg, do you believe this is the

22   commercial you saw?

23       A.    I'm not sure.

24       Q.    Not sure.

25             Again, no use of the word "healthy" or

1    "nutritious," correct?

2        A.    Not from what I heard, no.

3        Q.    And are your objections to this commercial the

4    same that we discussed previously; its setting and the

5    time of day, correct?

6        A.    Giving a misleading impression, yes.

7        Q.    Based on the time of day?

8        A.    Time of day, products on the counter; fruit,

9    orange juice, milk.

10       Q.    Right.

11             But as we've discussed earlier, if it was at

12   night, it would be a different story?

13       A.    On a bowl of ice cream, yes.

14       Q.    Well, so when we talked about the print ad, we

15   talked about the depiction of fruit on the table and the

16   scene.  And you said well, if it was dark outside it

17   would be okay, right?

18             MR. MARRON:  Objection; misstates her testimony

19   and...

20             THE WITNESS:  I think there's a lot more

21   circumstances that would come into play on that.

22   BY MR. BISH:

23       Q.    What are the circumstances?

24       A.    Again, it's depicting an impression that it's a

25   healthy breakfast item, part of a well-balanced

Page 189

1   breakfast.

2       Q.    Okay.   Anything else?

3       A.    No.

4       Q.    Okay.

5             MR. BISH:   Okay.   I think we're done with the

6   TV ads.   And it being 6:00 o'clock --

7             THE WITNESS:   How much longer do we have?

8             MR. BISH:   -- we can take a break and see if we

9   can wrap up.

10            THE VIDEOGRAPHER:   All agreed to go off the

11  record, we're off the record at 5:59 p.m.

12            (Recess from 5:59 p.m. to 6:02 p.m.)

13            THE VIDEOGRAPHER:   We're back on the record at

14  6:02 p.m.

15            MR. BISH:   Okay.   It being 6:00 p.m., and being

16  mindful of your time, we will go ahead and conclude for

17  today.   We'll just reserve our rights based on the --

18  what we believe to be some inadequate document discovery

19  responses.   So we're going to reserve our right in that

20  regard.   But --

21            MR. MARRON:   Okay.   And we'll --

22            MR. BISH:   -- today will be -- we'll be done

23  for today.

24            MR. MARRON:   Well, we'll object to the

25  documents being inadequate.   And you know, we'll consider

Page 190

1   this deposition concluded.

2            MR. BISH:  And we disagree, but --

3            MR. MARRON:  Okay.

4            MR. BISH:  Okay.  Thank you.

5            THE VIDEOGRAPHER:  This concludes media

6   number 2 of 2, Volume I, in the deposition of Athena

7   Hohenberg.  We're off the record at 6:03 p.m.

8

9            (Deposition concluded at 6:03 p.m.)

10                      *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           DECLARATION UNDER PENALTY OF PERJURY

2

3           I, ATHENA HOHENBERG, do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken September 29, 2011;

6    that I have made such corrections as appear noted herein,

7    in ink, initialed by me; that my testimony as contained

8    herein, as corrected, is true and correct.

9

10          DATED this _____ day of _____,

11   2011, at _____, California.

12

13

14

15

16

17

18

19

20          _____

21                  ATHENA HOHENBERG

22

23

24

25

Page 192

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF LOS ANGELES        )


I, NIKKI ROY, Certified Shorthand Reporter, certificate number 3052, for the State of California, hereby certify:

The foregoing proceedings were taken before me at the time and place therein set forth, at which time the deponent was placed under oath by me;

The testimony of the deponent and all objections at the time of the examination were recorded stenographically by me and were thereafter transcribed;

The foregoing transcript is a true and correct transcript of my shorthand notes so taken;

I further certify that I am neither counsel for nor related to any party to said action nor in any way interested in the outcome thereof.

In witness whereof I have hereunto subscribed my name 3rd day of October, 2011.


_____

NIKKI ROY

1                        CORRECTION LIST

2

3       PAGE/LINE        FROM                 TO

4       _____        _____

5       _____        _____

6       _____        _____

7       _____        _____

8       _____        _____

9       _____        _____

10      _____        _____

11      _____        _____

12      _____        _____

13      _____        _____

14      _____        _____

15      _____        _____

16      _____        _____

17      _____        _____

18      _____        _____

19      _____        _____

20      _____        _____

21      _____        _____

22      _____        _____

23      _____        _____

24      _____        _____

25      _____        _____