**LAW OFFICES OF RONALD A. MARRON, APLC**
RONALD A. MARRON (175650)
*ron@consumersadvocates.com*
MAGGIE REALIN (263639)
*maggie@consumersadvocates.com*
B. SKYE RESENDES (278511)
*skye@consumersadvocates.com*
3636 4th Avenue, Suite 202
San Diego, California 92103
Telephone:     (619) 696-9006
Facsimile:     (619) 564-6665

**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
JACK FITZGERALD (257370)
*jack@westonfirm.com*
MELANIE PERSINGER (275423)
*mel@westonfirm.com*
COURTLAND CREEKMORE (182018)
*courtland@westonfirm.com*
1405 Morena Blvd. Suite 201
San Diego, CA 92110
Telephone:     (619) 798-2006
Facsimile:     (480) 247-4553

<u>**Class Counsel**</u>

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FERRERO LITIGATION | Case No. 3:11-cv-00205-H-KSC<br>Pleading Type: Class Action<br><br>**DECLARATION OF JACK FITZGERALD IN SUPPORT OF PLAINTIFFS' RESPONSE TO THE OBJECTION OF MICHAEL E. HALE AND THE PURPORTED OBJECTION OF COURTNEY DREY & ANDREA PRIDHAM**<br><br>Judge: The Honorable Marilyn L. Huff<br>Hearing: July 9, 2012<br>Time: 10:30 a.m.<br>Location: Courtroom 13 |

I, Jack Fitzgerald, declare:

1.    I am Class Counsel in this action. I am a member in good standing of the State Bars of California and New York; and of the United States District Courts for the Northern, Central and Southern Districts of California and the Southern and Eastern Districts of New York; and of the United States Court of Appeals for the Ninth Circuit.

2.    On Sunday, June 3, 2012, I (along with my co-counsel and Defendant's counsel) received an email attaching a letter from attorney Mark T. Lavery who stated that he represented Courtney Drey, a class member in the Nutella California Class, and requested a "Rule 37 conference" to discuss the footnote in Plaintiffs' Final Approval Motion that explained that any Class Member could view the unredacted versions of Plaintiffs' briefs by agreeing to abide by the terms of the Protective Order entered in the action. A true and correct copy of the email chain containing Mr. Lavery's email is attached hereto as Exhibit 1. This is the only email I have ever received from Mr. Lavery directly. A true and correct copy of Mr. Lavery's letter is attached hereto as Exhibit 2.

3.    On Monday, June 4, 2012, Ferrero's counsel, Dale Bish, provided Mr. Lavery with the Protective Order. *See* Ex. 1.

4.    Later that day I received another email from Mr. Bish, responding to an earlier email from Mr. Lavery in which he copied his co-counsel, Grenville Pridham, who Mr. Lavery stated also represented Courtney Drey. Mr. Lavery's email made no mention of purported objector Andrea Pridham.[1] In his email, Mr. Bish explained that "[a]s soon as [Ferrero] receive[s] signatures from you and Mr. Pridham, we will authorize plaintiffs' counsel to send the unredacted version of their May 25th filing." *See* Ex. 1.

5.    Mr. Lavery and Mr. Bish continued to exchange emails throughout the day on Monday, June 4 on which Plaintiffs' counsel was not copied; I was, however, later copied on an email that included their previous exchange. During that exchange, Mr. Lavery stated that he and his co-counsel

---

[1] Purported objector Andrea Pridham appears to be attorney Grenville Pridham's wife. An internet search shows both Pridhams live at the same address in Orange, California. A true and correct copy of the results of that search are attached hereto as Exhibit 3.

1   would "sign and fax the [Protective Order] confirmation tomorrow morning and call [Mr. Bish] to

2   discuss any issues after we get the sales data." However, Mr. Lavery apparently never signed or

3   returned the Protective Order confirmation, as Mr. Bish confirmed two days later. *See* Ex. 1.

4        6.     A few hours after Mr. Bish confirmed on June 6 that Mr. Lavery and/or his client(s) had

5   not signed the Protective Order, Mr. Lavery called my office. At the time, my partner, Greg Weston

6   and I were in Los Angeles for a hearing before the Honorable George H. Wu. Our paralegal, Allan

7   Bradley, took the call. Shortly after getting off the phone with Mr. Lavery, Mr. Bradley sent me and my

8   co-counsel an email detailing the call, which is replicated here in full:

9

10          Here is a transcript of the call I just took at 11:47am, apparently regarding the Nutella case. The caller was rude and aggressive.

11          The caller never gave a name until the end, and even then he never explicitly identified himself as Mark Lavery.

12

13          The ellipses represent only a few words or sentences each that I don't remember exactly and didn't contain anything substantive. There are no large gaps in my memory. It was a

14          short conversation; I believe the phone showed about 2:15 on the timer when the caller disconnected.

15

16          Allan: "The Weston Firm, this is Allan."
          Lavery: "Is Jack there?"

17          Allan: No, he's not in the office.
          L: Is Greg there?

18          A: No, he's not available either.
          L: What's he doing?

19          ...
          A: Can I take a message?

20          ...
          L: "Who's the associate on the Nutella Case?"

21          ...
          L: Who are you?

22          A: Allan
          L: Allan who? (or What's your last name?)

23          A: "My name is Allan, I'm a paralegal at the Weston Firm"

24          ...
          A: Can I take a message for you sir?

25          ...
          L: "How about you're a paralegal and I'm an attorney," (something about how "in a few

26          years you can go to law school and then you'll be an attorney or whatever but now you're a paralegal") and you should interrupt whatever your boss is doing. He's been ignoring

27          my emails. ...

28          ...

<div align="center">2</div>

A: Again, I'm happy to take a message.
...
L: "Your boss went to Harvard," and he should know better...
...
A: Can I get your name, sir?
L: No. Now "with the disrespect you've shown me," and the "defensiveness,"
and "you were obviously expecting the call," how about you interrupt your boss. ...
...
L: How about you "interrupt Greg and ask if he wants to take a call from Mark Lavery."
A: What was the name again sir?
[Lavery disconnected]

7.     After returning from Los Angeles and learning of this call, I sent Mr. Lavery an email stating, "I understand you called to speak to Greg or me today. I'm sorry we missed your call, we were in Los Angeles for a hearing in another matter. If you'd like to speak, we are available after 11:00 a.m. PST tomorrow." A true and correct copy of my email is attached hereto as <u>Exhibit 4</u>. Mr. Lavery never responded to my email, and did not finally call me until two weeks later, on June 20.

8.     Mr. Lavery's conversation with Mr. Bradley was only the beginning of what would be a series of discourteous and unprofessional telephone calls by Mr. Lavery.

9.     Two days later, on Friday, June 8, Mr. Lavery sent Mr. Bish an email, without copying Plaintiff's counsel, stating that they could not agree with the Protective Order, and that "[i]f you are willing to allow the filing of an unredacted motion for final approval and an extension of the objection deadline, we may reach an accord, if not we may have to file a motion with the Court."[2] Mr. Bish responded that Mr. Lavery had "led me to believe that you had agreed to the protective order (and had sent signatures [previously])," and that he was sure "Mr. Pridham has explained that the protective order entered by Judge Bencivengo in this case is in the Southern District's form and is not objectionable." Mr. Bish noted that "[i]f you intend to file a motion with the court, we will respond in

---

[2] Drey and Pridham's purported objection brief, in a footnote, moves the Court "to order the parties to file an unredacted motion and provide extension of the time to object. . . . We may file a motion to lift the protective order." Drey/Pridham Obj. at 15 n.2. This request runs contrary to the Court's Order granting Plaintiffs' application to file the unredacted versions of her Final Approval Motion and Fee Application under seal. *See* Dkt. No. 120. Drey and Pridham also never agreed to sign the Protective Order, nor filed the motion to lift the protective order that they said they might file.

due course." Mr. Lavery responded with various demands for "proof" that Ferrero's sales data is confidential, and Mr. Bish responding that "[w]e will respond to your filed objection." *See* Ex. 1.

10.    On Thursday, June 14, my office received another call from the same number that had called on June 6 when Mr. Bradley took the call. Again, the caller did not identify himself, and demanded to speak to me or my partner. When our paralegal, David Newberry told him we were unavailable, he hung up on Mr. Newberry. Shortly thereafter, I received an email from Mr. Newberry describing the call.

11.    Later that day, on June 14, Mr. Lavery called the offices of my co-counsel, Ronald A. Marron. Mr. Marron's paralegal, Carlos Sanchez, took the call, after which he circulated an email memorializing the call, which is replicated in full here:

> All:
>
> This message is to memorialize the conversation I had today, June 14, 2012, at 11:05am with Mark Lavery and John Guglielmo.
>
> When asked to speak with Ron I responded that he was in a meeting and that I would take a message. After which point one of the attorneys informed me that it was a Rule 37 discovery dispute and that if Ron didn't take the call they would inform the court that Ron was being uncooperative. I again asked for contact information to return the call but was instead told to put them on hold and inform Ron of the call's subject matter. After conveying the callers posture to Ron (incredibly hostile), I for a third time asked for a call back number, to which they responded by asking for my name and ended the call by saying that they would inform the court of our conversation.

12.    On June 20, I received a call from Mr. Lavery, which lasted approximately 6 minutes. After asking how I could help him, Mr. Lavery asked our position on Ferrero's sales figures. I explained—just as the footnote in our briefs had explained—that we had requested Ferrero de-designate the information as confidential under the Protective Order, but that Ferrero had declined, and accordingly, we had an obligation under the Protective Order to maintain the information as confidential. I further explained that the parties had compromised by creating a relatively innocuous process whereby any member of the public could affirm they are not a Ferrero competitor, and agree to the terms of the Protective Order, and thereby receive the unredacted briefs, noting that Mr. Lavery and/or his clients had declined to do so. I also explained that the Court had considered the issue and granted the motion to file the information under seal, and that in any event, to the extent there is a

4

1  dispute, it is with Ferrero and needs to be resolved with Ferrero.[3] When Mr. Lavery asked about

2  Plaintiffs' position with respect to the purported Drey/Pridham objection, I stated that we would

3  respond to the objection in due course. Mr. Lavery, who was generally hostile and habitually

4  interrupting, accused me of "playing games." He also stated that they would appeal the objection to the

5  Ninth Circuit, which I took to suggest that they did not believe the objection was meritorious since they

6  anticipated it being overruled and appealing.

7        13.     During our call, Mr. Lavery also raised the issue discussed in the Drey/Pridham

8  objection concerning the filing of Ms. Rude-Barbato's complaint. He spoke in terms of "uncovering"

9  an "ethical issue." I explained that we did not agree with his clients' characterization of the situation or

10  its argument and would respond to the objection in due course. Again, he accused me of "playing

11  games." He told me "I've been doing this a lot longer than you," and threatened me, "don't ruin your

12  career over this." Shortly thereafter, as I was speaking, Mr. Lavery hung up on me.

13        14.     Neither I, nor anyone from my office or the offices of my co-counsel, have ever spoken

14  with Mr. Pridham nor Mr. Christopher V. Langone (who also appears as Drey and Pridham's attorney

15  on their purported objection brief).

16        15.     Mr. Lavery, Mr. Pridham and Mr. Langone appear to be so-called "professional

17  objectors." For example, they have individually or jointly been objectors, or represented objectors, in

18  the following recent cases:

19          •   *In re Nutella Mktg. & Sales Practices Litig.* (e.g., *Glover*), No. 11-cv-1086-FLW
20              (D.N.J.) (currently pending, *see* Dkt. No. 76).

21          •   *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-MD-1827-SI (N.D. Cal.)
              (currently pending, *see* Dkt. No. 5461).

22          •   *In re Classmates.com Consol. Litig.*, No. 09-cv-45-RAJ, Dkt. No. 211, slip op. at
23              14-15 (W.D. Wash. June 15, 2012) (denying Langone's request for $180,000 in
              fees, and a $50,000 "service award" because while "Mr. Langone and his counsel
24              appear to be convinced their efforts led to the improvements in the settlement[,]
              [t]hey are mistaken. . . . Mr. Langone . . . did more to slow this litigation than to
25              improve results for class members. . . . Mr. Langone's objections did not

26

27        [3] Mr. Lavery's series of emails with Mr. Bish in early June, in which he did not copy Plaintiffs'
    counsel, implicitly acknowledges this.

28

5

*In re Ferrero Litigation,* Case No. 3:11-CV-00205-H-KSC
DECLARATION OF JACK FITZGERALD IN SUPPORT OF PLAINTIFFS' RESPONSE TO OBJECTIONS

contribute significantly to obtaining any benefit for the class. Finally, the court observes that Mr. Langone's request for a $50,000 participation award is egregious.").[4]

- *Hall v. AT&T Mobility LLC*, No. 07-cv-5325-JLL, Dkt. No. 583, slip op. at 13 (D.N.J. Oct. 13, 2010) (overruling Langone objection).[5]

- *Ercoline v. Unilever United States, Inc.*, No. 10-cv-1747-SRC (D.N.J)

- *Duronslet v. Transworld Sys.*, No. 99-cv-12685 (C.D. Cal.).

16.     Plaintiff Laura Rude-Barbato hired attorney Ronald Marron to represent her in a class action against Ferrero after learning of the Hohenberg case, at around the same time, or shortly before the case was filed (Ms. Hohenberg and Ms. Rude-Barbato both live in the small San Diego community of Imperial Beach). Ms. Rude-Barbato signed a retainer agreement with Mr. Marron on February 4, 2011, three days *after* Ms. Hohenberg filed her Complaint. That retainer agreement provides, *inter alia*, that "Client grants Attorney the right to associate with other counsel to assist with the representation of Client, or the Class."[6]

17.     Prior to signing the retainer agreement, Mr. Marron sent an email to Ms. Rude-Barbato in which Messrs. Weston and Fitzgerald, of the Weston Firm, were copied. Mr. Marron advised Ms. Rude-Barbato that he would be working with these attorneys and requested Ms. Rude-Barbato's availability to introduce her to them, noting the need to coordinate schedules.[7]

---

[4] A true and correct copy of the Court's Order is attached hereto as Exhibit 5.

[5] In the same case, Mr. Lavery and Mr. Langone were sanctioned for the unauthorized practice of law. Attached hereto as Exhibit 6 is a true and correct copy of the court's order striking Mr. Langone's oral arguments in objection to the settlement (*Hall* Dkt. No. 570).

[6] Because of potential privilege issues, I do not attach the full retainer agreement to this Declaration. However, Class Counsel will provide the Court Ms. Rude-Barbato's full retainer agreement upon request for *in camera* review.

[7] Because the email is a privileged attorney-client communication, I describe its content only generally and do not attach it to this Declaration. However, Class Counsel will provide the Court with the communication for the Court's *in camera* review upon request.

18.     On Friday, June 29, a representative of Rust, the claims administrator in the case, advised me that, through June 28, 2012 there have been 58,794 claims filed by California Class members.

19.     I am led to believe that a third party posted Plaintiffs' fee application online shortly after it was filed because an individual who lodged an objection in the *Glover* New Jersey action cited portions of that brief and noted that he had obtained it in this manner, from a public website (e.g., not PACER). *See Glover* Dkt. No. 78 at 87 ("I stumbled over the public documents in the California papers that were filed on 5-25-12 and available on the web, (thanks Google) . . . ."). *See generally id.* at 87-96 (citing fee application extensively).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on July 2, 2012 in San Diego, California.

<div align="right">

/s/ Jack Fitzgerald
Jack Fitzgerald

</div>

DATED: July 2, 2012                              Respectfully Submitted,

<div align="right">

/s/ Jack Fitzgerald
Jack Fitzgerald

**THE WESTON FIRM**
GREGORY S. WESTON
JACK FITZGERALD
MELANIE PERSINGER
COURTLAND CREEKMORE
1405 Morena Blvd., Suite 201
San Diego, CA 92109
Telephone:    (619) 798-2006
Facsimile:    (480) 247-4553

**LAW OFFICES OF RONALD
A. MARRON, APLC**
RONALD A. MARRON
MAGGIE REALIN
B. SKYE RESENDES
3636 4th Street, Suite 202
San Diego, CA 92103
Telephone:    (619) 696-9006
Facsimile:    (619) 564-6665

**Class Counsel**

</div>

# EXHIBIT 1

| From: | Bish, Dale |
| --- | --- |
| To: | Mark Lavery |
| Cc: | Grenville Pridham; jack@westonfirm.com |
| Subject: | RE: In Re Ferrero Case No. 11-CV-205 H (CAB) |
| Date: | Friday, June 08, 2012 4:35:48 PM |

We will respond to your filed objection.

**From:** Mark Lavery [mailto:mark@laverylawfirm.com]
**Sent:** Friday, June 08, 2012 4:29 PM
**To:** Bish, Dale
**Cc:** Grenville Pridham
**Subject:** Re: In Re Ferrero Case No. 11-CV-205 H (CAB)

Dale,

Mr. Pridham discovered more publicly available sales data. That is the reason for the change in position.

Commercially sensitive is not the standard for a protective order. The information must be a trade secret or long term confidential information. Are you trying to tell me that A.C. Nielsen has no sales data on Ferrero USA?

We are filing our objection today. One of the grounds is the redacted motions.

We believe the class members have a right to see an unredacted information about a public settlement.

Please provide proof of your claim that Ferrero USA sales data is kept confidential.

I don't know what you mean

> If you intend to file a motion with the court, we will respond in due course.

We are requesting you provide proof that the redacted information has been kept confidential. Alternatively, we request you put an unrefacted version of the motions on the class website and allow additional time for all class members to object to the unrefacted motion.

Please talk to your client and get back to us.

Mark Lavery

Sent from my iPhone

On Jun 8, 2012, at 5:58 PM, "Bish, Dale" <DBish@wsgr.com> wrote:

> Mark,

Our conversations, including the email below and the voicemail you left Monday, led me to believe that you had agreed to the protective order (and had sent signatures on Tuesday). I don't see why you would reverse course and request an extension the day that objections are due. I'm sure Mr. Pridham has explained that the protective order entered by Judge Bencivengo in this case is the Southern District's form and is not objectionable.

With respect to your assertion regarding the sales data, you are wrong. Ferrero USA's sales data is confidential. The document you sent on Sunday does not change our view for a number of reasons, including that it is not even a Ferrero USA document. We have confirmed with our client that the data at issue is commercially sensitive and is not publicly disclosed.

If you intend to file a motion with the court, we will respond in due course.

Regards,
Dale

---

**From:** Mark Lavery [mailto:mark@laverylawfirm.com]
**Sent:** Friday, June 08, 2012 1:24 PM
**To:** Bish, Dale
**Cc:** Grenville Pridham
**Subject:** Re: In Re Ferrero Case No. 11-CV-205 H (CAB)

Dale,

After further consultation with Mr. Pridham, we cannot agree to your protective order. Ferrero Sales data is not confidential. Much sales data is available. If you are willing to allow filing of an unredacted motion for final approval and an extenstion of the objection deadline, we may reach an accord, if not we may have to file a motion with the Court.

Mark Lavery

On Jun 6, 2012, at 10:57 AM, Bish, Dale wrote:

Mark – we haven't received your signature; have you decided that you don't need the unredacted briefs?

--Dale

**From:** Mark Lavery [mailto:mark@laverylawfirm.com]
**Sent:** Monday, June 04, 2012 2:26 PM
**To:** Bish, Dale
**Subject:** Re: In Re Ferrero Case No. 11-CV-205 H (CAB)

We are occupied at that time. We will sign and fax the confirmation tomorrow morning and call you to discuss any issues after we get the sales data.

Thanks,

Mark Lavery


Sent from my iPhone

On Jun 4, 2012, at 3:00 PM, "Bish, Dale" <DBish@wsgr.com> wrote:

> OK.  Fyi, I'll be out of the office until approx. 3pm pst.

> **From:** Mark Lavery [mailto:mark@laverylawfirm.com]
> **Sent:** Monday, June 04, 2012 12:29 PM
> **To:** Bish, Dale
> **Subject:** Re: In Re Ferrero Case No. 11-CV-205 H (CAB)
>
> I will let you know soon.
>
> mark
>
> On Jun 4, 2012, at 1:14 PM, Bish, Dale wrote:
>
>
>
> > Sure thing.  650.849.3467.  approximate time?

> **From:** Mark Lavery [mailto:mark@laverylawfirm.com]
> **Sent:** Monday, June 04, 2012 11:13 AM
> **To:** Bish, Dale
> **Cc:** Grenville Pridham
> **Subject:** Re: In Re Ferrero Case No. 11-CV-205 H (CAB)
>
> Mr. Bish,
>
> Mr. Grenville had a few questions. Can we conference call with you later?

Mark Lavery

Sent from my iPhone

On Jun 4, 2012, at 1:05 PM, "Bish, Dale" <DBish@wsgr.com>
wrote:

> Mr. Lavery,
>
> Thank you for the note and the voicemail.  I'm attaching an
> Agreement to Be Bound (taken from the ND California form)
> that would suffice for present purposes.  As soon as we
> receive signatures from you and Mr. Pridham, we will
> authorize plaintiffs' counsel to send the unredacted version
> of their May 25th filing.
>
> Also, to the extent that you anticipate sharing the
> information with your client, we would just need her
> signature and a confirmation that she is not employed by a
> competitor of Ferrero USA.
>
> Thanks again,
> Dale

---

**From:** Mark Lavery [mailto:mark@laverylawfirm.com]
**Sent:** Monday, June 04, 2012 10:49 AM
**To:** Bish, Dale
**Cc:** Grenville Pridham
**Subject:** Re: In Re Ferrero Case No. 11-CV-205 H (CAB)

Mr. Bish,

I left you a voicemail. I want to confirm some issues
about the protective order. But we want the information
promptly and the order allows modification so we may
be willing to sign. I need to coordinate with Grenville
Pridham who also represents Courtney Drey. Mr.
Pridham serves as co-counsel and local counsel. Mr.
Pridham is admitted in California and S.D. Cal. Lets talk
soon.

Mark Lavery

Sent from my iPhone

On Jun 4, 2012, at 10:29 AM, "Bish, Dale" <DBish@wsgr.com> wrote:

> Mr. Lavery,
>
> Attached is the protective order entered in the California action.  I will call you this afternoon to discuss.
>
> Thanks,
> Dale

**From:** Mark Lavery [mailto:mark@laverylawfirm.com]
**Sent:** Sunday, June 03, 2012 12:13 PM
**To:** ron@consumeradvocates.com; jack@westonfirm.com; Bish, Dale
**Cc:** greg@westonfirm.com
**Subject:** In Re Ferrero Case No. 11-CV-205 H (CAB)

Counsel,

Please see attached letter. Call me tomorrow at 847-813-7771 to discuss.

Thanks,

Mark T. Lavery
Lavery Law Firm
733 Lee St.
Des Plaines, IL 60016
847-813-7771

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient.  Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited.  If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and

any attachments thereto.

&lt;CA Protective Order.pdf&gt;

&lt;CA Protective Order.pdf&gt;

&lt;SD Cal Agreement to Be Bound.docx&gt;

# EXHIBIT 2

MARK T. LAVERY

733 LEE ST.          180 N. LASALLE, SUITE 3700
DES PLAINES, IL 60016          CHICAGO, IL 60601
TEL 847 8137771   EMAIL MARK@LAVERYLAWFIRM.COM

# LAVERY LAW FIRM

Via Electronic Mail

June 3, 2012

Re: In Re Ferrero Case No. 11–CV–205 H (CAB)

Ronald A. Marron
LAW OFFICES OF RONALD A. MARRON, APLC
3636 4th Avenue, Suite 202
San Diego, CA 92103
Telephone: 619–696–9006

Gregory S. Weston
Jack Fitzgerald
THE WESTON FIRM
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone: 619–798–2006

Dale R. Bish
WILSON SONSINI GOODRICH & ROSATI PC
650 Page Mill Road
Palo Alto, CA 94304–1050
Telephone: 650–493–9300

Dear Counsel,

    We represent Courtney Drey, a class member in the Nutella California

class action settlement. We are writing with respect to the following footnote

contained the memorandum in support of final approval of the class action

settlement.

Plaintiffs previously filed Nutella sales information under seal. (See Dkt. No. 22–1, Ex. D; Dkt. No. 95 at 4, 10 (referring to evidence of Nutella sales).) Plaintiffs requested that Ferrero de-designate the sales information as "confidential" under the Protective Order for purposes of this Motion so that the public and Class Members might be able to fairly and fully evaluate the strength of the Settlement, but Ferrero declined. Ferrero has agreed as a compromise, however, that if any member of the public or Class Member, other than a competitor of Ferrero, wishes to review the unredacted version of this memorandum or the concurrently-filed memorandum in support of Plaintiffs' application for attorney fees, costs and incentive awards, he or she may do so by contacting Class Counsel and signing an agreement to abide by the terms of the Protective Order entered in this action (Dkt. No. 32).

We believe that the sales information is necessary for class members to fully evaluate the strength of the settlement.  We are reluctant to agree to sign an agreement to abide by the terms of this Protective Order. Courts have held that sales data is not a trade secret. N3 Oceanic, Inc. v. Shields, 2006 U.S. Dist. LEXIS 58563 at *20 (E.D. Pa. Aug. 21, 2006).  Our cursory research shows that Ferrero does not even hold sales data confidential and that such sales data is publicly available from AC Nielsen.  See attached document.

We do not believe that such information should be hidden from class members and do not believe that a class member should be required to sign an agreement to abide by its terms.  Nevertheless, please send us an electronic copy of the protective order and the motion for protective order and let us know when we can have a Rule 37 conference to discuss this issue.

Thanks,

Mark T. Lavery

# EXHIBIT 3

Free People Search | WhitePages



  



| Find People | Find a Business | Reverse Phone | Address & Neighbors | | Log In » | Help » |

**\***

Find

ADVERTISEMENT: See Andrea Pridham's full Internet profiles and photos.

ADVERTISEMENT: Get ... FREE

‹ Back

**Andrea C Pridham**

1424 N Pine St
Orange, CA 92867-3710

Associated: Grenville T Pridham,
Dana B Pridham

+1

**Claim It! »**

Are you Andrea?
Edit your info.
Connect with your
neighbors.

SPONSORED LINKS



| Print » | To Mobile » | To Outlook » |

Directions » View Neighbors » NEW



SPONSORED LINKS

**Andrea Pridham**

» Phone number for Andrea Available
» Additional Phone Numbers and Addresses

Not the right person?

A Pridham,
Adam R Pridham, 29
Alice L Pridham, 105

Sponsored by
PeopleFinders.com



---

**Learn more about Andrea Pridham at our sponsors**

SPONSORED LINKS

**Get Phone and other Contact Info for Andrea Pridham**

| Name | Location | Age | Possible Contact Info | People Report |
|------|----------|-----|----------------------|---------------|
| Andrea C Pridham | Orange, CA | 42 | 📄 ✉ 🏠 | That's the one |

See all Records for Andrea Pridham

Sponsored by PeopleSmart.com

---

SPONSORED LINKS

Find more information about **Andrea Pridham** on Ancestry.com!

Search for the following:

| Name | State | In this Category | Search Now! |
|------|-------|------------------|-------------|
| Andrea Pridham | CA | Birth, Marriage, & Death Records | View Records |
| Andrea Pridham | CA | Census & Voter Lists | View Records |
| Andrea Pridham | CA | Military Records | View Records |
| Andrea Pridham | CA | Historical Photos & Documents | View Records |

Free People Search | WhitePages









Find People | Find a Business | Reverse Phone | Address & Neighbors

Log In » | Help »

*

Find

ADVERTISEMENT: See Grenville Pridham's full Internet profiles and photos.

ADVERTISEMENT: Get

‹ Back

**Grenville T Pridham**

1424 N Pine St
Orange, CA 92867-3710

Age: 50-54
Associated: Dana B Pridham, Andrea C Pridham

[g+ +1]

**Claim It! »**

Are you Grenville?
Edit your info.
Connect with your
neighbors.

SPONSORED LINKS



Directions » View Neighbors » NEW


**Woman is 53 But Looks 27**
Mountain View: Mom publishes free facelift secret
that has angered doctors...

| Print » | To Mobile » | To Outlook » |

SPONSORED LINKS

**Grenville Pridham**
» Phone number for Grenville Available
» Additional Phone Numbers and Addresses

Not the right person?
Grenville Thomas Pridham, 52

Sponsored by
PeopleFinders.com

**Mountain View: Mom Makes
$89,844/Yr During Spare Time**
Out of job mom makes $7,487/month working on
the computer...

## Learn more about Grenville Pridham at our sponsors

SPONSORED LINKS

**Get Phone and other Contact Info for Grenville Pridham**

| Name | Location | Age | Possible Contact Info | People Report |
|------|----------|-----|----------------------|---------------|
| Grenville Thomas Pridham | Orange, CA | 52 | 📄 ✉ 🏠 | That's the one |

See all Records for Grenville Pridham

Sponsored by PeopleSmart.com

SPONSORED LINKS

Find more information about **Grenville Pridham** on Ancestry.com!

Search for the following:

| Name | State | In this Category | Search Now! |
|------|-------|------------------|-------------|
| Grenville Pridham | CA | Birth, Marriage, & Death Records | View Records |
| Grenville Pridham | CA | Census & Voter Lists | View Records |
| Grenville Pridham | CA | Military Records | View Records |

# EXHIBIT 4

| | |
|---|---|
| **From:** | Jack Fitzgerald |
| **To:** | "Mark Lavery" |
| **Cc:** | greg@westonfirm.com |
| **Subject:** | In Re Ferrero Case No. 11-CV-205 H (CAB) |
| **Date:** | Wednesday, June 06, 2012 5:20:00 PM |

Dear Mr. Lavery -

I understand you called to speak to Greg or me today. I'm sorry we missed your call, we were in Los Angeles for a hearing in another matter. If you'd like to speak, we are available after 11:00 a.m. PST tomorrow. Please let us know what time is convenient, and kindly circulate a dial-in number.

Very truly yours,
Jack

Jack Fitzgerald
The Weston Firm
2811 Sykes Court
Santa Clara, California 95051
Phone: (408) 459-0305
Cell: (650) 440-3170


_____ Information from ESET NOD32 Antivirus, version of virus signature database 7213 (20120611) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com


_____ Information from ESET NOD32 Antivirus, version of virus signature database 7258 (20120629) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

# EXHIBIT 5

HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE CLASSMATES.COM CONSOLIDATED LITIGATION | MASTER CASE NO. C09-45RAJ |
| | ORDER |
| | (APPLIES TO ALL ACTIONS) |

## I.  INTRODUCTION

The court issues this final order to dispose of a class action that will end in a settlement that delivers almost no individual benefit to 60 million people.  This case began as an effort to compensate millions of users of the classmates.com website who received allegedly deceptive emails from Defendants (collectively "Classmates") in a campaign to induce users to pay for classmates.com memberships.  The case will now end in a settlement that will wipe out the claims of 60 million classmates.com users for an average payment of less than five cents.  The overwhelming majority of those 60 million users will receive nothing.  About 700,000 of them submitted claims, and will receive less than four dollars each for their efforts.  Collectively, Classmates will pay $2.5 million directly to class members, another $1.05 million that the court will split between class members and the lawyers ("class counsel") who negotiated the settlement, and more than $1 million in administration costs, to say nothing of the untold sum that Classmates will pay its own lawyers.  If the purpose of class action litigation is to impose

ORDER – 1

hefty costs on corporations accused of wrongdoing, one could view this settlement as a success.  But class actions, as the lingo implies, are supposed to be about class members.  From their perspective, it is difficult to muster much enthusiasm for this settlement.

The long history of this case amply illustrates what many courts have observed: the settlement of a class action presents an inherent conflict between the interests of the class, the defendant's interest in minimizing the cost of the settlement, and class counsel's interest in maximizing its compensation.  *See*, *e.g.*, *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011); *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 995 (9th Cir. 2010).  No one attempted to litigate this case on the merits; it has been, in essence, a long settlement negotiation between Classmates and class counsel.  If Classmates and class counsel had their way, this suit would have ended in 2010 with a settlement that extinguished the claims of more than 50 million class members, paid class counsel more than $1 million, and paid class members[1] less than $60,000.

Although the current settlement is underwhelming, it is a dramatic improvement over the 2010 version; and the credit for the improvement belongs primarily to the hundreds of class members who objected to the first settlement and to later versions.  Objectors have the purest interest in looking out for the interest of the class, which makes their involvement in evaluating a settlement essential.  Class counsel have an obligation to negotiate a settlement that is at least adequate, but this case is a powerful example of the need to be wary of class counsel's inherent conflict of interest once settlement negotiations begin.  The court has an independent obligation to protect the interests of class members, and this court has attempted to fulfill that obligation.  But this court (presumably like most courts) has hundreds of other cases to resolve.  Especially in this case, where there are tens of thousands of pages of documents in the record, the court is

---

[1] For simplicity, the court refers to the nearly 60 million classmates.com users whose interests are at issue as the "class," even though the court has never certified a class before today.

ORDER – 2

indebted to the objectors who helped the court as it scrutinized the various settlement proposals.

Now before the court are a final series of motions. In a case that has too often been about lawyers rather than class members, it is perhaps fitting that most of the final motions present disputes between lawyers. One motion seeks final approval of the most recent version of the settlement. The court already explained, at a December 2011 hearing, that it will approve the settlement, and this order will formalize that ruling. The court must devote the bulk of this order, however, to resolving class counsel's claim for attorney fees, three sets of claims for attorney fees from objectors, and a series of acrimonious disputes between class counsel and those objectors.

## II.  BACKGROUND

To put the present disputes in context, the court reviews the history of this litigation. The court's prior orders present a more detailed examination of the events comprising this history.[2]

This case began in late 2008 in two different state courts. Those cases came to this court in January 2009. Much of 2009 was devoted not to resolving the claims of the class, but to deciding which group of attorneys could represent the class. The court ultimately chose current class counsel, largely because it was the only group of lawyers who agreed to place any limit at all on the attorney fees it would request. Class counsel's clients were Anthony Michaels and David Catapano, classmates.com users who hoped to serve as class representatives.

---

[2] The court issued orders in March and July 2009 addressing class counsel's battle with another group of attorneys for the right to represent the class. Dkt. ## 45, 51. By January 2010, class counsel announced that it had reached a settlement with Classmates, which the court preliminarily approved in April 2010. Dkt. # 76. In August 2010, the court issued an order addressing not only recent developments in case law, but the overwhelmingly negative reaction of class members to the settlement. Dkt. # 83. The court rejected the parties' first settlement in a February 2010 order because the settlement was not fair, not reasonable, and not adequate. Dkt. # 128. The parties returned to settlement negotiations, and the court preliminarily approved a new settlement in a July 2011 order. Dkt. # 156.

ORDER – 3

The court appointed class counsel at the end of July 2009.  By January 2010, class counsel and Classmates informed the court that they had reached a settlement.

## A.    The First Settlement

In April 2010, the court granted preliminary approval of the parties' initial settlement, which divided Classmates' registered users into a main class of about more than 50 million people and a subclass of 3 million people.  The chief distinguishing characteristic of the subclass was that its members, unlike the rest of the main class, had paid money for a Classmates membership, typically between $10 and $40.  To the main class, Classmates offered only a $2 coupon to be used at its website.  To the subclass, Classmates added an offer of a $3 cash payment.  Classmates agreed to pay up to $9.5 million to the subclass, a figure that class counsel touted even though it knew that Classmates would never pay nearly that much.  Every member of the main class and subclass would have released a broad range of claims against Classmates.

The reaction of class members disabused the court of its preliminary view that the settlement was adequate.  By the end of August 2010, the court had received communications from dozens of class members decrying the settlement.[3]  They objected to the minuscule offer of compensation and the comparatively gargantuan award to class counsel.  Coincidentally, the Ninth Circuit had just issued its decision in *Mercury Interactive*, holding that both Fed. R. Civ. P. 23(h) and due process require that class members have an opportunity to consider and object to class counsel's complete motion for attorney fees, not merely a statement of the upper limit of those fees.  618 F.3d at

---

[3] After reviewing the first objections from class members, the court summarized their reactions:

> The overarching theme [of the initial objections] is that the settlement, to put it mildly, leaves something to be desired.  Class members contend that the compensation to them is too piddling, the compensation to class counsel too generous, and that Classmates itself seems, on balance, to benefit from the settlement.  Class members used colorful language, and many were exceedingly blunt about their disappointment in Classmates, class counsel, and this court.

Aug. 30, 2010 ord. (Dkt. # 83) at 2 n.2.

ORDER – 4

994-95.  On August 30, 2010, the court issued an order requiring class counsel and Classmates to address *Mercury Interactive*, to address the objections of class members, and to consider whether their settlement was appropriate for final approval.  That led to a September 24 hearing at which the court discovered that the objections of comparatively few class members were merely the tip of the proverbial iceberg.  The first settlement was a flop.  Of the 52 million people who received notice of the first settlement, fewer than 60,000 responded to it.  All told, Classmates would have paid just over $50,000 to extinguish the claims of more than 50 million people.

At the September 24 hearing, class counsel and Classmates agreed to modify the settlement and give class members notice of the modifications and of class counsel's attorney fee motion in accordance with *Mercury Interactive*.  They made only modest changes to the settlement.  Classmates agreed to make a $500,000 *cy pres* payment to a charity.  Class counsel agreed to reduce its fee request from $1.3 million to $1.05 million.  Class counsel did not propose any measure that would have delivered more compensation to class members.

With the new notice to class members came a flood of new objections.  In previous orders, the court has expressed its gratitude to the objectors, most of whom made objections without the assistance of an attorney.  The court reiterates its thanks to those class members.

It was at about this time that three groups of objectors entered the fray.  Christopher Langone, himself an attorney, initially filed a pro se objection on August 16, 2010.  (Dkt. # 84 at 24-27).  Mr. Langone's initial objection was not significantly different than the other objections the court received.  At about the same time, the court received an objection that California attorney Charles Chalmers filed on behalf of two California objectors.  Mr. Chalmers sought to represent the objectors in court without complying with this District's rules for *pro hac vice* admission.  The court declined to

ORDER – 5

make an exception to the *pro hac vice* rules. Mr. Chalmers unsuccessfully petitioned the Ninth Circuit for mandamus relief. Putting aside his challenge to the application of *pro hac vice* requirements, Mr. Chalmers' objection did not raise any novel criticism of the first settlement. Objector Michael Krauss did not make his initial appearance until November 18, 2010, after the court ordered new notice to class members. Attorneys at the Center for Class Action Fairness ("CCAF"), an entity that has been active in objecting to class action settlements across the nation, represented Mr. Krauss. His objection provided new insight into the myriad defects in the first settlement, particularly with respect to class counsel's conflicts of interest and the inadequacy of the proposed *cy pres* payment. Mr. Krauss provided substantial legal authority for his positions, much of which was helpful to the court.

The court held a hearing on final approval of the first settlement on December 16, 2010. The court commenced that hearing by informing Classmates and class counsel that it was unlikely to approve the settlement, explaining its reasons. The remainder of the hearing only served to ensure the rejection of the settlement. Among other things, class counsel admitted that the $2 coupon, the sole form of compensation to more than 50 million class members,[4] was not intended to benefit class members. Instead, Classmates designed it as a means to ensure that it could wipe out the potential claims of class members who had never spent money at Classmates. Mr. Catapano and Mr. Michaels, the putative class representatives, neither appeared at the final fairness hearing nor submitted a declaration in support of the settlement. Mr. Krauss's counsel appeared at

---

[4] All versions of the settlement included a two-year injunction requiring Classmates to make modifications and additional disclosures in its marketing emails to its customers. The court has repeatedly questioned whether that injunctive relief has any value, and declines to repeat its discussion here. Class counsel has adhered persistently to its view that the injunction is valuable. Indeed, it contended at the December 2011 hearing that the injunction was worth $25 million, based on undisclosed evidence from an undisclosed expert about the alleged linguistic value of the changes that the injunction requires. Class counsel has not convinced the court of the injunction's worth, and it has wisely refrained from claiming the alleged monetary value of the injunction as an element of the relief it obtained for class members.

ORDER – 6

the final fairness hearing.  Among other things, he pointed out that the settlement made it unduly cumbersome for class members to opt out, object to the settlement, or make claims.  He also shared anecdotal evidence of class members' difficulties making claims and pointed out the inadequacy of the settlement's injunctive relief.  Mr. Langone appeared by telephone, again without an attorney.  His input was not helpful.  Neither Mr. Chalmers nor his clients participated.

## B.    The Second Settlement

Class counsel and Classmates went back to the drawing board.  They negotiated a new settlement, which they submitted for preliminary approval on March 25, 2011.  This time, the objectors were active even at the preliminary approval stage.  Mr. Langone obtained counsel, attempted to intervene in this litigation, then appealed the court's order denying intervention.  Mr. Chalmers submitted another brief objection on behalf of his clients, again declining to obtain *pro hac vice* admission.

The court preliminarily approved the new settlement on July 8, 2011.  In place of an empty agreement to pay $9.5 million, the new settlement guaranteed a distribution of at least $2.5 million to class members.  None of the $2.5 million would revert to Classmates in any circumstance.  *Cy pres* relief would be necessary only if class members who made claims did not cash the checks that Classmates sent to them.  The new settlement eliminated not only the Classmates coupons, but the distinction between class members who had paid for memberships and those who had not.  The court worked with the parties to create a class notice that permitted class members to participate online, whether they wished to make a claim, opt out of the class, or object to the settlement.  Class members could even receive payment online, if they chose.  Class counsel agreed not to increase its attorney fee request above the $1.05 million it had previously requested.  The court preliminarily approved the settlement, despite its concerns that if

ORDER – 7

the settlement succeeded in attracting claimants, those claimants would receive very little money.

The new settlement succeeded in increasing class members' participation. This time, about 700,000 class members made claims. Based on the original structure of the settlement, each claimant would receive about $3.50. In other words, the new settlement succeeded in attracting more claimants, but it provided them barely more cash compensation (per claimant) than the original settlement. The parties also agreed, in light of the Ninth Circuit's decision in *Bluetooth*, that if the court awarded less than $1.05 million to class counsel, Classmates would distribute the difference to claimants. *See Bluetooth*, 654 F.3d at 949 (requiring courts to closely scrutinize a "kicker arrangement" in which the difference between class counsel's negotiated fee award and the court's ultimate fee award reverts to the defendant).

At a December 2011 fairness hearing, the court stated that it would give final approval to the new settlement. The court noted its reservations, explaining that class counsel's agreement to create a settlement class with as many as 60 million members virtually ensured that no class member would receive significant compensation. The court explained, for example, that even if Classmates' corporate parent had decided to fully drain its then-existing cash coffers, Classmates could have paid no more than $2 to every class member.

Mr. Krauss and Mr. Chalmers submitted objections to the final settlement in advance of the December 2011 hearing. Mr. Krauss's counsel appeared at the final fairness hearing. He raised no objections to the settlement's relief to class members, but he continued to object to the amount of fees that class counsel requested. Mr. Langone also appeared along with his counsel. Not only did his counsel voice objections to the settlement, he put Mr. Langone on the witness stand to offer his own objections. For reasons not apparent to the court, class counsel chose to cross-examine Mr. Langone

ORDER – 8

about a variety of irrelevant conduct. At the request of Mr. Krauss and Mr. Langone, the court granted them leave to submit a motion for attorney fees. Mr. Chalmers did not attempt to participate in the December 2011 hearing.

## III.  ANALYSIS

In the wake of the final fairness hearing, there are six pending motions: class counsel's motion for final approval of the settlement (Dkt. # 176), class counsel's motion for attorney fees and costs (Dkt. # 159), Mr. Langone's motion for attorney fees and a participation award, Mr. Krauss's motion regarding attorney fees (Dkt. # 186), Mr. Krauss's motion for sanctions against class counsel (Dkt. # 187), and Mr. Chalmers' attempt to file a motion for attorney fees (Dkt. # 190). The court addresses each in turn.

**A.**     **The Court Grants Final Approval of the Settlement.**

As it promised at the final fairness hearing, the court grants final approval of the settlement. The court grants approval despite the small benefit that this settlement delivers to class members. Because of the size of the settlement class, the court finds it highly unlikely that another settlement or a resolution on the merits would provide significantly superior relief to class members. The court thus finds that the settlement is "fair, reasonable, and adequate," if only barely. Fed. R. Civ. P. 23(e)(2).

In reaching this finding, the court concludes that the settlement class meets the prerequisites of Fed. R. Civ. P. 23(a), and that it meets the additional requirements of Fed. R. Civ. P. 23(b)(3), as modified to reflect the resolution of this dispute by settlement as opposed to litigation on the merits.

The court further concludes that the parties provided class members reasonable notice of the settlement and of class counsel's request for attorney fees as well as an opportunity to object to the settlement and the fee request. Fed. R. Civ. P. 23(e)(1), 23(e)(4), 23(h)(1), 23(h)(4).

ORDER – 9

The court will enter a separate order formally certifying a settlement class and granting approval of the parties' settlement.

### B. The Court Awards Class Counsel Attorney Fees and Costs.

In considering an attorney fee request from class counsel, the court has discretion to determine the award as a percentage of the common fund that counsel created for class members or to use the "lodestar" method to calculate an award based on the number of hours that class counsel expended on the case multiplied by a reasonable hourly fee. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002).

Class counsel asks the court to focus on the lodestar method, contending that it spent almost 4,000 hours litigating this case, and that those 4,000 hours were worth just over $1.7 million at reasonable hourly rates. Class counsel has provided extensive documentation of the time it spent on this litigation. Mr. Langone attacks what he perceives as class counsel's "block billing," various unnecessary expenditures, excessive hourly rates, and other alleged deficiencies. The court will not dwell on his objections. It is no doubt true that the court could reduce class counsel's lodestar calculation, as it could in virtually any case in which this many attorneys worked for this many years. But class counsel seeks only about two-thirds of its lodestar amount, and has commendably declined to raise its fee request from the settlement that the court rejected in December 2010 despite putting in an additional year of work negotiating the second settlement. Rather than engage in a lengthy assessment of the propriety of class counsel's lodestar calculation, the court will focus on what it views to be the more compelling objection: the lodestar method in this case wholly overvalues class counsel's work in light of the minimal success it achieved in this litigation. *See Bluetooth*, 654 F.3d at 942 ("Foremost among [the factors bearing on the court's adjustment of the lodestar] is the benefit obtained for the class.").

ORDER – 10

Giving undue weight to class counsel's lodestar calculation would only encourage work that did not benefit the class. Nearly four years of litigation have resulted in no litigation on the merits, two versions of an initial settlement that the court could not approve, and a second settlement that the court approves only begrudgingly. One of the reasons that class counsel spent so much time litigating this case is that it spent so much time either negotiating or defending settlements that were either inadequate or barely adequate. When class counsel sought attorney fees in conjunction with the initial settlement (one that would have paid more than 50 million class members only $52,000), it informed the court that it had "Obtained a Very Good Result for the Class." Dkt. # 93 at 4. A year later, after the court rejected that "Very Good Result," class counsel touted the second settlement as a "Very Good Result for the Class." Dkt. # 159 at 5. The record suggests that class counsel is quick to characterize any settlement as a "Very Good Result." Class counsel need not adopt the court's view of the value of a settlement, but class counsel cannot satisfy its duty to the class by ignoring the weaknesses in the settlements it negotiated. Time and again, class counsel declined to acknowledge the weaknesses of the settlements, and declined to acknowledge the virtual impossibility of obtaining meaningful relief for a class of nearly 60 million people. Class counsel admitted that the coupon it once touted as a benefit for more than 50 million class members was little more than a means for Classmates to extinguish their claims at no cost. The court does not doubt that class counsel expended thousands of hours. The court cannot ignore that class counsel expended thousands of hours to obtain minimally adequate results for the class. Courts commenting on the utility of class actions often note that only a lunatic or fanatic files a suit for $30, citing Judge Posner's pithy observation in *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). Would even a lunatic or fanatic pay attorneys more than $1 million to obtain a settlement worth less than $60,000? In December 2010, class counsel touted that arrangement as a

ORDER – 11

"Very Good Result for the Class."  Now it touts the hours it expended to obtain that "Very Good Result" as justification for a fee award.

Eschewing the lodestar method, the court focuses on class counsel's fee request as a percentage of the common fund it ultimately created for class members.  That common fund is at least $3.55 million, the sum of the $2.5 million settlement fund and the $1.05 million that will be allocated between class counsel and the class.  Class counsel argues that the common fund should also include about $1.5 million in settlement administration costs that Classmates has paid or will pay, split among the cost of three rounds of notice for the settlements and the expected cost of paying class members in accordance with the most recent settlement.  Because Classmates' payment of these costs relieves the class of the burden of these expenses, the court may consider them as part of the common fund. *Staton v. Boeing Co.*, 327 F.3d 938, 974-975 (9th Cir. 2003).  The court cannot overlook, however, that those administration costs include two rounds of notice for an inadequate settlement.  The court accordingly considers $1 million in settlement administration costs as part of the common fund, yielding a common fund of $4.55 million.

Class counsel's $1.05 million fee request is about 23% of the $4.55 million common fund.  The oft-cited "benchmark" in the Ninth Circuit is 25%.  *See*, *e.g.*, *Vizcaino*, 290 F.3d at 1047.  The benchmark is merely a guideline, however, and any percentage-of-the-common-fund award must take into account all circumstances of the case.  *Id.* at 1048.  In this court's view, the most relevant circumstances are the minimally adequate settlement that class counsel ultimately negotiated, coupled with the amount of time expended pursuing a settlement that was not even minimally adequate.  This merits an award below the 25% benchmark.  When class counsel competed with another group of attorneys at the outset of this case for the right to represent the class, it won that battle in large part because it agreed to cap its attorney fees.  It agreed to seek no more than twice its lodestar amount in any event, and it agreed that if it sought a percentage-of-

ORDER – 12

common-fund recovery, it would seek no more than 15% of the common fund if it reached a settlement before it filed a class certification motion. Jul. 29, 2009 ord. (Dkt. # 51) at 2-3. Predictably, counsel now focuses on its lodestar cap rather than its percentage-of-common-fund cap.

After considering all of the circumstances of the case, the court awards class counsel attorney fees of $900,000, or slightly less than 20% of the common fund it created. The court finds that this award properly compensates class counsel both for its labor in both the pre-settlement and post-settlement phases in this litigation, and that it also reflects that counsel should not benefit from its efforts to win approval of an inadequate settlement. *See Bluetooth*, 654 F.3d at 943 (noting that in a common fund case, the court must "assure itself" that class counsel's fee award is "not unreasonably excessive in light of the results achieved").

No one objects to class counsel's request for $33,610.77 in litigation costs. The court finds that class counsel provided adequate evidentiary support for its cost request and that the request is reasonable.

The court will also grant a participation award of $1000 each to Mr. Catapano and to Mr. Michaels. Class counsel requested $2500 each on their behalf. The court can authorize incentive awards to class representatives. *Staton*, 327 F.3d at 976. It must consider the size of the incentive award, how it compares to the overall recovery of the class, and by what factor it exceeds the recovery of other class members. *Id.* at 977-78. The court must also consider the extent of the class representative's contribution to the litigation, the benefit to the class from those contributions, the amount of time the class representative spent on the litigation, and any danger of retaliation or other adverse consequences the class representative faced as a result of her participation. *Id.* Here, the class representatives request almost a thousand times more money than any other class member. Their declarations with respect to the second settlement consist essentially of

ORDER – 13

1    evidence that they provided information in discovery and communicated with class

2    counsel.  As the court has noted, neither class representative submitted anything to the

3    court in conjunction with the first settlement.  The court suspects they submitted

4    declarations in conjunction with the second settlement only because the court called

5    attention to their absence in February 2011 when it formally rejected the first settlement.

6         Considering all of the relevant circumstances, the court awards $1000 each to Mr.

7    Michaels and Mr. Catapano in recognition of their limited participation in this litigation.

8    **C.    The Court Declines to Award Mr. Langone Attorney Fees or a Participation**
     **        Award.**

9
10        Mr. Langone seeks nearly $180,000 in attorney fees as well as a $50,000 "service

11   award" for himself.  The court can award attorney fees to objectors, provided that the

12   objectors prove that they "substantially enhanced the benefits under the settlement."

13   *Vizcaino*, 290 F.3d at 1052; *see also Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 963

14   (9th Cir. 2009) (remanding for reconsideration where district court failed to award

15   attorney fees to objector whose conduct increased settlement fund by $325,000).  The

16   court is aware of no authority authorizing a "service award" to an objector.  If there were

17   such authority, the court assumes that it would treat a participation award to an objector

18   similarly to a participation award to a class representative.

19        Mr. Langone and his counsel appear to be convinced that their efforts led to the

20   improvements in the settlement.  They are mistaken.  Mr. Langone offered no more

21   substantial criticism of the first settlement than did dozens of unrepresented class

22   members who objected to the settlement.  When he appeared pro se (by telephone) at the

23   December 2010 hearing, he spent much of his time talking about a congressional report

24   with scant relevance to this case.  The court intensified its scrutiny of the first settlement

25   because of the dozens of objections from unrepresented objectors, the indifference of

26   99.9% of the proposed settlement class, and the miniscule payment Classmates would

27
28   ORDER – 14

have made to the class. The first settlement did not withstand the court's scrutiny. Mr. Langone has no better claim as the cause for that scrutiny than any other objector.

After the court rejected the first settlement, Mr. Langone obtained counsel, but did more to slow this litigation than to improve results for class members. Mr. Langone attempted to intervene in this litigation, apparently convinced that he could force a better settlement. He offered some criticism of the second settlement, but that amounted to little more than a slightly more lawyerly version of the same objections that numerous class members submitted. In some circumstances, a lawyer's insight, particularly where the lawyer supports that insight with legal authority, can call the court's attention to areas of concern it might not otherwise have recognized.[5] But where a lawyer merely reiterates the objections of unrepresented class members, or points out the routine or obvious, the lawyer does not enhance the settlement, he merely adds his voice to the chorus. Were the court to reach a contrary decision, it would only encourage attorneys to file "me-too" objections to class settlements in the hope of obtaining compensation. The court encourages objections, but it is not in the interest of the class to compensate an objector unless his objection contributes significantly to obtaining a substantial benefit for the class. Mr. Langone's objections did not contribute significantly to obtaining any benefit for the class.

Finally, the court observes that Mr. Langone's request for a $50,000 participation award is egregious. The court has already declined to award as little as $2,500 to Mr. Michaels and Mr. Catapano, although they have had some involvement in this case from its outset. Mr. Langone overreaches wildly by requesting twenty times as much for his participation.

---

[5] Mr. Langone repeatedly points out that he objected to a clause in one or both versions of the settlement agreement that he believed represented an unlawful promise by class counsel not to represent objectors to the settlement. The court has never shared Mr. Langone's concern about that clause. Class counsel modified the clause to clarify its meaning, although it was probably unnecessary to do so. Class counsel has an obvious conflict of interest with any objector to the settlement; it could not have represented an objector in any event.

ORDER – 15

**D. The Court Does Not Award Mr. Krauss Attorney Fees, but Grants His Request to Reduce Class Counsel's Award as a Sanction.**

Unlike Mr. Langone's objection, Mr. Krauss's objection was useful as the court sorted through the many deficiencies in each settlement the parties proposed. Mr. Krauss identified pertinent legal authority for his positions, which simplified the court's review. More importantly, Mr. Krauss was relentless in his identification of the numerous ways in which the proposed settlements would have rewarded class counsel (and a *cy pres* charity) at the expense of class members. Mr. Krauss's objections significantly influenced the court's decision to reject the first settlement and to insist on improvements to the second. Class members benefitted as a result.

Under these circumstances, the court would be inclined to award attorney fees to Mr. Krauss. The court will not do so, however, because Mr. Krauss has withdrawn his request for attorney fees. The court now explains why.

Class counsel has consistently opposed the efforts of Mr. Krauss and Mr. Langone to influence the court's consideration of the settlement. Class counsel is entitled to disagree with objectors, of course, but the vehemence of class counsel's reaction to these two objectors is unfortunate. Mr. Krauss and Mr. Langone acted in what they perceived to be class members interests, and in many instances, they achieved much more success in that regard than class counsel. Class counsel has often treated their counsel not as people with divergent views on the value of the settlement, but rather as a threat to this litigation. Perhaps the most striking demonstration of that approach was class counsel's decision to interrogate Mr. Langone when he took the witness stand at the December 2011 hearing. Counsel's questions focused not on the strength or weakness of Mr. Langone's objection, but on Mr. Langone himself.

At the December 2011 hearing, the court granted Mr. Langone and Mr. Krauss permission to submit requests for attorney fees. It is not surprising that class counsel wished to scrutinize their requests. Indeed, their obligation to class members likely

ORDER – 16

requires as much. Had class counsel chosen to conduct a reasonable inquiry to ensure that the objector's fee requests were reasonable, the court could not fault them. What class counsel did in this case, however, was utterly inappropriate.

Before class counsel had even received Mr. Langone's and Mr. Krauss's fee requests, it took the remarkable step of issuing subpoenas. The court focuses on the subpoenas class counsel issued to Mr. Krauss's counsel. It served the first of those subpoenas on CCAF, the entity that employs Mr. Krauss's counsel. The subpoena demanded exhaustive production of documents responsive to twenty document requests. Class counsel sought verification of CCAF's not-for-profit status, its tax returns, documentation of its stock ownership, verification of its funding sources, information on its corporate structure, documents revealing its relationship with one of its donors, and more. The subpoena also contained requests seeking information directly relevant to the work of CCAF's attorneys on this case, although those requests were vastly overbroad and overreaching. Class counsel directed a second subpoena to one of CCAF's donors, repeating many of the same document requests, and inquiring further into the donor's relationship with CCAF.

The subpoenas were legally invalid. Both CCAF and its donor are domiciled in Virginia. Class counsel nonetheless issued the subpoenas from this court, in apparent ignorance of the requirement that a subpoena issue from the court encompassing the domicile of the subpoena's target. Fed. R. Civ. P. 45(a)(2)(C).

Even had the subpoenas been valid, they were wholly improper. The court has no idea why class counsel believed it appropriate to conduct what amounted to a witch hunt, seeking not merely documents with arguable relevance to Mr. Krauss's forthcoming fee requests, but a host of documents designed clearly to root out CCAF's financial circumstances and its relationship with one of its donors. The subpoenas scarcely resemble a reasonable inquiry into facts relevant to Mr. Krauss's fee requests; they

ORDER – 17

resemble a litigation offensive designed to burden an entity that had the temerity to object to class counsel's settlement. If class counsel had legitimate concerns about any objector's fee request, it could have approached either the objector's counsel or this court to discuss appropriate discovery or another mode of inquiry. Instead, before class counsel had even received any objector's fee request, it went on the offensive against Mr. Krauss and Mr. Langone. The court takes a dim view of what amounts to little more than bullying by class counsel.

Rather than respond to class counsel's invalid and improper subpoenas, Mr. Krauss declined to make an attorney fee request. Instead, he asked the court to sanction class counsel and to reduce its attorney fee award. He consented to have any sanction deducted from class counsel's attorney fee award and thereby awarded to class members.

The court cannot permit class counsel's egregious attack on Mr. Krauss go by without notice. Objectors, as much as class counsel, play an important role in ensuring the fairness of a class action settlement. This case amply illustrates as much. In this court's view, Mr. Krauss and his counsel did more to secure compensation for class members than class counsel did. Class counsel performed the bulk of the labor necessary to reach the settlement, but Mr. Krauss's counsel did a substantially better job of attending to class members' interests. It is not surprising that class counsel would disagree with some objectors, or even with Mr. Krauss. That is no license, however, to engage in the litigation assault that class counsel chose here.[6] The court could simply admonish class counsel, but the court does not believe that would suffice.

The court awards sanctions in the amount of $100,000 against class counsel. The court reasons that it likely would have awarded Mr. Krauss's counsel at least that much, had he requested attorney fees. An award of $100,000 would be just over 2% of the

---

[6] Class counsel urges the court to consider that it attempted to negotiate the subpoenas with Mr. Krauss's counsel. The court rejects the suggestion that counsel's willingness to negotiate a facially invalid and disturbingly overbroad subpoena is mitigating evidence.

ORDER – 18

common fund in this case.  While Mr. Krauss's counsel did not perform as much labor as class counsel, it achieved manifestly better results.  If anything, a $100,000 award would have undercompensated CCAF.  CCAF cited many cases in which objectors were rewarded more handsomely for similar results.  *See, e.g.*, *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 273 F. Supp. 2d 563, 572 (D.N.J. 2002).  The court remains uncertain as to why Mr. Krauss's counsel decided to forego a fee request in response to two facially invalid subpoenas, but the court will respect that choice.  Class counsel declares that when it confronted CCAF with the subpoenas, one of its lawyers promised to use "hammer and tongs" to resist.  Class counsel was the first to wield the hammer, however, and it can hardly complain if its attack provoked a defense.  The court declines to use a hammer or tongs; it instead uses its power to impose sanctions.  The court reduces class counsel's attorney fee award by $100,000.  The court makes that reduction as a sanction, but it notes that it would have reduced class counsel's fees by at least that much to reflect conduct that was plainly not in the interests of the class.

**E.      The Court Declines to Award Relief to Mr. Chalmers.**

Mr. Chalmers applied for attorney fees for his work from July to August 2010 on behalf of his clients.  Again, Mr. Chalmers has not complied with the court's *pro hac vice* requirements.  Mr. Chalmers' application for fees does not request any particular award. He notes that he spent 28 hours working for his clients, and that a $500 per hour rate would be reasonable.  Mr. Chalmers apparently believes he is entitled to $14,000.  The court finds that even if Mr. Chalmers had satisfied the *pro hac vice* requirements, the court would not award him attorney fees.  The court does not find that Mr. Chalmers' work led to better results for class members.

**F.      Class Members Need Not Receive Notice of Objectors' Attorney Fee Motions.**

Before concluding, the court observes that the parties have raised questions about whether *Mercury Interactive* requires that class members be given notice of an objector's

ORDER – 19

attorney fee request in the same manner that they must be given notice of class counsel's fee request. The court holds that it does not. The *Mercury Interactive* panel based its holding on Rule 23(h), which requires only that "for motions by class counsel" the court must direct notice to class members in a "reasonable manner." Fed. R. Civ. P. 23(h)(1). Nothing in the rule suggests that a similar requirement applies to a fee petition from an objector. Nothing in *Mercury Interactive* suggests that the court would require notice to class members of an objector's fee motion. Indeed, it is hard to imagine how a court could impose such a requirement without making the denouement of every class settlement an endless series of notices to class members about class counsel's request for fees, fees for objections to that request, fees for objections to the objections, and so on.

## IV. CONCLUSION

For the reasons stated above, the court orders as follows:

1) The court GRANTS class counsel's motion for final approval of this settlement. Dkt. # 176. The court will enter a separate order formally certifying a settlement class. The court directs the clerk to DISMISS this case. The court further directs the clerk to enter a judgment that contains, among other things, the two-year injunction to which Classmates has consented. No later than December 15, 2012, Classmates shall file a report from the class administrator on the status of the distribution of settlement funds to class members.

2) The court GRANTS class counsel's motion for attorney fees and other monetary relief (Dkt. # 159) as follows:

    a. The court awards class counsel attorney fees of $800,000.

    b. The court awards class counsel litigation costs of $33,610.77.

    c. The court awards a participation payment of $1000 each to Mr. Michaels and Mr. Catapano.

ORDER – 20

3)  The court DENIES Mr. Langone's motion for attorney fees and a participation payment.  Dkt. # 189.

4)  The court TERMINATES Mr. Krauss's motion for attorney fees.  Dkt. # 186.

5)  The court GRANTS in part and DENIES in part Mr. Krauss's motion for sanctions against class counsel.  Dkt. # 187.  The court's $800,000 award to class counsel reflects the court's imposition of a $100,000 sanction.

6)  Because Mr. Chalmers has failed to comply with this court's rules regarding *pro hac vice* admission, the court declines to consider his proposed motion for attorney fees.  Dkt. # 190.  Even if it had considered that motion, however, the court would have denied it for the reasons stated above.

7)  Because the court has awarded class counsel only $800,000 of the $1.05 million it requested for attorney fees, and awarded Mr. Michaels and Mr. Catapano only $2,000 of the $5,000 they requested, Classmates must distribute an additional $253,000 to class members who made claims.  The court orders Classmates (in conjunction with the settlement administrator) to ensure the distribution of $2.753 million to class members in accordance with the settlement agreement.

DATED this 15th day of June, 2012.

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 21

# EXHIBIT 6

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| BARRY HALL, et al., | Civil Action No.: 07-5325 (JLL) |
| Plaintiffs, | |
| v. | |
| AT & T MOBILITY LLC f/k/a CINGULAR, WIRELESS LLC, et al., | **ORDER** |
| Defendants. | |

This Court held a Final Approval hearing in the above captioned matter on June 29, 2010. At said hearing Objector Christopher Langone ("Mr. Langone") moved for the admission of attorney Mark Lavery *pro hac vice* in the above captioned matter pursuant to L. Civ. R. 101.1(c). (CM/ECF No. 551.) At the hearing Class Counsel reserved his right to object to the motion pending his review of said motion. Therefore, this Court conditionally admitted Mr. Lavery *pro hac vice* pending a review of the moving papers. On July 1, 2010, Class Counsel filed an objection to the instant motion. The Court has reviewed the papers submitted in support of and in opposition to the motions. No oral argument was held. Fed. R. Civ. P. 78.

Pursuant to L. Civ. R. 101.1(c)(4) only members of the bar of this Court may file papers, enter appearances, and perform other relevant litigation activities. An attorney on the ineligible list for failure to make payments to the N.J. Lawyers' Fund for Client Protection is not eligible to practice in this Court. See L. Civ. R. 101.1(b).

Mr. Lavery's application was filed by Mr. Langone. Mr. Langone is not a member in good

standing of the Bar of this Court because he is on the ineligible list for failing to make payments to the N.J. Lawyers' Fund for Client Protection. Therefore, since Mr. Langone is not eligible to practice before this Court he can neither move for Mr. Lavery's admission, nor serve as his local counsel for filing purposes under L. Civ. R. 101.1. Therefore,

**IT IS** on this **22nd day of July, 2010,**

**ORDERED** that this Court's order conditionally admitting Mr. Lavery *pro hac vice* is vacated; and it is further

**ORDERED** that Mr. Langone's motion is DENIED; and it is further

**ORDERED** that all arguments made by Mr. Langone at the June 29th hearing are stricken from the record.

**SO ORDERED.**

Jose L. Linares
UNITED STATES DISTRICT JUDGE

-2-